**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | **Chapter 11** |
| **SUNEDISON, INC.**, *et al.*, | **Case No. 16-10992 (SMB)** |
| **Debtors.**[1] | **(Jointly Administered)** |
| **OFFICIAL COMMITTEE OF UNSECURED CREDITORS**, on behalf of the estates of the Debtors, | **Adversary Proceeding No. 16-01228 (SMB)** |
| **Plaintiff** | |
| **v.** | |
| **WELLS FARGO BANK, N.A.**, *et al.* | |
| **Defendants** | |

---

[1]        The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A); EverStream HoldCo Fund I, LLC (9564); Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757); SunE MN Development, LLC (8669); SunE MN Development Holdings, LLC (5388); and SunE Minnesota Holdings, LLC (8926).  The address of the Debtors' corporate headquarters is 13736 Riverport Dr., Maryland Heights, Missouri 63043.

**PREPETITION FIRST LIEN ADMINISTRATIVE AGENT'S AND
LENDERS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................1

STATEMENT OF FACTS ....................................................................5

    A.    The First Lien Credit Facility ...............................................5

    B.    The October 2014 Amendment................................................6

    C.    The January 2016 First Lien Amendment ...............................7

ARGUMENT .......................................................................................7

I.    To The Extent The Amended Complaint Seeks Lien Avoidance Or Otherwise Challenges Liens, It Fails To State A Claim Against First Lien Defendants That Do Not Hold Liens................................................8

II.    The Amended Complaint Fails To State A Claim For Fraudulent Transfer Against The First Lien Defendants ...............................................9

    A.    The Committee Fails To Plead An Intentional Fraudulent Transfer Claim Against The First Lien Defendants .......................................9

        1.    The Committee Fails To Allege A Transfer In Connection With The January 2016 First Lien Amendment ................................10

        2.    The Amended Complaint Does Not Allege Particularized—Much Less Plausible—Intentional Fraudulent Transfers....................11

        3.    The Committee Fails to Allege Any "Badges Of Fraud" .........14

        4.    The Committee's Claims For Intentional Fraudulent Transfer Are Barred By Section 548(c)'s Good Faith Defense ......................17

    B.    The Committee Fails To Plead A Constructive Fraudulent Transfer Claim Against The First Lien Defendants .......................................19

        1.    Liens Granted On Account Of The Extension Of Credit Or An Antecedent Debt Are Reasonably Equivalent Value As A Matter Of Law ......................................................................20

        2.    The Amended Complaint Fails To Allege Insolvency ..............22

        3.    Section 546(e) Protects The January 2016 First Lien Amendment ..........24

III.   To The Extent The Tenth Cause Of Action Applies To Goldman Sachs, The
       Committee Fails To Plead A Preferential Transfer Claim ................................................26

IV.    The Amended Complaint Fails To State A Claim For Equitable Subordination Of
       The First Lien Defendants' Claims ................................................................................26

       A.    The First Lien Defendants Were Not Insiders ......................................................27

       B.    The Committee Fails To Allege That The First Lien Lenders Engaged In
             Inequitable Conduct ........................................................................................29

       C.    The Committee Fails To Allege That The First Lien Lenders Injured Any
             Unsecured Creditor Or Were Conferred An Unfair Advantage ...........................31

V.     The Amended Complaint Fails To State A Claim Disputing The Perfection Of
       The First Lien Lenders' Claims ....................................................................................32

       A.    The First Lien Agent Has A Perfected Interest In The Securities Accounts ........32

       B.    The First Lien Agent Has A Perfected Interest In The Deposit Accounts Held By
             Wells Fargo ....................................................................................................32

       C.    The Amended Complaint Fails To State A Claim That The First Lien Agent Is
             Unperfected With Respect To The Debtors' Other Accounts ..............................33

       D.    The First Lien Agent Has A Perfected Security Interest In The Letter Of Credit
             Rights ............................................................................................................34

       E.    The Amended Complaint's Thirteenth Cause Of Action Fails To State A Claim
             Upon Which Relief Can Be Granted ..................................................................34

VI.    The Amended Complaint Fails To State A Claim That The First Lien Defendants
       Aided And Abetted A Breach Of Fiduciary Duty ..........................................................35

       A.    Missouri Does Not Recognize A Claim For Aiding And Abetting Breach Of
             Fiduciary Duty ................................................................................................36

       B.    No Aiding And Abetting Breach Of Fiduciary Duty Claim Is Stated Under
             Delaware Law ..................................................................................................36

             1.    The Committee Fails To Allege Any Breach Of A Fiduciary Duty ..........37

             2.    The Committee Fails To Allege That The First Lien Defendants
                   Knowingly Participated In Any Breach Of Fiduciary Duty ....................38

CONCLUSION .............................................................................................................39

ii

TABLE OF AUTHORITIES

**Page(s)**

**CASES**

80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.),
    169 B.R. 832 (Bankr. S.D.N.Y. 1994) ...................................................................29

Anand v. Nat'l Republic Bank of Chicago,
    239 B.R. 511 (N.D. Ill. 1999) ...............................................................................22

Ashcroft v. Iqbal,
    556 U.S. 662 (2009) ................................................................................................8

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007) ................................................................................................8

Blair v. City of Hannibal,
    No. 15-00061, 2016 WL 1449532 (E.D. Mo. Apr. 13, 2016) ...............................37

Boston Trading Grp., Inc. v. Burnazos,
    835 F.2d 1504 (1st Cir. 1987) ...............................................................................13

Burtch v. Huston (In re USDigital, Inc.),
    443 B.R. 22 (Bankr. D. Del. 2011) .......................................................................23

Capmark Fin. Grp. Inc. v. Goldman Sachs Credit L.P.,
    491 B.R. 335 (S.D.N.Y. 2013)...............................................................................28

Cuevas v. Hudson United Bank (In re M. Silverman Laces, Inc.),
    Nos. 01-6209, 97-B-43223, 2002 U.S. Dist. LEXIS 20288 (S.D.N.Y. Oct. 23,
    2002) ......................................................................................................................21

Ganino v. Citizens Utils. Co.,
    228 F.3d 154 (2d Cir. 2000)...................................................................................23

Geltzer v. Barish (In re Geltzer),
    502 B.R. 760 (Bankr. S.D.N.Y. 2013) .........................................................9, 10, 20

Geron v. Palladin Overseas Fund, Ltd. (In re AppliedTheory Corp.),
    323 BR 838 (Bankr. S.D.N.Y. 2005).................................................................20, 22

Global Link Liquidating Tr. v. Avantel, S.A. (In re Global Link Telecom Corp.),
    327 B.R. 711 (Bankr. D. Del. 2005) ......................................................................35

In re AlphaStar Ins. Grp. Ltd.,
    383 B.R. 231 (Bankr. S.D.N.Y. 2008)....................................................................30

Americas 92234977

In re Bernard L. Madoff Inv. Sec. LLC,
    773 F.3d 411 (2d Cir. 2014)..................................................................................25, 26

In re Capmark Fin. Grp., Inc.,
    438 B.R. 471 (Bankr. D. Del. 2010) ......................................................................21, 29

In re ICP Strategic Credit Income Fund Ltd.,
    No. 13-12116, 2015 WL 5404880 (Bankr. S.D.N.Y. Sept. 15, 2015)...................36

In re Lehman Bros. Holdings,
    541 B.R. 551 (Bankr. S.D.N.Y. 2015)..................................................................15, 17

In re M. Fabrikant & Sons, Inc.,
    394 B.R. 721 (Bankr. S.D.N.Y. 2008) (Bernstein, J.) ..........................................12

In re Mobile Steel Co.,
    563 F.2d 692 (5th Cir. 1977) ................................................................................27, 31

In re O.P.M. Leasing Services, Inc.,
    32 B.R. 199 (Bankr. S.D.N.Y. 1983).....................................................................11

In re Sabine Oil & Gas Corp.,
    547 B.R. 503 (Bankr. S.D.N.Y. 2016)..................................................................27, 39

In re W.T. Grant,
    699 F.2d 599 (2d Cir. 1983).................................................................................30

In re WorldCom, Inc.,
    No. 02-13533, 2003 Bankr. LEXIS 1401 (Bankr. S.D.N.Y. Oct. 31, 2003) .........19

Indus. Enters. of Am. v. Tabor Acad. (In re Pitt Penn Holding Co.),
    Nos. 09-11475, 11-51879, 2011 Bankr. LEXIS 3554
    (Bankr. D. Del. Sept. 16, 2011) ...........................................................................35

Innovative Custom Brands, Inc. v. Minor,
    15-2955, 2016 U.S. Dist. LEXIS 8354 (S.D.N.Y. Jan. 25, 2016) ....................22, 23

Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC),
    373 B.R. 283 (Bankr. S.D.N.Y. 2007)..................................................................23, 24

Joseph Stephens & Co., Inc. v. Cikanek,
    588 F. Supp. 2d 870 (N.D. Ill. 2008) ...................................................................33

Kalisch v. Maple Trade Fin. Co. (In re Kalisch),
    413 B.R. 115 (Bankr. S.D.N.Y. 2008)..................................................................27

Kirch v. Liberty Media Corp.,
    449 F.3d 388 (2d Cir. 2006).................................................................................8

iv

Liquidation Tr. v. Daimler AG (In re Old CarCo LLC),
    435 B.R. 169 (Bankr. S.D.N.Y. 2010) ........................................................... passim

Liquidation Trust v. Daimler AG (In re: Old CarCo LLC),
    454 B.R. 38 (Bankr. S.D.N.Y. 2011) ....................................................................23

Lyman Commerce Sols., Inc. v. Lung,
    12-cv-4398, 2014 U.S. Dist. LEXIS 15282 (S.D.N.Y. Feb. 6, 2014) ....................................19

Lyme Regis Partners, LLC v. Icahn (In re Blockbuster Inc.),
    2011 Bankr. LEXIS 1025 (Bankr. S.D.N.Y. Mar. 17, 2011) ...................................28

Malpiede v. Townson,
    780 A.2d 1075 (Del. 2001) .............................................................................37, 38

Marathon Petroleum Co. v. Cohen (In re Delco Oil, Inc.),
    599 F.3d 1255 (11th Cir. 2010) .............................................................................34

Marino v. Grupo Mundial Tenedora, S.A.,
    810 F. Supp. 2d 601 (S.D.N.Y. 2011) ..................................................................36

MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.,
    910 F. Supp. 913 (S.D.N.Y. 1995)...........................................................14, 15, 16

Nisselson v. Ford Motor Co. (In re Monahan Ford Corp.),
    340 B.R. 1 (Bankr. E.D.N.Y. 2006)...............................................................10, 17

O'Toole v. Karnani (In re Trinsum Grp., Inc.),
    460 B.R. 379 (Bankr. S.D.N.Y. 2011)............................................................21, 22

Official Comm. of Unsecured Creditors of Champion Enters. v. Credit Suisse (In
    re Champion Enters.),
    2010 Bankr. LEXIS 2720 (Bankr. D. Del. Sept. 1, 2010) .........................21, 29, 30

Official Comm. of Unsecured Creditors Hydrogen, L.L.C. v. Blomen (In re
    Hydrogen, L.L.C.), 431 B.R. 337 (Bankr. S.D.N.Y. 2010)................................27, 36

Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley &
    Co. (In re Sunbeam Corp.), 284 B.R. 355 (Bankr. S.D.N.Y. 2002) ........................29

Official Comm. of Unsecured Creditors v. Goldman Sachs Credit Partners L.P.
    (In re Fedders North America, Inc.), 405 B.R. 527 (Bankr. D. Del. 2009) ...........................38

Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp.
    (In re Verestar, Inc.),
    343 B.R. 444 (Bankr. S.D.N.Y. 2006) ...............................................................9, 10

v

Pani v. Empire Blue Cross Blue Shield,
    152 F.3d 67 (2d Cir. 1998) ................................................................................17

Pfeifer v. Hudson Valley Bank, N.A. (In re Pfeifer),
    No. 12-13852, 2013 Bankr. LEXIS 2950 (Bankr. S.D.N.Y. July 23, 2013) .........................20

Radnor Holdings Corp. v. Tennenbaum Capital Partners,
    353 B.R. 820 (Bankr. D. Del. 2006) ...........................................29, 37, 39

Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.),
    476 B.R. 715 (S.D.N.Y. 2012) ..........................................................................18

Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)
    403 F.3d 43 (2d Cir. 2005) .......................................................................13, 14, 21

Shields v. Citytrust Bancorp.,
    25 F.3d 1124 (2d Cir. 1994) ...............................................................................9

Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.),
    337 B.R. 791 (Bankr. S.D.N.Y. 2005) ...............................................................16

Tellabs, Inc. v. Makor Issues & Rights, Ltd.
    551 U.S. 308 (2007) ...........................................................................................10

Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.,
    906 A.2d 168 (Del. Ch. 2006) ...........................................................................38

Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.),
    503 B.R. 239 (Bankr. S.D.N.Y. 2013) ...............................................................24

Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.,
    191 A.d.2d 86 (1st Dep't 1993) ........................................................................21

Waslow v. MNC Commercial Corp. (In re Paolella), 161 B.R. 107 (Bankr. E.D.
    Pa. 1993) ............................................................................................................31

**STATUTES AND RULES**

11 U.S.C. § 101(22) .....................................................................................................25

11 U.S.C. § 101 (31) ....................................................................................................28

11 U.S.C. § 101(49)(A)(i) ...........................................................................................25

11 U.S.C. § 101(49)(A)(iv) ..........................................................................................25

11 U.S.C. § 510(c) ........................................................................................................27

vi

11 U.S.C. § 544(b) ................................................................................................19

11 U.S.C. § 546(e) ....................................................................................5, 24, 25, 26

11 U.S.C. § 548(1)(B) .............................................................................................19

11 U.S.C. § 548(a)(1)(A) .............................................................................9, 10, 18

11 U.S.C. § 548(a)(1)(B) .........................................................................................19

11 U.S.C. § 548(c) ............................................................................................17, 19

11 U.S.C. § 548(d)(2) ..............................................................................................20

11 U.S.C. § 741(7)(i) ...............................................................................................25

11 U.S.C. § 741(7)(vii) ............................................................................................25

11 U.S.C. § 741(7)(xi) .............................................................................................25

N.Y. Debt. & Cred. Law, §§ 272-75 (McKinney 2001) ...........................19, 20, 21

UCC § 9-104 .............................................................................................................33

UCC § 9-104 cmt. 3 ..................................................................................................33

UCC § 9-308(d) ........................................................................................................34

UCC § 9-312 .............................................................................................................32

UCC § 9-314 .............................................................................................................33

UCC § 9-315(a)(2) ...................................................................................................34

**MISCELLANEOUS**

5 <u>Collier on Bankruptcy</u> p. 548.01 (16th ed. 2016) ........................................13

5 <u>Collier on Bankruptcy</u> p. 548.05 (16th ed. 2016) ........................................19

Fed. R. Civ. P. 8(a) ..................................................................................................39

Fed. R. Civ. P. 8(a)(2) ...............................................................................................8

Fed. R. Bankr. P. 7009 ...............................................................................................1

Fed. R. Bankr. P. 7012(b) ..........................................................................................1

Fed. R. Civ. P. 8(a) ..................................................................................................39

Americas 92234977

Fed. R. Civ. P. 9(b) ............................................................................................... passim

Fed. R. Civ. P. 12(b)(6)............................................................................................1, 5

Americas 92234977

Wells Fargo Bank N.A. ("**Wells Fargo**"), Goldman Sachs Bank USA ("**Goldman Sachs**"), KeyBank National Association ("**Keybank**"), Morgan Stanley Senior Funding, Inc. ("**Morgan Stanley**") and BBVA Compass Bank ("**Compass Bank**", and collectively with the other movants herein, the "**First Lien Defendants**")[1], by their undersigned counsel, hereby move pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), as made applicable by Federal Rules of Bankruptcy Procedure 7012(b) and 7009, respectively, to dismiss with prejudice the Amended Adversary Complaint (the "**Amended Complaint**" or "**Am. Compl.**") of the Official Committee of Unsecured Creditors (the "**Committee**") for SunEdison Inc. ("**SUNE**" or the "**Company**") and its affiliated debtors.

## PRELIMINARY STATEMENT

The Amended Complaint's vague and poorly pleaded claims against the First Lien Defendants seek to turn the very basis of creditor-debtor relations on its head. The fraudulent conveyance claims do not describe fraudulent transfers that were designed to extract value from SUNE, but rather transactions that were the product of an arms'-length relationship in which the First Lien Defendants (along with many other First Lien Lenders (defined below)) provided or

---

[1] The Amended Complaint amends a complaint filed on October 20, 2016, on the eve of the expiration of the challenge period established by the Final DIP order, purportedly to name new defendants. The Amended Complaint refers to "First Lien Defendants" without actually defining which of the 96 defendants in the Amended Complaint are part of this group. Counsel for the Committee has advised the undersigned that "First Lien Defendants" in the original complaint intended to refer only to Wells Fargo, Goldman Sachs, KeyBank, Morgan Stanley and BBVA. While those defendants bring this motion in an abundance of caution, by doing so they do not concede they are properly identified. Opposing counsel's comments fail to remedy, and indeed further demonstrate, the Amended Complaint's obvious pleading deficiencies. With respect to the twelve newly named defendants in the Amended Complaint that are apparently intended to be additional First Lien Defendants, they will respond as appropriate if and when they receive service of process, including with respect to the Committee's failure to assert timely a claim within the challenge period.

To the extent Goldman Sachs has interests in the second lien debt of SUNE, it refers to and incorporates by reference the arguments made by the Second Lien Lenders in the Memorandum of Law in Support of the Second Lien Lender Defendants' Motion to Dismiss.

permitted SUNE to obtain much needed capital.  The lender liability-type claims asserted here—
fraudulent conveyance, equitable subordination and aiding and abetting breach of fiduciary
duty—are exceptional claims, designed to remedy improper control-like conduct that places a
debtor's assets beyond the reach of creditors or causes other creditors harm or losses.  The
Committee, however, attempts to apply those theories of liability to arms'-length transactions
that provided much-needed capital to SUNE, <u>increasing</u> the likelihood of all creditors recovering
their investment.

Indeed, it is evident that the Committee asserts claims against the First Lien
Defendants—who are not even defined—as part of a rush to commence this action before the
expiration of the claims challenge deadline established by the final DIP order (as extended
several times).  Thus, the Amended Complaint, which initially named among many First Lien
Lenders just the five First Lien Defendants responding here, is at times incomprehensible, failing
to (i) define terms, (ii) state clearly who its allegations are directed against, (iii) distinguish
between the unspecified first and second lien lenders, and (iv) specify improper conduct by any
First Lien Defendant.

The Committee challenges just two transactions with respect to the First Lien
Defendants, neither of which warrant liability: the October 2014 Amendment and the January
2016 First Lien Amendment (each defined below).  Both agreements amended and restated a
February 2014 credit agreement pursuant to which the First Lien Lenders had provided SUNE
with a $265 million credit facility and received in exchange a pledge of certain assets as
collateral.  The Amended Complaint demonstrates on its face that neither transaction was a
fraudulent conveyance or otherwise wrongful in any way.

2

Under the October 2014 Amendment, the First Lien Lenders agreed to increase the First Lien credit facility by $485 million in exchange for additional collateral. There is no dispute that new credit was extended. And, also critically fatal to the Committee's claim that this Amendment constituted a fraudulent conveyance is its allegation that it was not until 2015—well after the October 2014 Amendment—that SUNE experienced any signs of financial distress.

There is also no basis for avoidance or liability surrounding the January 2016 First Lien Amendment. SUNE and the First Lien Lenders entered into the January 2016 First Lien Amendment at a time when SUNE stood on the brink of bankruptcy and desperately needed additional credit. Pursuant to covenants to which the parties agreed in the February 2014 agreement, SUNE was required to obtain the consent of the First Lien Lenders before borrowing an additional $950 million in secured debt from the Second Lien Lenders. The First Lien Lenders were under no obligation to give their consent to a request that would further encumber assets on which they held a valid security interest, and according to the Amended Complaint the First Lien Lenders permitted SUNE to incur the additional debt in exchange for the promises in the January 2016 First Lien Amendment. Significantly, the Committee does not sufficiently allege that anything was actually transferred in that transaction. The only allegedly newly-pledged assets identified by the Committee, equity interests in SunEdison Utility Holdings and the Warehouse Entities, were <u>already</u> the subject of previous pledges to the First Lien Agent.

The alleged facts concerning the October 2014 Amendment and the January 2016 First Lien Amendment demonstrate the very opposite of a fraudulent conveyance. Rather, they show that SUNE granted certain liens and guarantees to the First Lien Agent on account of present or antecedent debt furnished by the First Lien Lenders for the survival of SUNE and, consequently, benefitted <u>all</u> of its creditors. Indeed, according to the Committee's own allegations, the First

3

Lien Defendants operated under the good faith assumption that "SUNE would quickly rebound from its liquidity crunch." (Am. Compl. ¶ 133) Moreover, because the lending banks do not hold liens directly, and the Amended Complaint seeks only to avoid liens and not debt, the First Lien Lenders are not appropriately named as defendants.

The Amended Complaint similarly fails to state claims for equitable subordination and aiding and abetting breach of fiduciary duty. Instead of specifically alleging how the First Lien Defendants were insiders, engaged in inequitable conduct or improperly helped cause SUNE directors to breach their fiduciary duties, the Committee impermissibly group-pleads such alleged misconduct against <u>all</u> defendants. Indeed, the Committee not only fails to plead any improper or unfair conduct particular to the First Lien Defendants, but also undermines its own allegations: the Amended Complaint alleges that it was actually the First Lien Defendants who were the *victims* of certain concealed improprieties perpetrated by SUNE executives. (Am. Compl. ¶¶121-131.) Further, the Amended Complaint alleges that the First Lien Defendants entered into the January 2016 transaction with the expectation that it would save the company— quite contrary to any claim that they acted unfairly toward other creditors. (<u>Id.</u> ¶ 133)

As described in further detail <u>infra</u>, the claims asserted against the First Lien Defendants should be dismissed with prejudice for the following reasons:

- The Sixth, Ninth, Twelfth, Thirteenth and Fourteenth Causes of Action should be dismissed against the First Lien Defendants that do not hold any liens that are being challenged (<u>id.</u> at 8).

- The Sixth Cause of Action for intentional fraudulent conveyance should be dismissed because the Amended Complaint (i) fails to satisfy the heightened pleading standards of Rule 9(b), much less plausibly allege an intent to hinder, delay or defraud creditors (<u>infra</u> at 11); (ii) fails to allege a fraudulent conveyance with respect to the January 2016 First Lien Amendment because the Committee fails to allege any transfer (<u>id.</u> at 10); (iii) does not allege any of the "badges of fraud" necessary to state an intentional fraudulent conveyance claim (<u>id.</u> at 14); and (iv) demonstrates the good faith of the First Lien Defendants (<u>id.</u> at 17).

4

- The Ninth Cause of Action for constructive fraudulent conveyance should be dismissed under applicable state and Bankruptcy law because (i) the granting of liens on account of present or antecedent debt is reasonably equivalent value or fair consideration as a matter of law (<u>id.</u> at 20); (ii) the Amended Complaint fails to allege insolvency, especially at the time of the October 2014 Amendment (<u>id.</u> at 22); and (iii) the claims relating to the January 2016 Amendments are barred under Section 546(e) of the Bankruptcy Code because they involve transfers with financial institutions "in connection with a securities contract" (<u>id.</u> at 24).

- The Eleventh Cause of Action for equitable subordination should be dismissed because the Amended Complaint fails to allege that (i) the First Lien Defendants were insiders of SUNE (<u>id.</u> at 27); (ii) the First Lien Defendants engaged in egregious (or indeed any) misconduct of the type necessary to justify subordination (<u>id.</u> at 29) and (iii) any unsecured creditor was injured or First Lien Defendant was unfairly advantaged (<u>id.</u> at 31).

- Portions of the Twelfth, Thirteenth and Fourteenth Causes of Action challenging the perfection of certain liens should be dismissed because the First Lien Agent has a perfected interest in (i) SUNE's securities accounts; (ii) certain deposit accounts, including those held by Wells Fargo; and (iii) certain letter of credit rights; and (iv) the Thirteenth Cause of Action also fails to identify the property or applicable law demonstrating a lack of perfection (<u>id.</u> at 32).

- The Fifteenth Cause of Action, alleging aiding and abetting the SUNE director's breach of fiduciary duty by delaying the bankruptcy filing should be dismissed because (i) if Missouri law applies to the claim, Missouri does not recognize such a claim (<u>id.</u> at 36); and (ii) if Delaware law applies, the Amended Complaint fails to allege (a) a breach of a fiduciary duty (<u>id.</u> at 36); or (b) that the First Lien Defendants knowingly participated in any alleged breach (or indeed engaged in any specific conduct) (<u>id.</u> at 38).

## STATEMENT OF FACTS[2]

### A.  The First Lien Credit Facility

On or about February 28, 2014, SUNE, as borrower, entered into a senior secured letter

of credit facility in the aggregate principal amount of $265 million (as amended, restated,

---

[2]     The facts set forth below are derived from the facts pleaded in the Amended Complaint and documents that are incorporated by reference or integral to the Amended Complaint.  <u>See</u> <u>Liquidation Tr. v. Daimler AG (In re Old CarCo LLC)</u>, 435 B.R. 169, 177 (Bankr. S.D.N.Y. 2010) ("In reviewing a Rule 12(b)(6) motion, a court may consider the allegations in the complaint; exhibits attached to the complaint or incorporated therein by reference; matters of which judicial notice may be taken; and a document of which plaintiff has notice and relied upon in bringing the claim or that are integral to the claim.") (citations omitted)

Americas 92234977

supplemented and/or modified from time to time, the "**First Lien Facility**"), with Wells Fargo,

as Administrative Agent (in such capacity, the "**First Lien Agent**"), and certain other financial

institutions as agents, bookrunners, issuing banks, and lenders (collectively, the "**First Lien

Lenders**").[3]  (See Declaration of Christopher Harris ("**Decl.**") Ex. 1)

Certain of SUNE's domestic subsidiaries (the "**Guarantors**")[4] jointly and severally

guaranteed substantially all of SUNE's obligations under the First Lien Facility.  As security for

their obligations under the First Lien Facility, SUNE and the Guarantors pledged to the First

Lien Agent substantially all of their present and future assets and all of the equity interests in the

Guarantors.  (Am. Compl. ¶ 151.)  SUNE and the Guarantors also granted to the First Lien Agent

pledges of (i) 65% of the outstanding voting capital stock of certain of SUNE's foreign

subsidiaries and (ii) the outstanding voting capital stock of SUNE's domestic subsidiaries,

including TerraForm Power, LLC.   See id., § 2.2(b), (d).   All such liens are valid and

enforceable, and not expressly challenged in the Amended Complaint.

## B.  The October 2014 Amendment

On October 6, 2014, SUNE, the Guarantors, the First Lien Agent and the First Lien

Lenders amended the First Lien Facility (the "**October 2014 Amendment**") to, among other

things, increase the First Lien Lenders' commitments by $485 million, bringing their total

commitment to $750 million under the First Lien Facility.  (Decl. Ex. 2 at 3.)  As additional

---

[3]      The First Lien Defendants who were identified in the original complaint and who are responding here
comprise a small and apparently random subset of financial institutions that comprise the First Lien Lenders,
and the two terms should not be confused.

[4]      SunEdison Holdings Corporation, SunEdison International, Inc., MEMC Pasadena, Inc., EnFlex
Corporation, NVT, LLC, Solaicx, Sun Edison LLC, SunEdison Canada, LLC, SunEdison International, LLC,
Fotowatio Renewable Ventures, Inc., SunEdison Contracting, LLC, NVT, Licenses, LLC, and Team-Solar Inc.
were the initial guarantors.  SunEdison Utility Holdings, Inc. and SUNE ML 1, LLC were later joined as
guarantors.  (Decl. Ex. 3 at 34-36, Ex. 4 at 445, 447.)

6

collateral for the increase in credit, SUNE pledged to the First Lien Agent security interests in the equity of TerraForm Global, Inc. ("**GLBL**") and TerraForm Global, LLC (up to 65% of the voting power of all equity interest therein).  (Decl. Ex. 2 at 7 § II.A; Am. Compl. ¶ 152.)[5]

### C.  <u>The January 2016 First Lien Amendment</u>

On January 11, 2016, SUNE, the Guarantors, the First Lien Agent and the First Lien Lenders further amended the First Lien Facility (the "**January 2016 First Lien Amendment**" and, with the October 2014 Amendment, the "**Amendments**") to permit SUNE and the Guarantors to incur additional second lien indebtedness by (i) issuing new 5-percent senior secured convertible notes with an aggregate principal amount of $225 million and (ii) entering into the Second Lien Credit Agreement.  Under the terms of the Second Lien Credit Agreement, certain lenders (the "**Second Lien Lenders**") would provide SUNE term loans with a principal amount of up to $725 million.  Those loans would include $500 million aggregate principal amount of tranche A-1 term loans and $225 million aggregate principal amount of tranche A-2 term loans.  (Decl. Ex. 4, §§ I.HH—KK.)  According to the Complaint, in conjunction with the First Lien Lenders' consent for SUNE to increase its leverage and further encumber its assets, SUNE pledged to the First Lien Agent, as additional collateral for the First Lien Facility, "equity pledges of SunEdison Utility Holdings and each Warehouse Entity."  (Am. Compl. ¶ 152.)

### <u>ARGUMENT</u>

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

---

[5]      The Amended Complaint vaguely alleges that the pledge of GLBL shares "may not have been approved by the appropriate corporate authority" and may therefore be "an act *ultra vires*."  (Am. Compl. ¶¶ 170-71.)  This conditional allegation is not linked to any cause of action, nor does it otherwise state that the pledge should be avoided as fraudulent or equitably subordinated.  Moreover, if intended to assert a fact, it cannot stand a Rule 11 challenge as SUNE's pledge of GLBL shares was properly approved by the acting directors of SunEdison Holdings Corporation, Brian Wuebbels and Martin Truong on October 14, 2014.

Americas 92234977

relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell

Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "[W]here the well-pleaded facts do not

permit the court to infer more than the mere possibility of misconduct, the complaint has

alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  Id. at 679 (quoting

Fed. R. Civ. P. 8(a)(2)).  Furthermore, "[c]onclusory allegations or legal conclusions

masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss."  Kirch v.

Liberty Media Corp., 449 F.3d 388, 398 (2d Cir. 2006) (citations omitted).  "A pleading that

offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will

not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual

enhancement.'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555, 557).  A complaint

that pleads facts that are merely consistent with a defendant's liability, "stops short of the line

between possibility and plausibility of 'entitlement to relief'" and is insufficient as a matter of

law.  Id.  (citing Twombly, 550 U.S. at 557).

### I.    To The Extent The Amended Complaint Seeks Lien Avoidance Or Otherwise Challenges Liens, It Fails To State A Claim Against First Lien Defendants That Do Not Hold Liens

The Sixth and Ninth Causes of Action seek lien avoidance and are purportedly asserted

against unspecified "Prepetition First Lien Lender Defendants."  Similarly, the Twelfth,

Thirteenth and Fourteenth Causes of Action challenge perfection of certain liens and are asserted

against unspecified "Prepetition Lender Defendants."  Although it is not clear who is intended to

be covered, if a claim is stated in any of these counts (none is), there is no basis for these claims

to proceed against Goldman Sachs, Morgan Stanley, Keybank or BBVA, because no such party

holds directly any liens in respect of the First Lien Facility and the Amended Complaint does not

8

seek to avoid debt obligations of any First Lien Defendant.  The liens were granted to the First Lien Agent, not the lenders.

## II.    The Amended Complaint Fails To State A Claim For Fraudulent Transfer Against The First Lien Defendants

The Committee incorrectly alleges that the liens and security interests granted in connection with the Amendments constitute actual and constructive fraudulent transfers in the Sixth and Ninth Causes of Action, respectively.

### A.  The Committee Fails To Plead An Intentional Fraudulent Transfer Claim Against The First Lien Defendants

Because claims for intentional fraudulent conveyance under § 548(a)(1)(A) sound in fraud, the Committee is required to plead the circumstances constituting fraud with particularity in order to satisfy the heightened pleading standards of Federal Rule of Civil Procedure ("Rule") 9(b).  See Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.), 343 B.R. 444, 459-60 (Bankr. S.D.N.Y. 2006) (citations omitted); Geltzer v. Barish (In re Geltzer), 502 B.R. 760, 769 (Bankr. S.D.N.Y. 2013) (citing O'Connell v. Penson Fin. Servs., Inc. (In re Arbco Capital Mgmt., LLP), 498 B.R. 32, 40 (Bankr. S.D.N.Y. 2013)). Under Rule 9(b), the plaintiff must "allege facts that give rise to a strong inference of fraudulent intent."  Shields v. Citytrust Bancorp., 25 F.3d 1124, 1128 (2d Cir. 1994) (citations omitted).

The strong inference of the transferor's fraudulent intent must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent . . . in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences."  Tellabs, Inc. v. Makor Issues & Rights, Ltd. 551 U.S. 308, 314, 323 (2007).

Americas 92234977

The intent to delay, hinder or defraud creditors under 11 U.S.C. § 548(a)(1)(A) must specifically relate to the transaction that the plaintiff seeks to avoid.  See Geltzer, 502 B.R. at 766 ("[T]he Court must focus precisely on the specific transaction or transfer sought to be avoided in order to determine whether that transaction falls within the statutory parameters of either an intentional or constructive fraudulent conveyance.") (citations omitted); In re Verestar, Inc., 343 B.R. at 468 (dismissing those intentional fraudulent transfer claims for which plaintiff failed to adequately connect the badges of fraud to the transaction in question); Nisselson v. Ford Motor Co. (In re Monahan Ford Corp.), 340 B.R. 1, 39 (Bankr. E.D.N.Y. 2006) (dismissing fraudulent conveyance claim where plaintiff adequately pled a general intent to defraud future creditors, but failed to add sufficiently particularized allegations that the transfers were made in furtherance of that fraud).  As set forth below, the Committee fails all of these requirements to state a claim for intentional fraudulent transfer.

### 1.    The Committee Fails To Allege A Transfer In Connection With The January 2016 First Lien Amendment

No fraudulent conveyance is alleged in connection with the January 2016 First Lien Amendment because the Amended Complaint fails to allege properly that anything was transferred to the First Lien Agent.  The assets that the Amended Complaint identifies as "previously unencumbered," equity pledges of SunEdison Utility Holdings and the Warehouse Entities, were already subject to liens under the First Lien Facility and were not encumbered as a result of the January 2016 First Lien Amendment.  (Am. Compl. ¶ 152.)  Specifically:

- SunEdison Utility Holdings was pledged on May 22, 2015, as part of the First Wind Acquisition.  (Decl. Ex. 5.)  The January 2016 First Lien Amendment amends and restates that the "First Wind Holdings," which include the SunEdison Utility Holdings, are collateral for the First Lien Lenders.  Thus it did not change the status of that collateral.  It merely restated what was already true.  (Decl. Ex. 4 at 45 § II(B)(ii).)

10

- Though the January 2016 First Lien Amendment amended and restated Section 2.2(d) of the First Lien Facility to include "any Warehouse Entity (if any equity interest therein is directly held or owned by any Grantor)" ultimately that never resulted in new pledges, because all of the Loan Party Service Providers were existing grantors. (Id.)

Because the First Lien Agent already had liens on the assets allegedly first pledged in the January 2016 First Lien Amendment, there was no alleged transfer that can be avoided.

### 2.  The Amended Complaint Does Not Allege Particularized—Much Less Plausible—Intentional Fraudulent Transfers

Regardless, the Committee's conclusory allegation that the Amendments were entered "with the actual intent to hinder, delay, or defraud its existing and future unsecured creditors" falls far short of the specificity required by Rule 9(b).  (Am. Compl. ¶ 154.)  The Committee makes no attempt to explain how obtaining additional financing in either the October 2014 Amendment or in connection with the 2016 First Lien Amendment was an attempt to defraud creditors.  Such a pleading tactic is insufficient to survive a motion to dismiss.  See In re O.P.M. Leasing Services, Inc., 32 B.R. 199, 204 (Bankr. S.D.N.Y. 1983) ("A complaint that merely repeats the wording of the statute and includes no facts in support of its allegations will be met with disfavor.").

This Court's decision in In re Old CarCo LLC, 435 B.R. at 174–76, is instructive.  The unsecured creditors' committee's complaint there alleged that the debtor – CarCo's former 100-percent equity owner, "engineered a complex restructuring of the [debtor], which fraudulently transferred valuable assets from CarCo . . . for little or no consideration," before it ultimately filed for bankruptcy.  Id. at 175.  This Court granted the defendants' motion to dismiss the claim for intentional fraudulent conveyance because, among other reasons, plaintiff did not "ma[k]e

11

any particularized allegations, which are required for a showing of intentional fraud."[6]  Id. at

192.  The Court rejected the argument that putative insolvency supports an inference of

intentional fraud because "no *facts* are offered to support what the [plaintiff] wants the Court to

infer."  Id. (emphasis added) (citing In re M. Fabrikant & Sons, Inc., 394 B.R. 721, 739 (Bankr.

S.D.N.Y. 2008) (Bernstein, J.) (dismissing actual and constructive fraudulent transfer claims,

noting that the plaintiff's arguments regarding why banks would make uncollectible loans were

"no more than an effort to bolster an implausible theory with rank speculation")).

And even if the Committee had alleged with particularity an intent to hinder, delay or

defraud creditors, such allegations would be wildly implausible.  The First Lien Defendants are

not equity holders.  There is no allegation whatsoever (not even a generalized insufficiently pled

one) of any fraudulent intent for the October 2014 Amendment, more than six months before the

earliest factual allegation of any financial distress.  Read most generously, the Amended

Complaint alleges that it was not until mid-2015 that SUNE started experiencing liquidity

problems.  (Am. Compl. ¶¶123-30.)

And, as to the January 2016 First Lien Amendment, the Amended Complaint concedes

that SUNE was seeking to raise capital to alleviate liquidity problems and give itself a chance to

right its teetering ship.  (Am. Compl. ¶ 133.)  By obtaining additional capital, the Company was

seeking an inflow of funds that would permit it to survive and, ultimately, pay back its creditors.

Such facts demonstrate the opposite of a fraudulent transfer, in which the debtor facilitates an

outflow of assets in an effort to move them beyond the reach of legitimate creditors.  See 5

Collier on Bankruptcy P 548.01 (16th ed. 2016) ("Fraudulent transfer law is an elemental and

---

[6]      As discussed infra, the Court also dismissed the plaintiff's constructive fraudulent conveyance claims.
In re OldCar Co., 435 B.R. at 187–90.

ancient part of debtor-creditor relations. Broadly speaking, fraudulent transfer law allows

creditors to avoid transactions which unfairly or improperly <u>deplete a debtor's assets</u> or that

unfairly or improperly dilute the claims against those assets.") (emphasis added); <u>Sharp Int'l</u>

<u>Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)</u> 403 F.3d 43, 55-56 (2d Cir. 2005)

("fraudulent conveyance law . . . is primarily concerned with transactions that shield company

assets from creditors") (citations omitted). Here, the opposite is the case.

The Amended Complaint does not allege that the Debtors intended to hinder delay or

defraud their creditors generally, but rather, at most, that they intended to prefer secured

creditors over unsecured creditors.[7] The Second Circuit, however, has expressly held that a

transaction that merely favors one creditor over another does not support an inference of

fraudulent intent. <u>In re Sharp Int'l Corp.</u>, 403 F.3d at 54 (stating that the "payment was at most a

preference between creditors and did not 'hinder, delay, or defraud either present or future

creditors'"). As explained in <u>Boston Trading Grp., Inc. v. Burnazos</u>, fraudulent conveyance laws

are not concerned with whether a debtor favors one creditor over another:

> [T]o find an actual intent to defraud creditors when, as in our example, an
> insolvent debtor prefers a less worthy creditor, would tend to deflect fraudulent
> conveyance law from one of its basic functions (to see that an insolvent debtor's
> limited funds are used to pay *some* worthy creditor), while providing it with a new
> function (determining *which* creditor is the more worthy).

835 F.2d 1504, 1511 (1st Cir. 1987). In short, even a debtor's "intent to prefer"—*i.e.*, knowledge

that a debt repayment may permit particular creditors to recover more than others—is not the

---

[7]     For instance, the Amended Complaint repeatedly states that by agreeing to the Amendments, SUNE
acted "with the actual intent to hinder, delay or defraud its existing and future <u>unsecured</u> creditors." (Am.
Compl. ¶¶ 153-54) (emphasis added.) Indeed, the Committee even titles a section of its Amended Complaint
"THE JANUARY TRANSACTIONS EFFECT FRAUDULENT TRANSFERS AND HINDER, DELAY,
AND DEFRAUD SUNE'S <u>UNSECURED</u> CREDITORS."  (Am. Compl. ¶ 28) (emphasis added.)

same as a debtor's "intent to hinder, delay, or defraud creditors" and cannot support an intentional fraudulent conveyance claim.

### 3.   The Committee Fails to Allege Any "Badges Of Fraud"

In the absence of direct evidence of intent, courts will examine whether the plaintiff has pleaded certain "badges of fraud." See In re Sharp Int'l Corp., 403 F.3d at 56. The following badges of fraud in conjunction, when sufficiently alleged, may create an inference of fraudulent intent: (1) a close relationship among parties to the transaction; (2) a secret or hasty transfer; (3) the inadequacy of consideration; (4) the transferor's knowledge of other creditors' claims and the debtor's inability to pay them; (5) use of dummies or fictitious parties; and (6) retention of control or reservation of rights in the transferred property by the transferor after the conveyance. See MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co., 910 F. Supp. 913, 935 (S.D.N.Y. 1995) (granting motion to dismiss intentional fraudulent conveyance claim).

The Committee's Amended Complaint fails to plead any badges of fraud. With respect to the October 2014 Amendment, in addition to the reasons that follow, the Amended Complaint fails to allege that SUNE was under any financial distress until May 2015, seven months after the October 2014 Amendment. (Am. Compl. ¶ 123.) There are no allegations, general or specific, that suggest that the October 2014 Amendment was entered with fraudulent intent. The Committee does not even assert that the particular First Lien Lenders named as First Lien Defendants had any direct interaction in particular, or even at all, with SUNE in connection with the transaction, as would be expected in a widely syndicated financing. Without any indication of insolvency or impropriety, the Committee is left with a bare-bones and insufficient conclusory allegation that the October 2014 Amendment was entered into "with the actual intent to hinder, delay, or defraud" creditors. (Id. ¶ 153.)

14

Indeed, the Committee similarly fails to plead any badges of fraud concerning the Amendments.  First, any "relationship" alleged between the First Lien Defendants and SUNE falls well short of the "close relationship" required to constitute a badge of fraud.  See MFS/Sun Life, 910 F. Supp. at 935 (finding no close relationship among parties to a leveraged buyout that "was an arm's length transaction by sophisticated businesspeople").  For example, in In re Lehman Bros. Holdings. v. JPMorgan Chase Bank, N.A, this court declined to find the existence of a "close relationship" between JPMorgan Chase and Lehman where plaintiffs "do not contend that Defendant exercised formal control over Lehman or became an insider so embedded within Lehman that it functioned as an alter ego of the company," but rather "merely argue that JPMC's insistence on additional collateral to support substantial lending activity presented the company with a difficult decision, not that JPMC served as Lehman's decision-maker."  541 B.R. 551, 576 (Bankr. S.D.N.Y. 2015) (emphasis in original).

Similarly, the Amended Complaint here does not allege that the First Lien Defendants were operating as an alter ego of SUNE or otherwise were embedded within the management of the company.  To the contrary, the Amended Complaint portrays the First Lien Defendants, unaffiliated financial institutions that are not alleged to have materially interacted directly with SUNE, as outsiders who were unaware of the financial improprieties taking place within SUNE.  According to the Amended Complaint, the First Lien Defendants entered into the January 2016 transaction under the "belie[f] that SUNE would quickly rebound from its liquidity crunch."[8] (Am. Compl. ¶ 133.)

---

[8]    The Committee is also unable to demonstrate a badge of fraud by suggesting SUNE did not receive adequate consideration in connection with the Amendments.  As discussed infra at 20, granting additional security on account of present or antecedent debt is, as a matter of law, reasonably equivalent value.

15

Second, the Amended Complaint does not allege a "secret or hasty transfer," the use of "dummies or fictitious parties," or SUNE's "retention of control" in any security interest. See MFS/Sun Life, 910 F. Supp. at 935 (declining to find badges of fraud where LBO was not secretive or structured in an unusual manner, not conducted with inappropriate speed and did not use shell companies to hide assets); see also Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.), 337 B.R. 791, 809-10 (Bankr. S.D.N.Y. 2005) (granting motion to dismiss intentional conveyance claim where "badges of fraud" not pleaded because there were no allegations suggesting a lack of consideration, familial or other close relationship between the parties, or allegations of secrecy, haste or unusualness of the transactions). To the contrary, the Amended Complaint shows that the Amendments were negotiated, publicly disclosed, arms'-length transactions between unrelated parties.

Further, the Amended Complaint's allegations demonstrate that SUNE was not attempting to shield its assets in the face of an impending bankruptcy filing. To the contrary, the Amended Complaint describes a desperate company seeking to recapitalize. The Committee repeatedly acknowledges that in 2016, SUNE's extremely limited cash reserves stymied its business. (Am. Compl. ¶¶ 120, 121, 126.) According to the Amended Complaint, the January 2016 First Lien Amendment was a necessary part of a series of transactions that allowed SUNE to raise additional capital in an attempt to remedy its liquidity problems and, ultimately, create value for all stakeholders—including the unsecured creditors.

Importantly, SUNE was required to obtain the First Lien Lenders' consent pursuant to a covenant the parties agreed to in the First Lien Facility almost two years earlier. The First Lien Lenders (generally) and the First Lien Defendants in particular were under no obligation to provide such consent and only agreed to do so in exchange for the promises made in the January

16

2016 First Lien Amendment.  Such action does not support an inference of fraudulent intent—

and indeed, to hold otherwise "would place in question any contract executed during a financial

downturn and invite upheaval in the financial markets."  In re Lehman Bros. Holdings, 541 B.R.

at 564, 577 (finding no claim arising from a lender's use of its "life or death leverage" as the

debtor's primary clearing bank to gain additional collateral during the tumultuous period leading

to debtor's collapse); see also In re Monahan Ford Corp., 340 B.R. at 39 (granting motion to

dismiss where allegations of transfers from a debtor in a weak financial condition did not

sufficiently particularize how the transfers were made in furtherance of a scheme to defraud).  A

contrary finding would chill the willingness of lenders to assist distressed companies.

### 4.  The Committee's Claims For Intentional Fraudulent Transfer Are Barred By Section 548(c)'s Good Faith Defense

Even if a *prima facie* claim for intentional fraudulent transfer is properly alleged—it is

not—the Amended Complaint establishes the First Lien Defendants' good faith defense under

Section 548(c).  11 U.S.C. § 548(c).[9]  Defenses that appear on the face of the complaint may be

raised by a motion to dismiss.  Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 74 (2d Cir.

1998); see also Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.),

476 B.R. 715, 723 (S.D.N.Y. 2012) ("Thus, the Court concludes that the Trustee has adequately

pled a prima facie case under § 548(a)(1)(A) . . . Nonetheless, the defendants can prevail on their

motion to dismiss these claims if they prove that, 'on the face of the complaints,' they can invoke

---

[9]    Section 548(c) of the Bankruptcy Code provides:

Except to the extent that a transfer or obligation voidable under this section is voidable under
section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation
that takes for value and in good faith has a lien on or may retain any interest transferred or
may enforce any obligation incurred, as the case may be, to the extent that such transferee or
obligation gave value to the debtor in exchange for such transfer or obligation.

Americas 92234977

the affirmative defense provided by § 548(c).") (internal bracket omitted). Here, the face of the Amended Complaint admits both elements of the good faith defense.

First, the Amended Complaint establishes that the First Lien Lenders gave value in exchange for the security transferred as a result of the Amendments.  The October 2014 Amendment was provided for value in the form of the extension of $485 million in credit, the January 2016 First Lien Amendment permitted SUNE to obtain $950 million of additional second lien capital and both Amendments granted or reaffirmed additional liens to the First Lien Agent on account of antecedent debt relating to the February 2014 First Lien Facility.  As set forth infra at 20, the granting of liens in exchange for the incurrence of present or antecedent debt is "value" as a matter of law.

Second, the Amended Complaint admits that the lenders entered into the Amendments in good faith.  Specifically, the Amended Complaint states that "as a result of Management's gross financial improprieties, the lenders involved in the January 2016 transactions believed that SUNE would quickly rebound from its liquidity crunch, and thus provided new money simply to improve their own position within SUNE's capital structure."  (Am. Compl. ¶ 133) (emphasis added.)  A belief that the Company would "quickly rebound" as a result of the extension of credit is the apotheosis of good faith—it demonstrates a belief that additional credit would solve the company's liquidity problems, not exacerbate them.

Because the Amended Complaint clearly establishes that the First Lien Defendants took the subject transfers for value and in good faith, the Committee's claims for intentional fraudulent transfer are barred by § 548(c) of the Bankruptcy Code.

18

**B. The Committee Fails To Plead A Constructive
Fraudulent Transfer Claim Against The First Lien Defendants**

In the Ninth Cause of Action, the Committee asserts constructive fraudulent transfers pursuant to §§ 544 and 548(a)(1)(B) of the Bankruptcy Code.  Under Bankruptcy Code § 548(a)(1)(B), a trustee may avoid a transfer only if the debtor "received less than a reasonably equivalent value in exchange for such transfer" and at the time (i) was insolvent, (ii) possessing an unreasonably small capital or (iii) believing that the debtor would incur debts beyond its ability to repay after the transaction, or became such as a result of the transfer.  5 Collier on Bankruptcy P 548.05 (16th ed. 2016).

Under § 544(b) of the Bankruptcy Code, a trustee or debtor-in-possession may bring a fraudulent conveyance claim under applicable state law if there exists a creditor holding an unsecured claim who could pursue the action.  11 U.S.C. §§ 548(1)(B), 544(b).[10]  The elements of a claim under the New York Debtor and Creditor Law are substantially the same as the elements under § 548(1)(a)(B) of the Bankruptcy Code.  N.Y. Debt. & Cred. Law, §§ 272–75, (McKinney 2001) ("DCL").  A transfer will be constructively fraudulent only if: the transferor does not receive "fair consideration"; and (i) the transferor is insolvent or will be rendered insolvent by the transfer in question; (ii) the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital, or (iii) the transferor believes that it will incur debt beyond its ability to pay.  The term "fair

---

[10]    The Committee does not allege the applicable law or sufficient facts from which a choice of law analysis may be performed.  For purposes of this Motion, the First Lien Defendants assume New York law applies because New York law governs the Amendments and this case is commenced in bankruptcy court located in New York by a creditors committee constituted in New York.  See, e.g. Lyman Commerce Sols., Inc. v. Lung, 12-cv-4398, 2014 U.S. Dist. LEXIS 15282, at *9 (S.D.N.Y. Feb. 6, 2014) (finding that the alleged fraudulent conduct occurred in New York because, inter alia, the "agreements were executed, at least in part, in New York."); In re WorldCom, Inc., No. 02-13533, 2003 Bankr. LEXIS 1401, at *117-19 (Bankr. S.D.N.Y. Oct. 31, 2003) (stating that in determining which state's law is applicable the "contacts to be taken into account" include "the place where the relationship, if any, between the parties is centered").

19

consideration" is roughly equivalent to "reasonably equivalent value." Geltzer, 502 B.R. at 771

(citations omitted); see also Geron v. Palladin Overseas Fund, Ltd. (In re AppliedTheory Corp.),

323 BR 838, 840 (Bankr. S.D.N.Y. 2005) ("Courts typically use these terms interchangeably,

and do not usually make a distinction between the standard required for reasonably equivalent

value, on the one hand, and fair consideration, on the other.").

### 1. Liens Granted On Account Of The Extension Of Credit Or An Antecedent Debt Are Reasonably Equivalent Value As A Matter Of Law

Pursuant to § 548(d)(2) of the Bankruptcy Code, "'value' means property, or satisfaction

or securing of a present or antecedent debt of the debtor."  Similarly, "fair consideration" is

defined by the DCL as "When such property, or obligation is received in good faith to secure a

present advance or antecedent debt in an amount not disproportionately small as compared with

the value of the property, or obligation obtained."  N.Y. Debt. & Cred. Law § 272.

As a result, there is a per se rule that "when a debtor grants a security interest to a lender

in respect of antecedent debt, the debtor must necessarily receive reasonably equivalent value or

fair consideration in exchange." See In re AppliedTheory Corp., 323 BR at 841–42 (Bankr.

S.D.N.Y. 2005) aff'd Geron v. Palladin Overseas Fund, Ltd. (In re AppliedTheory Corp.), 330

B.R. 362, 363 (S.D.N.Y. 2005) (rejecting appellant's argument that the court should abandon

"the per se rule consistently applied in [the Southern District of New York], which provides that

a debtor's grant of a security interest in its assets to a lender who has previously given the debtor

a cash loan may not be considered a fraudulent conveyance."); Pfeifer v. Hudson Valley Bank,

N.A. (In re Pfeifer), No. 12-13852, 2013 Bankr. LEXIS 2950, at *8–9 (Bankr. S.D.N.Y. July 23,

2013) ("securing an antecedent debt is not, as a matter of law, a constructive fraudulent

conveyance"); In re Old CarCo LLC., 435 B.R. at 187-88 (granting motion to dismiss fraudulent

transfer claim with prejudice because, inter alia, transfer was made on account of antecedent

20

debt); <u>Cuevas v. Hudson United Bank (In re M. Silverman Laces, Inc.)</u>, Nos. 01-6209, 97-B-43223, 2002 U.S. Dist. LEXIS 20288, at *15 (S.D.N.Y. Oct. 23, 2002) (holding that debtor "received 'value' when its antecedent debt was extended and collateralized"); <u>O'Toole v. Karnani (In re Trinsum Grp., Inc.)</u>, 460 B.R. 379, 388-89 (Bankr. S.D.N.Y. 2011) (granting defendant's motion to dismiss constructive fraudulent transfer claim because transfers were payments for an antecedent debt and were presumptively made for value).

The same result applies under the New York DCL.  <u>See</u> <u>In re Sharp Int'l Corp.</u>, 403 F.3d at 54–55 ("[A] conveyance which satisfies an antecedent debt made while the debtor is insolvent is neither fraudulent nor otherwise improper, even if its effect is to prefer one creditor over another.") (internal quotation marks omitted) (quoting <u>Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.</u>, 191 A.d.2d 86, 90–91 (1st Dep't 1993)); <u>Official Comm. of Unsecured Creditors of Champion Enters. v. Credit Suisse (In re Champion Enters.)</u>, 2010 Bankr. LEXIS 2720 at *61 (Bankr. D. Del. Sept. 1, 2010) (holding under New York law that "security interests granted by [debtor] in respect of an antecedent debt . . . like repayment of antecedent debt . . . are necessarily fair consideration."); <u>In re Capmark Fin. Grp., Inc.</u>, 438 B.R. 471, 516 n.16, 518 (Bankr. D. Del. 2010) ("collateralizing antecedent debt constitutes 'value' and 'fair consideration' under the Bankruptcy Code and New York law.").

Further, the value of the collateral committed to secure the antecedent debt is reasonably equivalent as a matter of law because the rights of the secured creditor are limited to the amount of its debt.  <u>In re AppliedTheory Corp.</u>, 323 B.R. at 841-42; <u>see also</u> <u>Anand v. Nat'l Republic Bank of Chicago</u>, 239 B.R. 511, 518 (N.D. Ill. 1999) ("the value the debtor receives is the proceeds of the loan itself . . . . [b]y definition, a security interest is pegged to the value of the

21

secured assets; a high degree of equivalence between the two values is, therefore, a safe assumption.").

Here, the October 2014 Amendment granted security interests on account of $485 million of present credit extended as well as the antecedent debt from the February 2014 extension of $265 million of credit.  The January 2016 First Lien Amendment granted (or reaffirmed) security with respect to the $750 million of antecedent debt extended by the First Lien Lenders in February and October 2014.[11]  Thus, as a matter of law, the liens granted in connection with the Amendments were extended for "reasonably equivalent value" and "fair consideration."

### 2.  The Amended Complaint Fails To Allege Insolvency

The Committee does not allege any facts to support its bald assertion that the Debtors were insolvent at the time of the transfers—an essential element of a constructive fraudulent transfer.  See In re Trinsium, 460 B.R. at 392 (granting defendant's motion to dismiss constructive fraudulent transfer claims under New York law because plaintiff failed to sufficiently plead the insolvency element, where plaintiff included only net income figures and net cash flow figures in the complaint without more detailed information);  Innovative Custom Brands, Inc. v. Minor, 15-2955, 2016 U.S. Dist. LEXIS 8354 (S.D.N.Y. Jan. 25, 2016) (granting defendants' motion to dismiss constructive fraudulent transfer claims because, inter alia, plaintiff failed to provide any "balance sheet information to suggest that the corporation's liabilities exceed[ed] its assets at the time the transfers took place") (internal quotations marks omitted).  Rather, the Committee merely alleges insolvency in conclusory fashion: that "[u]pon information and belief, SUNE entered into the Prepetition First Lien Security Amendments when it was

---

[11]    As noted above, the Complaint does not properly allege a transfer in connection with the January 2016 First Lien Amendment.

Americas 92234977

insolvent." (Am. Compl. ¶ 154.) Such barebones allegations are insufficient as a matter of law. See Burtch v. Huston (In re USDigital, Inc.), 443 B.R. 22, 39 (Bankr. D. Del. 2011) (dismissing fraudulent transfer claim inter alia because complaint "failed to provide any support to the factual allegations that [debtor] was insolvent or was rendered insolvent at the time [of the transfer]").

Indeed, there are no allegations whatsoever supporting an inference that SUNE was insolvent at the time of the October 2014 Amendment. That amendment was entered into on October 6, 2014, which is the relevant date for pleading insolvency. See Innovative Custom, 2016 U.S. Dist. LEXIS 8354 at *8 ("[p]laintiff fails to adequately plead that the Company's liabilities exceeded its assets at the time of the transfers, and thus fails to adequately plead insolvency."). As discussed supra, the Amended Complaint concedes that SUNE's first signs of financial distress were not until approximately May 2015. (Am. Compl. ¶ 124.)

Moreover, as set forth in Appendix A, the market data confirms that the Company was solvent as of October 2014.[12] SUNE's common stock price and market capitalization—as well as that of two major assets, its ownership interests in TERP and GLBL—demonstrate that the

---

[12] The Court may take judicial notice of publicly available market information to determine that SUNE was solvent as of October 2014. See Ganino v. Citizens Utils. Co., 228 F.3d 154, 166 n.8 (2d Cir. 2000) ("the district court may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment."); see also In re Old CarCo LLC, 435 B.R. at 193−94 (relying on contemporaneous market information to reject plaintiff's allegation that the company's insolvency at the time of the transaction suggested fraudulent intent, and granting motion to dismiss intentional fraudulent transfer claim); Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC), 373 B.R. 283, 346 (Bankr. S.D.N.Y. 2007) ("A company's stock price is an 'ideal datapoint' for determining value . . . [T]he advantage of contemporaneous market evidence . . . [is that it is] 'untainted by hindsight or post-hoc litigation interests' . . . ."); Liquidation Trust v. Daimler AG (In re: Old CarCo LLC), 454 B.R. 38, 59−60 (Bankr. S.D.N.Y. 2011) (granting motion to dismiss plaintiff's constructive fraudulent conveyance claim because, inter alia, contemporaneous market information concerning the involvement of other sophisticated parties in the transaction made it implausible that the company was insolvent at the time of the transfer).

company had a strong valuation indicative of solvency and adequate capitalization in October 2014 and for a material time thereafter.   (See App A, Figures 1–2.).

Similarly, the price of SUNE's unsecured convertible notes and SUNE's ability to issue additional tranches subsequent to October 2014, in January and May 2015, demonstrate widespread market acceptance that SUNE was solvent, adequately capitalized and not in distress as of October 2014 and for many months thereafter.  See Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.), 503 B.R. 239, 297–98 (Bankr. S.D.N.Y. 2013) ("[Debtor's] ability to issue unsecured bond debt and stock in the IPO is Defendants' strongest indication of solvency based on the market."); Iridium, 373 B.R. at 349 ("The fact that [the debtor] closed on three syndicated bank loans and raised over $2 billion in the capital markets between 1996 and 1999 is an indication of both solvency and capital adequacy.") (See App. A, Figures 3–6.)  The Committee accordingly has no basis to plead or conclude that SUNE was insolvent when it entered the October 2014 Amendment nine months earlier.

### 3.  Section 546(e) Protects The January 2016 First Lien Amendment

Section 546(e) of the Bankruptcy Code shields from avoidance the security interests granted in connection with the January 2016 First Lien Amendment.  Section 546(e) bars avoidance of a transfer if it is made (1) by or to a "financial institution" and (2) "in connection with a securities contract."  11 U.S.C. § 546(e).

Here, Wells Fargo, the agent bank to which liens are pledged, is a commercial bank. Thus, it is a "financial institution" as defined in the Bankruptcy Code.  See 11 U.S.C. § 101(22) (defining a "financial institution" as including "an entity that is a commercial or savings bank").

The January 2016 First Lien Amendment was "in connection with a securities contract" which is interpreted broadly to include any "contracts for the purchase or sale of securities, as

24

well as any agreements that are . . . related to contracts for the purchase or sale of securities." In re Bernard L. Madoff Inv. Sec. LLC, 773 F.3d 411, 418 (2d Cir. 2014). In connection with this, the Second Circuit has explicitly stated that, "[s]ection 546(e) sets a low bar for the required relationship between the securities contract and the transfer sought to be avoided." Id. at 422. A "security" is defined by the Bankruptcy Code to include, among other things, a note or bond. 11 U.S.C. §§ 101(49)(A)(i),(iv). Thus, the term "securities contract" expansively includes contracts for the purchase or sale of notes or bonds, as well as any agreements that are similar or related to those contracts. In re Bernard L. Madoff Inv. Sec. LLC, 773 F.3d at 418. Indeed, section 741(7) of the Bankruptcy Code, to which section 546(e) refers, defines "securities contract" with extraordinary breadth to include, among other things, "a contract for the purchase sale or loan of a security." 11 U.S.C. §§ 741(7)(i),(vii),(xi).

As alleged in the Amended Complaint, the January 2016 First Lien Amendment was entered "[i]n connection" with the issuance of the Second Lien Notes and the Second Lien Loans, that was used to "repay the remaining US $5 million outstanding on a margin loan provided by a group of financial institutions."[13] (Am. Compl. ¶¶ 138, 140, 149.) Both the Prepetition Second Lien Notes and the margin loan qualify as "securities" or "securities contracts." Thus, the security interests granted pursuant to the January 2016 First Lien Amendment fall with section 546(e)'s requirement "that a covered transfer be broadly related to a 'securities contract.'" In re Bernard L. Madoff Inv. Sec. LLC, 773 F.3d at 420. Accordingly, § 546(e) of the Bankruptcy Code bars the Committee's claim with respect to the January 2016 First Lien Amendment.

---

[13]    In the context of § 546(e), "a transfer is made 'in connection with' a securities contract if it is 'related to' or 'associated with' the securities contract. In re Bernard L. Madoff Inv. Sec. LLC, 773 F.3d at 421.

25

### III.    To The Extent The Tenth Cause Of Action Applies To Goldman Sachs, The Committee Fails To Plead A Preferential Transfer Claim

To the extent (and it is unclear) that the Amended Complaint's Tenth Cause of Action seeks to avoid the repayment in January 2016 of the $169 million August 2015 Term Loan issued by Goldman Sachs from the proceeds of the Second Lien Term Loan,[14] the Amended Complaint fails to allege a preferential transfer under Section 547(b) as a matter of law.  The payments to Goldman Sachs fall outside the 90–day preference window.  Nor, as set forth infra at 27 is Goldman Sachs, an arms'-length lender, sufficiently alleged to be an insider.  And, as set forth supra at 22, the Amended Complaint does not sufficiently plead that SUNE was insolvent as of January 2016.  Accordingly, if the Tenth Cause of Action does seek relief against Goldman Sachs, it fails to state a claim.

### IV.    The Amended Complaint Fails To State A Claim For Equitable Subordination Of The First Lien Defendants' Claims

The Committee's Eleventh Cause of Action, which alleges that the First Lien Lenders' security interests should be equitably subordinated to all general unsecured claims pursuant to section 510(c) of the Bankruptcy Code,[15] should be dismissed.  Equitable subordination is considered an "extraordinary remedy that is to be used sparingly."  In re Sabine Oil & Gas Corp.,

---

[14]    The Amended Complaint is unclear as to what it is seeking.  On the one hand, the Committee seeks a judgment avoiding the "Transfers," defined as the Prepetition Second Lien Term Loan and the issuance of the Prepetition Second Lien Notes.  (Am. Compl. ¶ 240.)  Importantly, this definition does not include the payoff of $169 million on the existing second lien term loan issued by Goldman Sachs.  (Am. Compl. 138.)  On the other hand, the Amended Complaint requests that the Court direct the "Transfer Defendants," defined as the "Defendants that held Old Notes" and the "2015 Prepetition Second Lien Term Loan Defendants" (previously defined, in the singular, as Goldman Sachs), to turn over to the Debtors' estate the sum of the Transfers.  (Am. Compl.¶¶ 138, 237, 240, prayer for relief ¶ 10.)  Therefore, whether the Committee intends to include the $169 million payment concerning the August 2015 Term Loan in the "Transfers" to be avoided is uncertain.

[15]    Section 510(c) provides, in relevant part, that: "(c) the court may (1) under principles of equitable subordination, subordinate for purposes of distribution all of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate."

26

547 B.R. 503, 564 (Bankr. S.D.N.Y. 2016) (quoting Kalisch v. Maple Trade Fin. Co. (In re
Kalisch), 413 B.R. 115, 133 (Bankr. S.D.N.Y. 2008)) (finding facts alleged were insufficient to
state a colorable claim to equitably subordinate the claims of secured lenders).

As this Court has explained, "[t]o plead equitable subordination successfully, a complaint
must contain enough facts to satisfy each part of the following three-part test: (1) that the
defendant-claimant engaged in inequitable conduct, (2) that the misconduct caused injury to the
creditors or conferred an unfair advantage on the defendant-claimant and (3)[16] that bestowing the
remedy of equitable subordination is not inconsistent with bankruptcy law." Official Comm. of
Unsecured Creditors Hydrogen, L.L.C. v. Blomen (In re Hydrogen, L.L.C.), 431 B.R. 337, 360
(Bankr. S.D.N.Y. 2010) (applying factors articulated in In re Mobile Steel Co., 563 F.2d 692,
700 (5th Cir. 1977)).

Here, the Committee has failed to plead any facts showing that the First Lien Defendants
(i) were statutory or non-statutory insiders of SUNE, (ii) engaged in any inequitable conduct, or
(iii) injured any unsecured creditors or obtained any unfair advantage.

### A. The First Lien Defendants Were Not Insiders

Aside from a conclusory statement that "Defendants were at all relevant times an
'insider' of the Debtors under the definition set forth in section 101(31) of the Bankruptcy Code
and under applicable non-statutory law," (Am. Compl. ¶ 243), the Committee has failed to
advance any facts indicating how the First Lien Defendants fit that statutory definition.[17] Nor
has the Committee advanced any allegations to suggest that the First Lien Defendants had a level

---

[16]     As the Bankruptcy Code has now codified the remedy of equitable subordination, the third Mobile
Steel factor "carries minimal significance today," and some courts have found that meeting the first two factors
is sufficient to survive a motion to dismiss. See Hydrogen, 431 B.R. at 360–61.

[17]     The Bankruptcy Code contains a non-exclusive list of who constitutes an "insider" of a debtor, such
as, in the case of a corporation, a debtor's director, officer, person in control, or relative of the same.  11
U.S.C. § 101 (31).

Americas 92234977

of control sufficient to be a "non-statutory" insider.  See Capmark Fin. Grp. Inc. v. Goldman Sachs Credit L.P., 491 B.R. 335, 351 (S.D.N.Y. 2013) ("In evaluating whether an entity is a non-statutory insider, courts examine two factors: '(1) the closeness of the relationship between the debtor and the transferee, and (2) whether the transactions between the transferee and the debtor were conducted at arm's length.'") (internal citations omitted); Lyme Regis Partners, LLC v. Icahn (In re Blockbuster Inc.), 2011 Bankr. LEXIS 1025, at *11 (Bankr. S.D.N.Y. Mar. 17, 2011) (dismissing equitable subordination claim where complaint "fail[ed] to allege facts sufficient to show that [defendants] were non-statutory insiders, nor has it adequately pled any sort of close relationship that would justify such a conclusion.").

The Committee alleges nothing more than negotiating leverage arising from certain undefined and unnamed defendants' creditor-debtor relationship and the exercise of contractual rights.  (Am. Compl. ¶¶ 162, 164.)  Courts routinely find that such allegations, particularly against banks loaning money at arms'-length, fail to demonstrate insider status.  See Capmark Fin. Group, 491 B.R. at 351–52 (granting motion to dismiss equitable subordination claim where plaintiffs alleged no more than that lenders were "ordinary commercial lenders" in "widely syndicated" credit facilities and did not suggest that the lenders "had a 'close' relationship with the debtors," even where affiliated entity to lender had board seat and participated in board decision to wait until preference period ran to file for bankruptcy); In re Champion Enters., 2010 Bankr. LEXIS 2720 at *26 ("[W]here a lender's influence on a debtor's actions merely arises by operating of bargained-for rights under a credit agreement, those 'reasonable financial controls negotiated at arms'-length between a lender and a borrower do not transform a lender into an insider") (citation omitted); Radnor Holdings Corp. v. Tennenbaum Capital Partners, 353 B.R.

28

820, 840–41 (Bankr. D. Del. 2006) (refusing to find that shareholder/lender that did not exercise day-to-day control over the debtor's business affairs was insider).

**B. The Committee Fails To Allege That The First Lien Lenders Engaged In Inequitable Conduct**

For non-insiders, such as the First Lien Defendants, there are "fewer traditional grounds available" to show inequitable conduct, and "unless the claimant controls the debtor, and exercises that control to gain an unfair advantage, the proponent of equitable subordination must show wrongful conduct involving fraud, illegality or some other breach of a legally recognized duty." 80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.), 169 B.R. 832, 839 (Bankr. S.D.N.Y. 1994). For this reason, claims against non-insiders are virtually impossible to plead. See Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co. (In re Sunbeam Corp.), 284 B.R. 355, 364 (Bankr. S.D.N.Y. 2002) ("When a non-insider or non-fiduciary is involved, courts have required that a claimant's conduct be egregious and severely unfair to other creditors before its claim will be equitably subordinated. The conduct required has been described as substantial misconduct tantamount to fraud, misrepresentation, overreaching or spoliation.") (citations omitted).[18]

The Amended Complaint fails to allege any improper conduct by the First Lien Defendants, let alone "egregious" misconduct that rises to the level of inequitable conduct justifying equitable subordination. Indeed, it is clear that the First Lien Facility was a large, syndicated transaction, in which there is no reason to believe that any particular lender had any

---

[18]    In addition, because the type of egregious conduct required for a non-insider would be akin to fraud, the Complaint must meet the requirements of Rule 9(b). See In re AlphaStar Ins. Grp. Ltd., 383 B.R. 231, 276-277 (Bankr. S.D.N.Y. 2008) (Noting failure to satisfy pleading requirements to support fraud-based equitable subordination claims when allegations were "fraud-based claims that failed to satisfy Rule 9(b)."). As explained above, Committee has failed to plead a claim for actual fraudulent conveyance with the particularity that Rule 9(b) requires. Accordingly, that claim, and any related claim for equitable subordination, should be dismissed.

29

particular interaction with the company at all.  The Committee's allegations about the First Lien Defendants' conduct amount to nothing more than a typical creditor's interest in negotiations.

Where creditors have successfully or even "forcefully" negotiated or amended a credit agreement, "use of [a creditor's] leverage does not provide a basis for the Court to find inequitable conduct."  In re Champion Enters., 2010 Bankr. LEXIS 2720, at *26; see also In re W.T. Grant, 699 F.2d 599, 610 (2d Cir. 1983) (a lender's goal "to recoup the most amount of money as possible on [its] loans, [is] an understandable and permissible desire" and does not support a finding of inequitable conduct).  Here, the Committee has not alleged that the negotiations of any financing provided by the First Lien Lenders violated the terms of the parties' previous contracts, applicable law, or even went beyond the scope of "normal lender-borrower agreements in distressed debt negotiations."  In re Champion Enters., 2010 Bankr. LEXIS 2720 at *26 (granting motion to dismiss equitable subordination claim where complaint fails to describe how a lending group's actions were inconsistent with typical lender behavior in distressed debt negotiations).

Moreover, the alleged general and non-specific conduct of the secured lenders in the weeks leading up to SUNE's decision to file for bankruptcy—including input into the appointment of a chief restructuring officer and oversight of decision making with regard to bankruptcy protection—were an exercise of the contractual rights of the First Lien Lenders. (Decl. Ex. 1, §§ 7.01(u), 7.03(t).)  A creditor does not act inequitably by exercising its contractual rights.  See Waslow v. MNC Commercial Corp. (In re Paolella), 161 B.R. 107, 117–18 (Bankr. E.D. Pa. 1993) ("For purposes of the doctrine of equitable subordination, it is not inequitable for a non-insider creditor to monitor a debtor closely, pursuant to a valid financing agreement, for the purpose of choosing the most advantageous time to foreclose on a loan that

30

has been out of formula for several years . . . [t]his principle has even more force . . . where . . . all creditors were aware of the debtor's precarious financial position.").

### C. The Committee Fails To Allege That The First Lien Lenders Injured Any Unsecured Creditor Or Were Conferred An Unfair Advantage

Although failure to satisfy the first <u>Mobile Steel</u> factor alone warrants dismissal, the Committee further fails to allege any facts to support the second factor of the <u>Mobile Steel</u> test: that the misconduct injured the unsecured creditors or conferred an unfair advantage on the First Lien Defendants.  <u>See</u> <u>Mobile Steel</u>, 563 F.2d at 700.  The Committee vaguely alleges that (unnamed) "Defendants' collateral position substantially improved while the unsecured creditors were damaged; (b) the Debtors delayed commencing these chapter 11 cases earlier, to the detriment of the Debtors and their unsecured creditors."  (Am. Compl. ¶ 247.)  Such allegations do not hold water.

<u>First</u>, as noted <u>supra</u> at 10, the Amended Complaint does not allege that the January 2016 First Lien Amendment granted additional property or value to which the unsecured creditors would have been entitled to even if the allegations were true.  Simply, the Committee fails to allege any assets that were "previously unencumbered."

<u>Second</u>, the Committee alleges—based on nothing more than bare bones "information and belief" pleading—that unspecified "secured creditors" caused the Debtors to delay commencing bankruptcy proceedings.  (Am. Compl. ¶ 163.)  The only aspect of the January 2016 transactions that the Amended Complaint alleges as an avoidable preferential transfer is the debt exchange, which involves solely the Second Lien Lenders.  The Committee's allegations accordingly fail to support any claim for relief against the First Lien Defendants.

## V.   The Amended Complaint Fails To State A Claim
   Disputing The Perfection Of The First Lien Lenders' Claims[19]

### A.   The First Lien Agent Has A
   Perfected Interest In The Securities Accounts

The Committee alleges that the First Lien Defendants failed to perfect their security

interests in certain securities accounts "because they have failed to enter into account control

agreements with Debtors over . . . [those] accounts."  (Am. Compl. ¶ 257.)  The Committee,

however, is incorrect: the Uniform Commercial Code ("UCC") provides that a creditor may

perfect its interest in a securities account by filing a UCC Financing Statement: "[a] security

interest in chattel paper, negotiable documents, instruments, or <u>investment property</u>, may be

perfected by filing."  UCC § 9-312 (emphasis added).  The UCC defines "investment property"

to include a "securities account."  Id. § 9-102(a)(46); see also id. § 9-312 cmt. 4 ("A security

interest in investment property, including . . . securities accounts, may be perfected by filing").

Since the First Lien Agent properly filed the UCC Financing Statement, it has a perfected

interest in SUNE's securities accounts.[20]  (Decl. Ex. 6)

### B.   The First Lien Agent Has A Perfected
   Interest In The Deposit Accounts Held By Wells Fargo

The Committee alleges the First Lien Defendants failed to perfect their security interest

in certain deposit accounts "because they have failed to enter into account control agreements

with Debtors over [those] accounts . . . ."  (Am. Compl. ¶ 257.)  The deposit accounts that were

held by Wells Fargo, however, were perfected by virtue of UCC § 9-314, which states that "[a]

security interest in investment property, deposit accounts, letter-of-credit rights, or electronic

---

[19]    As noted, supra at 8, these claims should be dismissed against First Lien Defendants that do not hold liens.

[20]    The UCC Financing Statement states that the collateral includes "all assets of the debtor whether now existing hereafter arising."  (Decl. Ex. 6 at 1).

32

chattel paper may be perfected by control of the collateral under Section 9-104 . . . ."  Section 9-

104 provides that a secured party has control of a deposit account if "the secured party is the

bank with which the deposit account is maintained."  UCC § 9-104.[21]

    The First Lien Agent has thus a perfected security interest in all deposit accounts held at

Wells Fargo, as the administrative agent and the bank "with which the deposit account is

maintained."  See UCC § 9-104; (Decl. Ex. 7); Joseph Stephens & Co., Inc. v. Cikanek, 588 F.

Supp. 2d 870, 875 (N.D. Ill. 2008) (finding a bank's interest in a deposit account automatically

perfected because the bank maintained the account and thus controlled the account).  The First

Lien Agent did not need to take any further action with respect to perfecting its interest in

deposit accounts it holds.

### C.  The Amended Complaint Fails To State A Claim That The First Lien Agent Is Unperfected With Respect To The Debtors' Other Accounts

    As to the remaining deposit accounts, the Amended Complaint fails to identify which, if

any, are not held at Wells Fargo.  Further, even if the Committee had so alleged, the Committee

fails to allege any non-collateral source for the cash in such accounts because, the First Lien

Agent has perfected liens on the overwhelming bulk of the Debtors' (cash generating) assets.

The cash is the proceeds of the First Lien Lenders' collateral and therefore protected.  See UCC

§ 9-315(a)(2) ("a security interest in proceeds is a perfected security interest if the security

interest in the original collateral was perfected"); Marathon Petroleum Co. v. Cohen (In re Delco

Oil, Inc.), 599 F.3d 1255, 1260 (11th Cir. 2010) (holding that cash in deposit account was

perfected despite the lack of a control agreement because it was proceeds of collateral subject to

---

[21]    Per the Official Comment to the UCC, "[t]he effect of this provision is to afford the bank automatic
perfection.  No other form of public notice is necessary; all actual and potential creditors of the debtor are
always on notice that the bank with which the debtor's deposit account is maintained may assert a claim
against the deposit account."  UCC § 9-104 cmt. 3.

Americas 92234977

a perfected lien).  Here, the Amended Complaint fails to allege that the cash in any account was

not the proceeds of the First Lien Lenders' collateral.

### D.  The First Lien Agent Has A Perfected
### Security Interest In The Letter Of Credit Rights

The Amended Complaint's allegations regarding the Debtors' letter of credit rights are

similarly deficient.  The Committee alleges that the First Lien Defendants do not have liens in

certain of the Debtors' letter of credit rights due to a lack of control over such assets.  UCC § 9-

308(d) expressly states that a security interest in a letter of credit right that serves as a

supporting obligation for collateral is perfected without control to the extent that the lien in the

underlying collateral is perfected.  Here, the Amended Complaint does not allege that liens on

any such underlying collateral are unperfected and therefore does not state a claim.

### E.  The Amended Complaint's Thirteenth Cause Of Action
### Fails To State A Claim Upon Which Relief Can Be Granted

The Thirteenth Cause of Action seeking avoidance of liens does not identify the property

at issue or the attendant state law, thus requiring dismissal.  In Pitt Penn Holding Co. the

bankruptcy court dismissed a section 544 claim, holding that:

> [T]he Plaintiff has failed to allege the applicable state law upon which its § 544
> claim is grounded, and its failure to identify the applicable law necessitates the
> Court to conclude that [the defendant] has received insufficient notice of the
> Plaintiff's allegations against it with respect to this claim. Case law, especially in
> light of Twombly and Iqbal, provides that inadequate notice requires the Court to
> dismiss the Plaintiff's § 544 claim for failure to state a claim upon which relief
> can be granted.

See Indus. Enters. of Am. v. Tabor Acad. (In re Pitt Penn Holding Co.), Nos. 09-11475, 11-

51879, 2011 Bankr. LEXIS 3554, at *35 (Bankr. D. Del. Sept. 16, 2011).  Such is the case here.

The Amended Complaint does not reasonably identify the "Unperfected Collateral," let alone

34

the state laws that the Committee hopes to use to avoid the First Lien Defendants' purportedly

unperfected liens.  Indeed, the Amended Complaint does not even allege that such laws exist.[22]

## VI.    The Amended Complaint Fails To State A Claim That The First Lien Defendants Aided And Abetted A Breach Of Fiduciary Duty

In the Fifteenth Cause of Action, the Committee alleges that all Defendants, including,

the First Lien Defendants, aided and abetted breaches of fiduciary duties owed by the SUNE

board to the Debtors by "avoiding filing for bankruptcy within the preference period."  (Am.

Compl. ¶ 276.)  The Amended Complaint, however, fails to allege either a breach of fiduciary

duty or any conduct by the First Lien Defendants aiding and abetting such breach.[23]

To determine that applicable law governing the Committee's claim, "New York courts

have taken three approaches to deciding which state's law applies to an aiding and abetting

breach of fiduciary duty claim: an internal affairs approach, a torts based 'greatest interest'

approach, and a hybrid approach."  Marino v. Grupo Mundial Tenedora, S.A., 810 F. Supp. 2d

601, 612 (S.D.N.Y. 2011).  Under the internal affairs doctrine, "the law of the Debtor's state of

incorporation" governs.  Hydrogen, 431 B.R. at 350.  Alternatively, "other courts have

classified the aiding and abetting cause of action as a tort claim and accordingly applied

traditional tort conflicts of laws principles to determine the applicable state law."  Id.  Under

that approach, the tort occurred where the related economic losses were sustained, which is the

---

[22]    See also Global Link Liquidating Tr. v. Avantel, S.A. (In re Global Link Telecom Corp.), 327 B.R. 711, 718 (Bankr. D. Del. 2005) (dismissing fraudulence conveyance claims for failure to identify "the applicable state law, the legal standard, or any relevant facts").

[23]    The Fifteenth Cause of Action is also barred by the in pari delicto doctrine.  The First Lien Defendants adopt and incorporate by reference the Second Lien Defendants' arguments for dismissal on this ground.

Americas 92234977

relevant corporation's principal place of business.  Id.[24]  As explained in In re ICP Strategic

Credit Income Fund Ltd., the recent trend in this district is to apply the conflicts principles

applicable to torts and to apply the law where the injury was sustained, i.e. the principal place of

business.  No. 13-12116, 2015 WL 5404880, at *11 (Bankr. S.D.N.Y. Sept. 15, 2015).

Here, SUNE's principal place of business is Missouri, where SUNE has its corporate

headquarters, and is incorporated in Delaware.  Regardless of whether Missouri or Delaware

law applies, the Fifteenth Cause of Action should be dismissed.

### A. Missouri Does Not Recognize A Claim For Aiding And Abetting Breach Of Fiduciary Duty

The Missouri Supreme Court has not recognized a common law tort for aiding and

abetting a breach of a fiduciary duty.  In Blair v. City of Hannibal, the Eastern District of

Missouri dismissed an aiding and abetting claim, holding that that the Supreme Court of

Missouri would not adopt this theory of liability:

> This Court extensively reviewed case law pertaining to aiding and abetting claims in
> Missouri in Jo Ann Howard & Assoc., P.C. v. Cassity, and came to the conclusion the
> Missouri Supreme Court would decline to adopt this substantial assistance theory of
> liability . . . Plaintiffs' aiding and abetting claim on the basis of the 'substantial
> assistance' theory will not stand.

No. 15-00061, 2016 WL 1449532, at *8 (E.D. Mo. Apr. 13, 2016).  If the Court determines that

Missouri law applies, it should dismiss the Fifteenth Cause of Action for this reason.

### B. No Aiding And Abetting Breach Of Fiduciary Duty Claim Is Stated Under Delaware Law

In Delaware, "[t]o survive a motion to dismiss, the complaint must allege facts that

satisfy the four elements of an aiding and abetting claim: '(1) the existence of a fiduciary

---

[24]    Some courts apply a "hybrid" approach, saying that the internal affairs doctrine applies but that it is
not applied in every case, "particularly if some other state has an overriding interest in [the] dispute."  See
Marino, 810 F. Supp. 2d at 613 (discussing approach).

36

relationship, (2) a breach of the fiduciary's duty . . . (3) knowing participation in that breach by

the defendants,' and (4) damages proximately caused by the breach." <u>Malpiede</u> v. <u>Townson</u>,

780 A.2d 1075, 1096 (Del. 2001); <u>see also</u> <u>Radnor Holdings Corp.</u>, 353 B.R. at 842.[25]  Here the

Committee's claim fails because the Amended Complaint fails to allege a breach of fiduciary

duty by the SUNE Board and fails to allege that the First Lien Defendants knowingly

participated in any breach.

### 1.    The Committee Fails To Allege Any Breach Of A Fiduciary Duty

Under Delaware law, directors owe fiduciary duties of care and loyalty.  The Amended

Complaint does not purport to identify a breach of the duty of care.  With respect to the duty of

loyalty, the Committee alleges in conclusory fashion that "the Board had fiduciary duties to the

Debtors that preclude them from acting to further their self-interest to the prejudice of the

Debtors."  (Am. Compl. ¶ 275.)

The duty of loyalty mandates that the best interest of the corporation and its shareholders

takes precedence over any interest possessed by a director, officer, or controlling shareholder and

not shared by the stockholders generally.  <u>See</u>, <u>e.g.</u>, <u>Official Comm. of Unsecured Creditors v.</u>

<u>Goldman Sachs Credit Partners L.P. (In re Fedders North America, Inc.)</u>, 405 B.R. 527, 539

(Bankr. D. Del. 2009).  A claim for a breach of the duty of loyalty requires a showing that a

fiduciary was on both sides of a transaction and that the transaction was not entirely fair to the

company.  <u>Id.</u> at 540.  Plaintiff never identifies what self-interest SUNE's directors had in

"avoiding filing for bankruptcy within the preference period," (Am. Compl. ¶ 276), or why such

---

[25]    To the extent that the court determines that Missouri law applies, but that Missouri would recognize the tort of aiding and abetting breach of fiduciary duty, the elements of such a claim would likely be substantially identical to the elements in Delaware.

37

decision as to the filing for bankruptcy was otherwise improperly infected with self-dealing. Thus no breach of fiduciary duty is alleged.[26]

### 2. The Committee Fails To Allege That The First Lien Defendants Knowingly Participated In Any Breach Of Fiduciary Duty

The Amended Complaint does not advance any allegations of knowledge, much less "participation" or "inducement" of any alleged breach and therefore fails to state a claim. See Malpiede, 780 A.2d at 1097 (to satisfy the "knowing participation" element, a plaintiff must establish that the defendant acted "with the knowledge that the conduct advocated or assisted constitutes such a breach [of fiduciary duty].").

First, the Amended Complaint's own allegations disprove any suggestion that the First Lien Defendants had knowledge of any breach of a fiduciary duty. To the contrary, the Amended Complaint concedes that the First Lien Defendants were unaware of SUNE's financial improprieties and actually believed that "SUNE would quickly rebound from its liquidity crunch." (Am. Compl. ¶ 133.) Far from knowingly assisting the breach of any fiduciary duties, the Amended Complaint describes how the First Lien Defendants were operating under the impression that their actions would help the company avoid filing for bankruptcy.

Second, the Fifteenth Cause of Action fails to allege that the First Lien Defendants participated in any such breach, and instead lumps all 96 named Defendants together, claiming that they "used their influence to induce, coerce, and substantially contribute to SUNE's avoiding filing for bankruptcy within the preference period."[27]  (Am. Compl. ¶ 276.)  Such

---

[26]    Indeed, even when a corporation is insolvent, a board is under no fiduciary duty to file for bankruptcy protection.  Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P., 906 A.2d 168, 204 (Del. Ch. 2006) ("Delaware law imposes no absolute obligation on the board of a company that is unable to pay its bills to cease operations and to liquidate.").

[27]    Although no conduct is alleged, as required, the only allegation concerning the preference period broadly asserts that unspecified "Defendants" "expressly acknowledged potential preference liability."  (Am.

*(cont'd)*

38

shotgun pleading is insufficient as a matter of law.  See Sabine, 547 B.R. at 563–64 (dismissing

aiding and abetting breach of fiduciary duty claim and accepting argument that the "Complaint is

based entirely on conclusory statements concerning the 'Secured Parties' (*i.e.,* lumping together

the [New] RBL Lenders and the Second Lien Lenders as if they are one and the same) and

cannot possibly meet the pleading standard of Rule 8(a) of the Federal Rules of Civil

Procedure.") (applying New York law); see also Radnor Holdings Corp., 353 B.R. at 842

(finding that where complaint alleged only participation in complained-of transactions and failed

to allege that defendant participated in a scheme to defraud or breach fiduciary duties, no claim

for breach of fiduciary duty would be sustained) (applying Delaware law).   The Amended

Complaint lacks any allegations regarding how the First Lien Defendants' actions—*i.e.* granting

consent to SUNE to increase its debt—aided or abetted delaying the company's bankruptcy

filing outside of the 90-day preference period.  Without any allegations suggesting that the First

Lien Defendants substantially assisted any breach of a fiduciary duty, the Committee's aiding

and abetting claim fails.

## **CONCLUSION**

The Sixth, Ninth, Tenth, Eleventh, Twelfth, Thirteenth, Fourteenth and Fifteenth Causes

of Action should accordingly be dismissed with prejudice against the First Lien Defendants.


Dated: November 22, 2016
       New York, New York

                                        Respectfully Submitted

                             By:    */s/ Douglas P. Baumstein*
                                    WHITE & CASE LLP

---

*(cont'd from previous page)*
Compl. ¶ 162.)   The mere acknowledgement of the law cannot be conduct that constitutes "knowing
participation" in a breach.

Americas 92234977

Scott Greissman
Douglas P. Baumstein
Elizabeth Feld
1155 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 819-8200

*Counsel for*

Goldman Sachs Bank USA,
KeyBank National Association,
Morgan Stanley Senior Funding, Inc.
and Compass Bank

LATHAM & WATKINS
Christopher Harris
885 Third Avenue
New York, NY 10022
Telephone: (212) 906-1200

*Counsel for*

Wells Fargo Bank N.A.

40

# APPENDIX A

**FIGURE 1**



**FIGURE 2**



41

Americas 92234977

**FIGURE 3**



**SUNE 2.0% Convertible 2018 Notes**
(Issued on 1/12/13)

**FIGURE 4**



**SUNE 0.25% Convertible 2020 Notes**
(Issued on 6/5/14)

42

**FIGURE 5**



**SUNE 2.375% Convertible 2022 Notes**
(Issued on 1/27/15)

**FIGURE 6**



**SUNE 2.63% Convertible 2023 Notes**
(Issued on 5/20/15)

43

Americas 92234977