Kobre & Kim LLP
800 Third Avenue
New York, NY 10022
Telephone: (212) 488-1200
Michael S. Kim
Jeremy C. Hollembeak
Benjamin J.A. Sauter
Sara B. Gribbon

*Special Counsel to*
*Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 16-10992 (SMB) |
| SUNEDISON, INC., *et al.*, | : | (Jointly Administered) |
| | : | |
| Debtors.[1] | : | |
| --------------------------------------------------------- | : | |
| OFFICIAL COMMITTEE OF UNSECURED | : | |
| CREDITORS, on behalf of the estates of the | : | |
| Debtors, | : | |
| | : | Adversary Proceeding |
| Plaintiff, | : | No. 16-01228 (SMB) |
| | : | |
| v. | : | |
| | : | |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A); EverStream HoldCo Fund I, LLC (9564); Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757); SunE Minnesota Holdings, LLC (8926); SunE MN Development Holdings, LLC (5388); and SunE MN Development, LLC (8669).  The address of the Debtors' corporate headquarters is 13736 Riverport Dr., Maryland Heights, Missouri 63043.

WELLS FARGO BANK, N.A., in its capacity :
as administrative agent for the Prepetition First:
Lien Facility on behalf of all Prepetition First  :
Lien Lenders not individually named as      :
Defendants herein, WILMINGTON SAVINGS:
FUND SOCIETY, FSB, in its capacity as      :
successor administrative agent for the      :
Prepetition Second Lien Facility on behalf of  :
all Prepetition Second Lien Term Loan Lenders:
not individually named as Defendants herein,  :
WILMINGTON TRUST, NATIONAL      :
ASSOCIATION, in its capacity as Indenture  :
Trustee on behalf of all holders of      :
Prepetition Second Lien Notes not individually:
named herein and as Collateral Trustee under  :
the Prepetition Security Agreement, and    :
683 CAPITAL PARTNERS, LP, APOLLO    :
A-N CREDIT FUND (DELAWARE), LP,    :
APOLLO CAPITAL MANAGEMENT, LP    :
APOLLO CREDIT STRATEGIES MASTER  :
FUND LTD., BALDR MASON FUND INC.,  :
BANK OF AMERICA MERRILL LYNCH,    :
BANK OF AMERICA, NATIONAL      :
ASSOCIATION, BARCLAYS BANK PLC,    :
BBVA COMPASS BANK, BLACKROCK    :
FINANCIAL MANAGEMENT, INC.,      :
BRIGADE CAPITAL MANAGEMENT, LP,  :
BRIGADE DISTRESSED VALUE      :
MASTER FUND LTD., BRIGADE      :
LEVERAGED CAPITAL STRUCTURES    :
FUND LTD., CADBURY HEDGE FUND    :
ALTERNATIVES PORTFOLIO,      :
CANDLEWOOD FINANCIAL      :
OPPORTUNITIES FUND, LLC,      :
CANDLEWOOD FINANCIAL      :
OPPORTUNITIES MASTER FUND, LP,    :
CANDLEWOOD INVESTMENT GROUP,    :
CANDLEWOOD SPECIAL SITUATIONS    :
MASTER FUND, LTD, CASTLELAKE LP,  :
CENTERBRIDGE PARTERS L.P.,      :
CERBERUS CAPITAL MANAGEMENT, LP,:
CERBERUS INSTITUTIONAL PARTNERS  :
VI, LP, CIFC ASSET MANAGEMENT LLC, :
CITIBANK, N.A., CITICORP NORTH    :
AMERICA, INC., CITIGROUP FINANCIAL :
PRODUCTS INC., CITIGROUP GLOBAL    :

MARKETS, INC., CL III SOLUTIONS LLC,  :
CL IV SOLUTIONS LLC, CORBIN CAPITAL :
PARTNERS MANAGEMENT, LLC, CORBIN :
OPPORTUNITY FUND, L.P., CREDIT         :
SUISSE LOAN FUNDING, CREDIT            :
SUISSE AG CAYMAN ISLANDS,              :
CRESCENT 1, LP, CRS MASTER FUND, LP,:
CVI OPPORTUNITIES FUND I, LLLP, CWD:
OC522 MASTER FUND, LTD.,                :
CYRUS CANARY MASTER FUND, LP,      :
CYRUS CAPITAL PARTNERS, LP, CYRUS :
OPPORTUNITIES MASTER FUND II, LTD.,:
CYRUS SELECT OPPORTUNITIES          :
MASTER FUND, LTD., DEUTSCHE BANK :
AG CAYMAN ISLANDS, DEUTSCHE         :
BANK AG NEW YORK,                       :
EMPYREAN CAPITAL PARTNERS, LP,     :
EMPYREAN INVESTMENTS, LLC,            :
FLAGLER MASTER FUND SPC, LTD.,       :
ON BEHALF OF AND                        :
FOR THE ACCOUNT OF THE CLASS A     :
SEGREGATED PORTFOLIO, FLAGLER      :
MASTER FUND SPC, LTD., ON BEHALF    :
OF AND FOR THE ACCOUNT OF THE       :
CLASS B SEGREGATED PORTFOLIO,       :
FORT GEORGE INVESTMENTS, LLC,       :
GOLDMAN SACHS BANK, USA,              :
GREENLIGHT CAPITAL INC.,                :
HIGHBRIDGE INTERNATIONAL, LLC,      :
HIGHBRIDGE TACTICAL CREDIT &         :
CONVERTIBLES MASTER FUND, LP,        :
INVESTMENT PARTNERS IV (A), LLC,     :
JMB CAPITAL PARTNERS MASTER FUND:
LP, K SPECIAL OPPORTUNITY FUND, LP,:
KEYBANK NATIONAL ASSOCIATION,       :
KTRS CREDIT FUND, LP, LINCOLN         :
SQUARE FUNDING ULC, LORIN             :
CAPITAL MANAGEMENT LLC, LUXOR      :
CAPITAL GROUP, LP, LUXOR CAPITAL,   :
LLC, MACQUARIE CAPITAL (USA) INC.,  :
MANCHESTER SECURITIES CORP.,          :
MANGROVE PARTNERS, MARATHON        :
ASSET MANAGEMENT, LP, MARATHON    :
COURT SQUARE, LP, MARATHON           :
CREDIT DISLOCATION FUND, LP,          :
MARATHON LIQUID CREDIT LONG         :

SHORT FUND, MARATHON SPECIAL          :
OPPORTUNITY MASTER FUND, LTD.,        :
MARBLEGATE ASSET MANAGEMENT,          :
LLC, MARBLEGATE SPECIAL               :
OPPORTUNITIES MASTER FUND, LP,        :
MIHI LLC, MORGAN STANLEY SENIOR       :
FUNDING, INC., P MARBLEGATE LTD.,     :
PENTELI MASTER FUND, LTD.,            :
REDWOOD CAPITALMANAGEMENT,LLC:
SAINSBURY'S CREDIT                    :
OPPORTUNITIES FUND, LTD., SOUND       :
POINT CAPITAL MANAGEMENT, LP,         :
STRATEGIC VALUE MASTER FUND LTD.,:
STRATEGIC VALUE OPPORTUNITIES         :
FUND LP, STRATEGIC VALUE SPECIAL      :
SITUATIONS MASTER FUND III LP,        :
SVP ACQUISITIONS LLC,                 :
TENNENBAUM CAPITAL PARTNERS,          :
LLC, TENNENBAUM HEARTLAND CO-         :
INVEST, LP, TENNENBAUM SENIOR         :
LOAN FUND II, LP, TENNENBAUM          :
SENIOR LOAN FUND V, LLC,              :
TENNENBAUM SPECIAL SITUATIONS         :
FUND IX, LLC, TENNENBAUM SPECIAL      :
SITUATIONS FUND IX-S, LP,             :
TENNENBAUM SPECIAL SITUATIONS         :
IX-C, LP, TENNENBAUM SPECIAL          :
SITUATIONS IX-O, LP, THE MANGROVE     :
PARTNERS MASTER FUND, LTD., THE       :
ROYAL BANK OF CANADA, THE ROYAL:
BANK OF SCOTLAND PLC, WELLS           :
FARGO BANK,NATIONAL ASSOCIATION.:
                                      :
          Defendants.                 :

---

## AMENDED ADVERSARY COMPLAINT

The Official Committee of Unsecured Creditors (the "**Committee**" or "**Plaintiff**")

of SunEdison, Inc. ("**SUNE**") and certain of its affiliates in the above-captioned chapter 11

4

cases, as debtors and debtors in possession[2] (collectively, the "**Debtors**"), by and through its

undersigned counsel, on behalf of and as the representative of the Debtors' estates, and based

upon knowledge, information, belief, and the results of its investigation to date, alleges as

follows:

### NATURE OF ACTION

1.      This action concerns the fraudulent and preferential transfer of hundreds of

millions of dollars of value by the Debtors to their secured creditors shortly before the

commencement of these chapter 11 bankruptcy proceedings, to the substantial detriment of the

Debtors' unsecured creditors.  Also at issue are amounts that the Debtors' secured creditors are

improperly claiming in these bankruptcy proceedings, including but not limited to

approximately $200 million of unamortized "original issue discount" arising from the

fraudulent transfers at issue.

2.      In January 2016, in an effort to put off the day of reckoning for the gross financial

manipulations they deployed to hide their failed business strategy and mismanagement, the

Debtors hastily granted a sweetheart deal to their first- and second-lien creditors.  The Debtors

knew that, once they lost the ability to access new capital, it would be only a matter of time

before their financial improprieties were discovered, leaving them little choice but to seek

bankruptcy protection.  Having raised $24 billion in capital since 2013 through the debt and

equity markets, the Debtors were unwilling to seek new third-party financing.  Instead, the

Debtors turned to their existing lenders, consummating a series of transactions in January 2016

---

[2] SUNE and its affiliate debtors in the above-captioned chapter 11 cases are referred to collectively herein as (the
"**Debtors**").

that they disguised to the public as business-as-usual for their self-described "deal-making" business.

3.      Specifically, the Debtors structured the January 2016 transactions to (i) replace some of their outstanding unsecured notes with substantially more valuable secured notes; and (ii) grant their existing secured creditors a substantially expanded package of liens on and guarantees by SUNE's previously unencumbered subsidiaries for little or no consideration. Given their undisclosed toxic financial condition, the Debtors knew that this latest borrowing, by pledging whatever remaining unencumbered assets they had to their secured creditors, would hinder, delay and defraud their existing and future unsecured creditors not *if* but *when* the money to perpetuate their financial improprieties eventually ran out.

4.      As it turned out, "eventually" was only a matter of weeks.  Within 30 days of the closing of the January 2016 transactions, on February 13th, 2016, counsel for one of the second lien lenders acknowledged that the debtors were headed not just for a bankruptcy filing, but a piecemeal liquidation rather than a reorganization.  Once this realization set in, the secured lenders brought to bear the significant control they had obtained through the January 2016 transactions, dictating as a *de facto* insider the Debtors' decision-making process as it prepared for, commenced, and proceeded with these Chapter 11 cases.  Perhaps most egregious among their efforts to insulate their recently enhanced claims from avoidance as fraudulent and preferential transfers, the secured lenders made sure the Debtors waited exactly three months and ten days to file for bankruptcy, thus avoiding the 90-day window applicable to preferential transfers under the Bankruptcy Code for non-insiders.  On April 21, 2016, with the prepetition secured lenders (and by then, proposed-DIP financiers) firmly in the driver's seat, and Debtors filed for chapter 11 bankruptcy.

5.      As if those efforts were not enough, the secured creditors are now making bankruptcy claims for hundreds of millions of dollars of value to which they are not entitled under the Bankruptcy Code, including approximately US $200 million in OID that should not and cannot be allowed under the Bankruptcy Code.

6.      By this action, as described more fully below, the Committee seeks to recover amounts wrongfully transferred by the Debtors to the secured creditors, and to invalidate amounts improperly claimed by the secured creditors in these bankruptcy proceedings.

## JURISDICTION

7.      This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

8.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

9.      Venue is proper before the Court pursuant to 28 U.S.C. § 1409.

## PROCEDURAL HISTORY

10.     On April 21, 2016 (the "**Petition Date**"), certain of the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").[3]  The Debtors' chapter 11 cases are being jointly administered pursuant to Fed. R. Bankr. P. 1015(b) [Docket No. 66].  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, neither a trustee nor an examiner has been appointed in these chapter 11 cases.

---

[3] The remaining Debtors subsequently petitioned for chapter 11 relief.

11.     On April 29, 2016, the U.S. Trustee for the Southern District of New York appointed the seven member Committee pursuant to section 1102(a)(1) of the Bankruptcy Code [Docket No. 148].

12.     On June 9, 2016, the Court entered the Final DIP Order [Docket No. 523].4  The Final DIP Order provided that the Committee, or any other party in interest, would have until 75 days after the entry of the Final DIP Order to challenge the validity of the Debtors' Prepetition Obligations or the validity of the liens on the Prepetition Collateral securing the Prepetition Obligations (the "**Challenge Period**").  Final DIP Order ¶ 9.  The Challenge Period was originally set to expire on August 23, 2016, but the deadline was extended to October 20, 2016 by stipulation.  *See* Second Stipulation and Order Further Extending Challenge Period With Respect to Prepetition Secured Parties [Docket No. 1317].

## PARTIES

13.     Plaintiff was duly appointed on April 29, 2016 by the Office of the U.S. Trustee pursuant to 1102(a)(1) of the Bankruptcy Code [Docket No. 148].

14.     United States Bankruptcy Judge Bernstein conferred standing on Plaintiff to prosecute this Complaint at the April 22, 2016 hearing in In re SunEdison, Inc., No. 16 Br. 10992 (Bankr. S.D.N.Y). See First Day Hearing Transcript [Docket No. 147] at 65:16–20.

15.     Upon information and belief, Defendant Wells Fargo Bank, National Association ("**Wells Fargo Bank, National Association**") is a California incorporated national bank and

---

4  The "**Final DIP Order**" refers to the Final Order (I) Authorizing Debtors To (A) Obtain Senior Secured, Superpriority, Postpetition Financing Pursuant To Bankruptcy Code Section 105, 361, 362, 364(C)(1), 364(C)(3), 364(D)(1), and 364(E) and (B) Utilize Cash Collateral Pursuant To Bankruptcy Code Section 363, And (II) Granting Adequate Protection To Prepetition Secured Parties Pursuant To Bankruptcy Code Sections 361, 362, 363, And 364.

federally insured financial institution, with its principal place of business at 420 Montgomery Street, San Francisco, California 94101.

16.    Upon information and belief, Defendant Wilmington Savings Fund Society, FSB ("**Wilmington Savings**") is a Delaware incorporated corporation, with its principal place of business at 500 Delaware Avenue, Wilmington, Delaware 19801.

17.    Upon information and belief, Defendant Wilmington Trust, National Association ("**Wilmington Trust**") is a Delaware incorporated corporation, with its principal place of business at 1100 North Market Street, Wilmington, Delaware 19890.

18.    Upon information and belief, Defendant 683 Capital Partners, LP ("**683 Capital**") is a Delaware incorporated foreign limited partnership, with its principal place of business at 3 Columbus Circle, Suite 2205, New York, New York 10019.

19.    Upon information and belief, Defendant Apollo A-N Credit Fund (Delaware), LP ("**Apollo A-N**") is a Delaware incorporated foreign limited partnership, with its principal place of business at 9 West 57th Street, Floor 43, New York, New York, 10019.

20.    Upon information and belief, Defendant Apollo Capital Management, LP ("**Apollo Capital**") is a Delaware incorporated foreign limited partnership, with its principal place of business at 9 West 57th Street, Floor 43, New York, New York, 10019.

21.    Upon information and belief, Defendant Apollo Credit Strategies Master Fund Ltd. ("**Apollo Credit**") is a Delaware incorporated foreign limited partnership, with its principal place of business at 9 West 57th Street, Floor 43, New York, New York, 10019.

22.    Upon information and belief, Defendant Baldr Mason Fund Inc. ("**Baldr**") is a company registered in Cayman Islands, with its executive office at 71 Tower Road, Office 4, Sliema, SLM 1609.

23.    Upon information and belief, Defendant Bank of America Merrill Lynch ("**Bank of America Merrill Lynch**") is a global banking and global markets businesses, with its executive office at 100 North Tryon Street, Charlotte, North Carolina 28255.

24.    Upon information and belief, Defendant Bank of America, National Association ("**Bank of America, NA**") is an American multinational banking and financial services corporation, with its executive office at 100 North Tryon Street, Charlotte, North Carolina 28255.

25.    Upon information and belief, Defendant Barclays Bank PLC ("**Barclays**") is a British multinational banking and financial services company, with its principal place of business at 1 Churchill Place, London, E14 5HP, United Kingdom.

26.    Upon information and belief, Defendant BBVA Compass Bank ("**BBVA**") is an Alabama incorporated foreign business corporation, with its executive office at 15 South 20th Street, Suite 801, Birmingham, Alabama 35233, and maintains a branch at 1345 Avenue of the Americas, Floor 4, New York, New York 10105.

27.    Upon information and belief, Defendant BlackRock Financial Management, Inc. ("**BlackRock**") is a Delaware incorporated foreign business corporation, with its principal place of business at Park Avenue Plaza, 55 East 52nd Street, New York, New York 10055.

28.    Upon information and belief, Defendant Brigade Capital Management, LP ("**Brigade**") is a Delaware incorporated foreign limited partnership, with its principal place of business at 399 Park Avenue, Floor 16, New York, New York 10022.

29.    Upon information and belief, Defendant Brigade Distressed Value Master Fund Ltd. ("**Brigade Distressed**") is a Delaware incorporated foreign limited partnership, with its principal place of business at 399 Park Avenue, Floor 16, New York, New York 10022.

30.    Upon information and belief, Defendant Brigade Leveraged Capital Structures Fund Ltd. ("**Brigade Leveraged**") is a Delaware incorporated foreign limited partnership, with its principal place of business at 399 Park Avenue, Floor 16, New York, New York 10022.

31.    Upon information and belief, Defendant Cadbury Hedge Fund Alternatives Portfolio ("**Cadbury**") is a company registered in the Cayman Islands, with an executive office at Maples Corporate Services Limited, P.O. Box 309, Ugland House, George Town KY1-1104, Cayman Islands.

32.    Upon information and belief, Defendant Candlewood Financial Opportunities Fund, LLC ("**Candlewood Fund**") is a Delaware incorporated limited liability company, with its principal place of business at 777 3rd Avenue, Suite 19B, New York, New York 10017.

33.    Upon information and belief, Defendant Candlewood Financial Opportunities Master Fund, LP ("**Candlewood Master Fund**") is a Cayman Islands exempted limited partnership, with its principal place of business at 777 3rd Avenue, Suite 19B, New York, New York 10017.

34.    Upon information and belief, Defendant Candlewood Investment Group ("**Candlewood**") is a Delaware incorporated foreign limited partnership, with its principal place of business at 777 3rd Avenue, Suite 19B, New York, New York 10017.

35.    Upon information and belief, Defendant Candlewood Special Situations Master Fund, Ltd ("**Candlewood Special Master Fund**") is a Cayman Islands ordinary non-resident company, with its principal place of business at 777 3rd Avenue, Suite 19B, New York, New York 10017.

36.    Upon information and belief, Defendant CastleLake, LP ("**CastleLake**") is a Delaware incorporated foreign limited partnership, with its principal place of business at 4600 Wells Fargo Center, 90 South Seven Street, Minneapolis, Minnesota 55402.

37.    Upon information and belief, Defendant Centerbridge Partners L.P. ("**Centerbridge**") is a Delaware incorporated multi-strategy private investment limited partnership, with its principal place of business at 375 Park Avenue, New York, New York 10152.

38.    Upon information and belief, Defendant Cerberus Capital Management, LP ("**Cerberus**") is a Delaware incorporated foreign limited partnership, with its principal place of business at 875 Third Avenue, New York, New York 10022.

39.    Upon information and belief, Defendant Cerberus Institutional Partners VI, LP ("**Cerberus Institutional**") is a Cayman Islands exempted limited partnership, with its principal place of business at 875 Third Avenue, New York, New York 10022.

40.    Upon information and belief, Defendant CIFC Asset Management LLC ("**CIFC**") is a Delaware incorporated foreign limited liability company, with its principal place of business at 250 Park Avenue, Floor 5, New York, New York 10177.

41.    Upon information and belief, Defendant Citibank N.A. ("**Citibank**") is the consumer division of the American multinational financial services, Citigroup, with its executive office at 701 East 60th Street, Sioux Falls, South Dakota 57104.

42.    Upon information and belief, Defendant Citicorp North America, Inc. ("**Citicorp**") is a Delaware incorporated corporation, with its principal place of business at 399 Park Avenue, New York, New York 10043.

43.    Upon information and belief, Defendant Citigroup Financial Products Inc.
("**Citigroup Financial**") is a Delaware incorporated corporation, with its principal place of
business at 388 Greenwich Street, New York, New York 10013.

44.    Upon information and belief, Defendant Citigroup Global Markets, Inc.
("**Citigroup Global**") is a New York incorporated corporation, with its principal place of
business at 388 Greenwich Street, New York, New York 10013.

45.    Upon information and belief, Defendant CL III Solutions LLC ("**CL III**") is a
Delaware incorporated limited liability company, with its executive office at The Corporation
Trust Company, The Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware
19801.

46.    Upon information and belief, Defendant CL IV Solutions LLC ("**CL IV**") is a
Delaware incorporated limited liability company, with its executive office at The Corporation
Trust Company, The Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware
19801.

47.    Upon information and belief, Defendant Corbin Capital Partners Management,
LLC ("**Corbin Capital**") is a Delaware incorporated foreign limited liability company, with its
principal place of business at 590 Madison Avenue, Floor 31, New York, New York 10022.

48.    Upon information and belief, Defendant Corbin Opportunity Fund, L.P. ("**Corbin
Opportunity**") is a Delaware incorporated foreign limited liability company, with its principal
place of business at 590 Madison Avenue, Floor 31, New York, New York 10022.

49.    Upon information and belief, Defendant Credit Suisse Loan Funding ("**Credit
Suisse Loan Funding**") is a Swiss multinational financial services company, with its executive

office in Zurich, Switzerland, maintaining its principal place of business at 11 Madison
Avenue, New York, New York 10010.

50.    Upon information and belief, Defendant Credit Suisse AG Cayman Islands
("**Credit Suisse Cayman Islands**") is a Swiss multinational financial services company, with
its executive office in Zurich Switzerland, maintaining its principal place of business at CIBC
Financial Centre, Floor 5, 11 Dr. Roy's Drive, George Town, Cayman Islands.

51.    Upon information and belief, Defendant Crescent 1, LP ("**Crescent**") is a
Delaware incorporated limited partnership, with its principal place of business at 399 Park
Avenue, Floor 39, New York, New York 10022.

52.    Upon information and belief, Defendant CRS Master Fund, LP ("**CRS**") is a
Cayman Islands exempted limited partnership, with its principal place of business at 399 Park
Avenue, Floor 39, New York, New York 10002.

53.    Upon information and belief, Defendant CVI Opportunities Fund I, LLLP
("**CVI**") is a Delaware incorporated domestic limited partnership, with its principal place of
business at 1 Commerce Center, 1201 N. Orange Street, Suite 715, Wilmington, Delaware
19801.

54.    Upon information and belief, Defendant CWD OC 522 Master Fund, Ltd.
("**CWD**") is a Cayman Islands ordinary non-resident company, with its principal place of
business at 777 3rd Avenue, Suite 19B, New York, New York 10017.

55.    Upon information and belief, Defendant Cyrus Canary Master Fund, LP ("**Cyrus
Canary**") is a Cayman Islands exempted limited partnership, with its principal place of
business at 399 Park Avenue, Floor 39, New York, New York 10002

56.    Upon information and belief, Defendant Cyrus Capital Partners, LP ("**Cyrus Capital**") is a Delaware incorporated foreign limited partnership, with its principal place of business at 399 Park Avenue, Floor 39, New York, New York 10022.

57.    Upon information and belief, Defendant Cyrus Opportunities Master Fund II, Ltd. ("**Cyrus Opportunities**") is a Corporation, with its principal place of business at 399 Park Avenue, Floor 39, New York, New York 10022.

58.    Upon information and belief, Defendant Cyrus Select Opportunities Master Fund, Ltd. ("**Cyrus Select**") is a Cayman Islands ordinary non-resident company, with its principal place of business at 399 Park Avenue, Floor 39, New York, New York 10022.

59.    Upon information and belief, Defendant Deutsche Bank AG Cayman Islands ("**Deutsche Bank Cayman Islands**") is a subsidiary of Deutsche Holdings Malta Ltd., with its principal place of business at Boundary Hall, Cricket Square, 171 Elgin Avenue, P.O. Box 1984, George Town, Cayman Islands 1-1104.

60.    Upon information and belief, Defendant Deutsche Bank AG New York ("**Deutsche Bank New York**") is a German multinational financial services company, with its executive office in Frankfurt, Germany, maintaining its principal place of business at 60 Wall Street, New York, New York 10005.

61.    Upon information and belief, Defendant Empyrean Capital Partners, LP ("**Empyrean Capital**") is a Delaware incorporated foreign limited partnership, with its principal place of business at 10250 Constellation Boulevard, Suite 2950, Los Angeles, California 90067.

62.    Upon information and belief, Defendant Empyrean Investments, LLC ("**Empyrean Investments**") is a Delaware incorporated foreign limited liability company, with

its principal place of business at 10250 Constellation Boulevard, Suite 2950, Los Angeles, California 90067.

63.    Upon information and belief, Defendant Flagler Master Fund SPC, Ltd., on behalf of and for the account of the Class A Segregated Portfolio ("**Flagler Master Fund Class A**") is a limited entity, with its principal place of business at 777 3rd Avenue, Suite 19B, New York, New York 10017.

64.    Upon information and belief, Defendant Flagler Master Fund SPC, Ltd., on behalf of and for the account of the Class B Segregated Portfolio ("**Flagler Master Fund Class B**") is a limited entity, with its principal place of business at 777 3rd Avenue, Suite 19B, New York, New York 10017.

65.    Upon information and belief, Defendant Fort George Investments, LLC ("**Fort George**") is a Delaware incorporated limited liability company, with its principal place of business at 590 Madison Avenue, Floor 31, New York, New York 10022.

66.    Upon information and belief, Defendant Goldman Sachs Bank, USA ("**Goldman Sachs**") is a Delaware incorporated financial services company, with its principal place of business at 85 Broad Street, New York, New York 10004.

67.    Upon information and belief, Defendant Greenlight Capital, Inc. ("**Greenlight**") is a Delaware incorporated foreign business corporation, with its principal place of business at 140 East 45th Street, Floor 24, New York, New York 10017.

68.    Upon information and belief, Defendant Highbridge International, LLC ("**Highbridge International**") is managed by Highbridge Capital Management, LLC, a Delaware incorporated foreign limited liability company, with its principal place of business at 40 West 57th Street, Floor 33, New York, New York 10019.

69.    Upon information and belief, Defendant Highbridge Tactical Credit & Convertibles Master Fund, LP ("**Highbridge Tactical**") is managed by Highbridge Capital Management, LLC, a Delaware incorporated foreign limited liability company, with its principal place of business at 40 West 57th Street, Floor 33, New York, New York 10019.

70.    Upon information and belief, Defendant Investment Partners IV (A), LLC ("**Investment Partners**") is a limited liability company, with its principal place of business at 601 Union Street, Floor 56, Seattle, Washington 98101.

71.    Upon information and belief, Defendant JMB Capital Partners Master Fund, LP ("**JMB Capital**") is a California incorporated limited liability company, with its principal place of business at 1999 Avenue of the Stars, Suite 2040, Los Angeles, California 90067.

72.    Upon information and belief, Defendant K Special Opportunity Fund, LP ("**K Special**") is a Cayman Islands exempted limited partnership, with its principal place of Maples Corporate Services Limited, P.O. Box 309, Ugland House, George Town KY1-1104, Cayman Islands.

73.    Upon information and belief, Defendant KeyBank National Association ("**KeyBank**") is an American regional bank, with its executive office at Key Tower, 127, Public Square, Cleveland, Ohio 44114.

74.    Upon information and belief, Defendant KTRS Credit Fund, LP ("**KTRS**") is a limited partnership, with its principal place of business at 1 Bryant Park, Floor 38, New York, New York 10036.

75.    Upon information and belief, Defendant Lincoln Square Funding ULC ("**Lincoln Square**") is a British Columbia incorporated entity with its executive office at 1055 West Georgia Street, Vancouver, British Columbia, V6E4N7 Canada.

76.    Upon information and belief, Defendant Lorin Capital Management LLC ("**Lorin**") is a Delaware incorporated limited liability company, with its principal place of business at 721 Fifth Avenue, Suite 34G, New York, New York 10022.

77.    Upon information and belief, Defendant Luxor Capital Group, LP ("**Luxor Capital Group**") is a Delaware incorporated foreign limited partnership, with its principal place of business at 1114 Avenue of the Americas, Floor 29, New York, New York 10036.

78.    Upon information and belief, Defendant Luxor Capital, LLC ("**Luxor Capital**") is a Delaware incorporated limited liability company, with its principal, with its principal place of business at 1114 Avenue of the Americas, Floor 29, New York, New York 10036.

79.    Upon information and belief, Defendant Macquarie Capital (USA) Inc. ("**Macquarie**") is a Delaware incorporated limited liability company, with its principal place of business at 125 West 55th Street, Floor 22, New York, New York 10019.

80.    Upon information and belief, Defendant Manchester Securities Corp. ("**Manchester**") is a New York incorporated domestic business corporation, with its principal place of business at 40 West 57th Street, Floor 4, New York, New York 10019.

81.    Upon information and belief, Defendant Mangrove Partners ("**Mangrove**") is a Cayman Island incorporated foreign limited liability company, with its principal place of business at 645 Madison Avenue, Floor 14, New York, New York 10022.

82.    Upon information and belief, Defendant Marathon Asset Management, LP ("**Marathon Asset**") is a Delaware incorporated foreign limited partnership, with its principal place of business at 1 Bryant Park, Floor 38, New York, New York 10036.

83.    Upon information and belief, Defendant Marathon Court Square, LP ("**Marathon Court Square**") is a Delaware incorporated limited partnership entity, with its principal place of business at 1 Bryant Park, Floor 38, New York, New York 10036.

84.    Upon information and belief, Defendant Marathon Credit Dislocation Fund, LP ("**Marathon Credit**") is a Delaware incorporated limited partnership entity, with its principal place of business at 1 Bryant Park, Floor 38, New York, New York 10036.

85.    Upon information and belief, Defendant Marathon Liquid Credit Long Short Fund ("**Marathon Liquid**") is a Cayman Islands incorporated entity, with its principal place of business at 89 Nexus Way, Floor 2, Camana Bay KY1-1205, Cayman Islands.

86.    Upon information and belief, Defendant Marathon Special Opportunity Master Fund, Ltd. ("**Marathon Special Opportunity**") is a Cayman Islands ordinary non-resident company, with its principal place of business at 89 Nexus Way, Floor 2, Camana Bay KY1-1205, Cayman Islands.

87.    Upon information and belief, Defendant Marblegate Asset Management, LLC ("**Marblegate**") is a Delaware incorporated foreign limited liability company, with its principal place of business at 80 Field Point Road, Suite 101, Greenwich, Connecticut 06830.

88.    Upon information and belief, Defendant Marblegate Special Opportunities Master Fund, LP ("**Marblegate Special**") is a limited partnership, with its principal place of business at 80 Field Point Road, Suite 101, Greenwich, Connecticut 06830.

89.    Upon information and belief, Defendant MIHI LLC ("**MIHI**") is a Delaware limited liability company, with its principal place of business at 2042 Crandall Drive, San Diego, California 92111.

90.    Upon information and belief, Defendant Morgan Stanley Senior Funding, Inc.

("**Morgan Stanley**") is a Delaware incorporated foreign business corporation, with its

principal place of business at 1585 Broadway, New York, New York 10036.

91.    Upon information and belief, Defendant P Marblegate Ltd. ("**P Marblegate**") is a

British Virgin Islands incorporated limited entity, with its principal place of business at 900

Third Avenue, New York, New York 10022.

92.    Upon information and belief, Defendant Penteli Master Fund, Ltd. ("**Penteli**") is a

Cayman Islands limited entity, with its principal place of business at 1 Bryant Park, Floor 38,

New York, New York 10036.

93.    Upon information and belief, Defendant Redwood Capital Management, LLC

("**Redwood**") is a Delaware incorporated limited liability company, with its principal place of

business at 910 Sylvan Avenue, Englewood Cliffs, New Jersey 07632.

94.    Upon information and belief, Defendant Sainsbury's Credit Opportunities Fund,

Ltd. ("**Sainsbury**") is a Cayman Islands ordinary non-resident company, with its principal

place of business at Maples Corporate Serviced Limited, P.O. Box 309, Ugland House, South

Church Street, George Town KY1-1104.

95.    Upon information and belief, Defendant Sound Point Capital Management, LP

("**Sound Point**") is a Delaware incorporated foreign limited partnership, with its principal

place of business at 375 Park Avenue, Floor 25, New York, New York 10152.

96.    Upon information and belief, Defendant Strategic Value Master Fund Ltd

("**Strategic Value Master**") is a limited liability company, with its principal place of business

at 100 West Putnam Avenue, Greenwich, Connecticut 06830.

97.    Upon information and belief, Defendant Strategic Value Opportunities Fund LP

("**Strategic Value Opportunities**") is a limited partnership, with its principal place of business

at 100 West Putnam Avenue, Greenwich, Connecticut 06830.

98.    Upon information and belief, Defendant Strategic Value Special Situations Master

Fund III LP ("**Strategic Value Special Situations**") is a limited partnership, with its principal

place of business at 100 West Putnam Avenue, Greenwich, Connecticut 06830.

99.    Upon information and belief, Defendant SVP Acquisitions LLC ("**SVP**

**Acquisitions**") is a limited liability corporation, with its principal place of business at 100

West Putnam Avenue, Greenwich, Connecticut 06830.

100.  Upon information and belief, Defendant Tennenbaum Capital Partners, LLC

("**Tennenbaum**") is a Delaware incorporated foreign limited liability company, with its

principal place of business at 2951 28th Street, Suite 100, Santa Monica, California, 90405.

101.  Upon information and belief, Defendant Tennenbaum Heartland Co-Invest, LP

("**Tennenbaum Heartland**") is a Delaware incorporated limited partnership, with its principal

place of business at 2951 28th Street, Suite 100, Santa Monica, California, 90405.

102.  Upon information and belief, Defendant Tennenbaum Senior Loan Fund II, LP

("**Tennenbaum Senior II**") is a Delaware incorporated limited partnership, with its principal

place of business at 2951 28th Street, Suite 100, Santa Monica, California, 90405.

103.  Upon information and belief, Defendant Tennenbaum Senior Loan Fund V, LLC

("**Tennenbaum Senior V**") is a Delaware incorporated limited partnership, with its principal

place of business at 2951 28th Street, Suite 100, Santa Monica, California, 90405.

104.    Upon information and belief, Defendant Tennenbaum Special Situations Fund IX,

LLC ("**Tennenbaum Special IX**") is a Delaware incorporated limited partnership, with its

principal place of business at 2951 28th Street, Suite 100, Santa Monica, California, 90405.

105.    Upon information and belief, Defendant Tennenbaum Special Situations Fund IX-

S, LP ("**Tennenbaum Special IX-S**") is a Delaware incorporated limited partnership, with its

principal place of business at 2951 28th Street, Suite 100, Santa Monica, California, 90405.

106.    Upon information and belief, Defendant Tennenbaum Special Situations IX-C, LP

("**Tennenbaum Special IX-C**") is a Delaware incorporated limited partnership, with its

principal place of business at 2951 28th Street, Suite 100, Santa Monica, California, 90405.

107.    Upon information and belief, Defendant Tennenbaum Special Situations IX-O,

LP ("**Tennenbaum Special IX-O**") is a Delaware incorporated limited partnership, with its

principal place of business at 2951 28th Street, Suite 100, Santa Monica, California, 90405.

108.    Upon information and belief, Defendant The Mangrove Partners Master Fund,

Ltd. ("**Mangrove Partners**") is a Cayman Islands ordinary non-resident company, with its

principal place of business at 645 Madison Avenue, Floor 14, New York, New York 10022.

109.    Upon information and belief, Defendant The Royal Bank of Canada ("**RBC**") is a

Canadian multinational financial service company, with its principal place of business at One

Liberty Plaza, 165 Broadway, New York, New York 10006.

110.    Upon information and belief, Defendant The Royal Bank of Scotland PLC

("**RBS**") is a United Kingdom public liability company, with its principal place of business at

Gogarburn 175 Glasgow Road, Edinburgh EH12 1HQ, Scotland.

111.    Each of the Defendants has been identified by the Committee based on reasonable

inquiry, including, among other things, documents produced by the Debtors.

## FACTUAL BACKGROUND

### A.    DEBTORS AND THEIR BUSINESS

112.    The Debtors are a renewable-energy development company that plans, develops, owns, operates, and sells renewable energy power plants.  In addition, the Debtors provide asset management services in connection with renewable energy projects, which include operational, maintenance, monitoring, and reporting services.

113.    Debtor SUNE is the ultimate parent company of hundreds of domestic and foreign subsidiaries that include the remaining Debtors and many affiliated non-Debtors. These subsidiaries operate throughout the world, including in the United States, Canada, Mexico, Latin America, Europe, India, Malaysia, Singapore, Africa, the Middle East, Australia, and Asia.

114.    SUNE has two non-Debtor "YieldCo" subsidiaries — TerraForm Power, Inc. ("**TERP**") and TerraForm Global, Inc. ("**GLBL**") — that were formed to raise capital, purchase and hold completed energy projects, and contribute dividends to their  investors (including SUNE).  SUNE seeded TERP by contributing certain completed energy projects located in developed countries (e.g., North America, the United Kingdom, and Chile).  On July 22, 2014, SUNE completed the initial public offering of TERP.  Subsequently, SUNE seeded GLBL by contributing completed energy projects located in emerging markets (e.g., Brazil, China, and India).  On August 5, 2015, SUNE completed the initial public offering of GLBL.  Plaintiffs currently are investigating potential estate claims against TERP and GLBL that will bring significant value to the estates and their unsecured creditors and intend to seek standing in the near term.

### B.    AGGRESSIVE AND FAILED ACQUISITIONS KICKSTART A LIQUIDITY CRISIS.

115.    The Debtors describe their business as one of "deal-making." They have relied heavily on the capital markets to fuel this business, including through both debt and equity raises (by SUNE, TERP, and GLBL), and also the procurement of non-recourse financing. This business model, and the ability to close deals that it depended on, was crippled by, at first, a series of significant investments, and later, after the Debtors failed to establish adequate processes and controls to track capital, financial manipulation designed to conceal management's failures.

116.    SUNE had expanded aggressively in the years leading up to the petition date using borrowed and invested capital.  Indeed, between December 2013 and January 2016, SUNE committed to over $18 billion in acquisitions funded by approximately $24 billion of capital raised through debt and equity offerings.  SUNE's significant investments during this period included (i) the investment in the TERP IPO; (ii) the $2.4 billion acquisition of First Wind Holdings, LLC, a competing renewable energy project development company; (iii) the $525 million acquisition of wind projects from Atlantic Power Transmission, Inc.; and (iv) the investment in the GLBL IPO; and (v) the $2.2 billion commitment (at announcement) to purchase Vivint Solar, Inc. ("**Vivint**") (a member of the Committee).  Each of these acquisitions required cash or additional leverage, putting strain on SUNE's liquidity position.

117.    Although SUNE acknowledged in its first day filings with the Court that "[t]he creation of the YieldCos was a significant step in SUNE's growth as a global renewable energy development company," SUNE's investments in TERP and GLBL proved disastrous.  The YieldCos' creation "required intensive capital in order to build the YieldCos' portfolios prior to their IPOs and grow them thereafter."  This investment was based on the unfulfilled expectation that those entities would serve as buyers of projects developed by SUNE.  To the contrary, the

24

YieldCos' costs of capital were much higher than had been anticipated, limiting their ability to acquire SUNE projects.

118.    As SUNE expanded, a number of significant deals began to fail as a result of its unwillingness or inability to pay cash consideration.  In May 2015, SUNE agreed to a deal to acquire Latin American Power ("**LAP**") for a maximum aggregate consideration of US $677 million in a transaction set to close on September 30, 2015.  However, the deal did not close because SUNE declined to make a roughly US $335 million upfront payment, and the deal descended into litigation.  In July 2015, SUNE entered into a merger agreement with Vivint pursuant to which SUNE would acquire all outstanding shares of Vivint common stock for total consideration valued at $2.2 billion at the time of the announcement, and comprising a combination of cash, shares of SUNE common stock, and SUNE convertible notes to be issued in connection with the merger.  The Vivint transaction was never consummated, however.  On March 8, 2016, after SUNE failed to file its 10-K on time due to financial irregularities, Vivint terminated the merger agreement due to SUNE's failure to close the transaction and filed suit for breach of the agreement.

119.    Unsurprisingly, market indicators showed a growing lack of confidence in SUNE's business.  Following the announcement of the Vivint transaction, the stock prices of both SUNE and TERP declined.  Specifically, SUNE dropped by approximately two-thirds (from US $31.66 per share on July 20, 2015 down to US $10.40 per share on August 31, 2015) and continued to trend downward. TERP share prices followed a similar trajectory, falling from US $34.90 on July 20, 2015 down to US $22.50 on August 31, 2015.  The precipitous decline in the price of SUNE and TERP stocks came at an inopportune time – right before SUNE commenced the IPO of GLBL in August 2015.  Although SUNE commenced this IPO with the expectation of

raising additional capital to fund its operations, it found public demand for GLBL stock insufficient for the IPO to close on the offered terms.  Accordingly, in order to complete the offering, SUNE was forced to acquire US $30 million of Class A common stock of GLBL that it had expected the public to purchase.  This unexpected outlay of cash put further strain on SUNE's liquidity.

120.    Shortly thereafter, in September and October 2015, TERP share prices fell below a critical threshold for a margin loan that SUNE had entered into to finance its acquisition of First Wind Holdings, LLC.  As a result, SUNE incurred a mandatory obligation to repay the US $439 million balance of the loan.  This prepayment obligation further depleted SUNE's cash reserves.

## C.    FINANCIAL IMPROPRIETIES EXACERBATE DEBTORS' LIQUIDITY CRISIS AND CONTRIBUTE TO INSOLVENCY.

121.    As SUNE clung to its disastrous acquisition spree, it also failed to implement the processes and controls necessary to keep track of its growing capital structure, despite knowledge that such processes and control were necessary.  As SUNE's cash position declined to critical levels through 2015 and into 2016, rather than implement the necessary processes and controls, SUNE's management turned to manipulating financial reports and forecasts in an effort to delay and conceal the crisis.

122.    SUNE management ("**Management**") – including, without limitation, SUNE's Executive Vice President, Chief Financial Officer, and Chief Administrative Officer Brian Wuebbels, and SUNE's Vice President of Financial Planning and Analysis ("**FP&A**") Jeremy Avenier – is directly responsible for the lack of capital controls and tracking processes, and in fact used them to their advantage.   Monitoring SUNE's finances and forecasting cash flows were squarely within the scope of both Mr. Wuebbels' and Mr. Avenier's employment

responsibilities in their respective capacities in Management.  As such, they each had a duty to disclose the inadequacies they recognized in the cash forecasting systems.  Upon information and belief, neither did.

123.    Management knew that existing capital controls and trackers were woefully inadequate, and by failing to put sufficient controls in place, made it difficult, if not impossible, to track the movement of cash and SUNE's liquidity at any given time, enabling Management to hide SUNE's increasingly precarious liquidity position and their own failed business strategy. At least as early as May 2015, Management was made aware of the cash-forecasting problem, but did not make these problems known to the financial markets.

124.    Instead, Management took steps that assured the financial markets did not have an accurate view of SUNE's finances and liquidity.  Under Wuebbels and Avenier, Management routinely provided inaccurate and manipulated forecasts.

125.    SUNE's accounts payable quickly became a favorite lever used to manipulate SUNE's finances after it became clear to Management, including Wuebbels and Avenier, that SUNE faced serious liquidity problems and could not pay all of its obligations as they became due.  Mr. Wuebbels and Mr. Avenier recognized the need to manipulate the accounts payable to mask the insolvency, and were each involved in the decisions to do so.  For example, as early as July 2015, Senior Vice President of Finance Manavendra Sial told Mr. Wuebbels and Chief Executive Officer Ahmad Chatila that individual teams had been directed to free up trapped cash that had already been committed to projects.  In August 2015, after one employee complained about a freeze on payments to vendors, Mr. Manavendra was asked to silence the employee and remind him not to send emails on the subject.  After the State of Massachusetts threatened legal action for an overdue tax payment, one employee acknowledged that it was the result of SUNE's

cash crisis, and that the need for working capital had caused other employees to violate their fiduciary responsibilities.

126.    Management's manipulation of accounts payable proved insufficient to alleviate the liquidity crisis.  By mid-September 2015, Management had acknowledged that it could not continue running the business in this manner and that the cash situation was and would continue to be unsustainable.  A freeze was placed on all cash movement other than payroll or debt covenant payments through the end of the quarter; contractors were not paid as obligations became due.

127.    Making matters worse, Management itself had lost any reliable visibility into SUNE's finances and liquidity position.  On November 1, 2015, Executive Vice President of Global EPC & Global Asset Management, Michael Alvarez, acknowledged that he was having trouble tracking and balancing the payments because of the way money was being moved from the projects, and he understood that sooner or later the scheme would catch up with itself. One day later, on November 2, 2015, Chief Operating Officer Pancho Perez lamented that he was receiving no support and that SUNE effectively had no cash forecast.

128.    Once again, rather than implementing effective processes and controls, Management turned to more egregious mechanisms of financial manipulation.  Management intentionally defrauded the market and SUNE's creditors by attempting to bury errors and adjust its artificial forecasts by going back and editing the forecasts to show new money or moving money around.

129.    Led by Mr. Wuebbels and Mr. Avenier, Management encouraged the FP&A team to manipulate numbers by issuing what they called "challenges."  Where the FP&A team used a realistic number that failed to meet forecasting goals, Management would "challenge" the FP&A

team to hit a higher number by using unrealistic assumptions that would allow them to satisfy

their goals.   For example, on November 13, 2015, Jeremy Avenier stated that a particular cash

forecast for the first quarter of 2016 was unacceptable and directed the team to set new

"challenges" to find an offset.  Mr. Groves in particular attempted to cover up forecasting

discrepancies in November 2015 before bringing them to anyone's attention.

130.   Management even instituted a rule that was intentionally designed to hide

SUNE's insolvency.  Specifically, Management required that each weekly cash forecast show

US $50 million in free cash, a requirement that could only be achieved through manipulation of

SUNE's finances.  For example, in early December 2015, Management knew that cash flow

would be substantially negative through the end of 2016, yet plotted ways to "push" and

manipulate its cash flow forecast in order to achieve a minimum balance of US $50 million on

paper.  On December 29, 2015, just days before the January 2016 Transactions, Mr. Avenier told

a subordinate to hold payments committed to a project because of concerns about breaking a

contract covenant.

131.   All of these financial manipulations were intended to conceal SUNE's liquidity

crisis and insolvency.

**D.    THE JANUARY 2016 TRANSACTIONS EFFECT FRAUDULENT
       TRANSFERS AND HINDER, DELAY, AND DEFRAUD SUNE'S
       UNSECURED CREDITORS.**

132.   As described above, by late 2015, it had become clear internally to Management

that SUNE was in need of additional capital to continue to hide its lack of internal controls and

falsified financials.  In a last gasp effort to avoid exposure of their financial improprieties and

failed business strategy, Debtors hastily completed a series of transactions in January 2016

(collectively, the "**January 2016 Transactions**") that (i) replaced the Debtors' outstanding

unsecured notes with substantially more valuable second-lien secured notes; and (ii) granted the

Debtors' existing first- and second-lien creditors a substantially expanded package of liens on

and guarantees by SUNE's previously unencumbered subsidiaries.  The Debtors engaged in the

January 2016 Transactions with the actual intent to hinder, delay or defraud SUNE's existing and

future unsecured creditors.

133.    Upon information and belief, as a result of Management's gross financial

improprieties, the lenders involved in the January 2016 Transactions believed that SUNE would

quickly rebound from its liquidity crunch, and thus provided new money simply to improve their

own position within SUNE's capital structure.  The Prepetition Second Lien Lenders themselves

have alleged that they believed that SUNE still had significant value when they entered into the

January 2016 Transactions.  Moreover, at the first day hearing before the Bankruptcy Court,

counsel for the Prepetition Second Lien Lenders stated in open court that the Prepetition Second

Lien Lenders were provided with misleading information about SUNE's financials and were

misled about the dire nature of SUNE's liquidity. See First Day Hearing Transcript [Docket No.

147] at 41:4–20.

134.    Nonetheless, even if the secured creditors who benefitted from the January 2016

Transactions were not aware of the depths of SUNE's financial improprieties and insolvency,

they did realize that they were receiving an abnormally favorable deal.  At least one secured

creditor surmised that the real reason SUNE was willing to enter into a deal with such onerous

terms was that SUNE was trying to cover up its "shadiness" by avoiding having to raise money

on the public markets, where SUNE would need to be more transparent about its finances.

1.      **The Prepetition Second Lien Facilities Fraudulently Transfer Second Lien Creditors An Expanded Package Of Collateral, Guarantees And New Secured Notes.**

135.    SUNE achieved its momentary liquidity fix on January 11, 2016.  Pursuant to a second lien credit agreement, SUNE obtained a two-tranche term loan in a principal amount of US $725 million (the "**Prepetition Second Lien Term Loan**").  Tranche A of the Second Lien Term Loan, including both sub-tranches A-1 ("**Tranche A-1 Term Loan**") and A-2 ("**Tranche A-2 Term Loan**"), was issued with a combined 28.7 million warrants, which were immediately exercisable for a strike price of US $0.01.  These warrants had a fair value of approximately US $84 million at issuance.[5]

136.    Tranche A-1 of the Second Lien Term Loan was subject to an original issue discount ("**OID**") of 4.0% on the principal amount of US $500 million, meaning the Tranche A-1 lenders provided US $480 million of actual funding for the US $500 million in face amount of debt (the "**Tranche A-1 OID**").  In other words, Tranche A-1 of the Second Lien Term Loan was issued with US $20 million of OID.

137.    Because the Tranche A-1 Term Loan and Tranche A-2 Term Loan and warrants were issued together in an original issuance, the consideration received by SUNE was allocated between the loans and the warrants and resulted in US $84 million of OID on the Tranche A-1 Term Loan and Tranche A-2 Term Loan based on the fair market value of the warrants (the "**Warrant OID**").

138.    Proceeds from the Prepetition Second Lien Term Loan were used, among other things, to (i) pay off a US $169 million existing second lien term loan issued as of August 11,

---

[5]  Per Bloomberg, the market value of the warrants is based on the 10-day VWAP of $2.93 for the first 10 days of trading following the issuance of the warrants (January 8, 2016 to January 24, 2016), per warrant, multiplied by the number of warrants issued.

2015 (the "**2015 Prepetition Second Lien Term Loan**") issued by Goldman Sachs Bank USA

(the "**2015 Prepetition Second Lien Term Loan Defendant**"); and (ii) repay the remaining US

$5 million of principal outstanding on a margin loan provided by a group of financial institutions

(with Deutsche Bank as agent) in January 2015 in connection with SUNE's acquisition of First

Wind Holdings, LLC.

139.    Concurrently with the closing of the Prepetition Second Lien Term Loan, SUNE

also completed a series of "exchange transactions" for either debt or equity of SUNE.

140.    In one such exchange (the "**Debt Exchange**"), pursuant to an indenture dated as

of January 11, 2016, SUNE issued 5% second lien senior secured convertible notes in an

aggregate principal amount of US $225 million due on July 2, 2018 (the "**New Notes**," or

"**Prepetition Second Lien Notes**," and together with the Prepetition Second Lien Term Loan,

the Second Lien Credit Agreement ["**Prepetition Second Lien Facilities**"] and the lenders and

holders under the Prepetition Second Lien Facilities, ["**Prepetition Second Lien Lenders**"]) in

exchange for US $336 million of outstanding unsecured convertible notes (the "**Old Notes**").

141.    The Debt Exchange granted unsecured holders of the Old Notes guarantees and

security that they did not have under the Old Notes and represented no less than a 23% premium

to the value of the tendered notes.

142.    SUNE did not receive reasonably equivalent value in exchanging the Old Notes

for the New Notes.  Moreover, in exchanging the Old Notes for the New Notes, SUNE acted

with the actual intent to hinder, delay or defraud SUNE's existing and future unsecured creditors.

143.    In addition to the US $20 million OID on the Tranche A-1 Term Loan and the US

$84 million OID on the Tranche A-1 and Tranche A-2 Term Loans, the exchange of the Old

Notes, with a face value of US $336 million and market value of US $132 million,[6] for the New

Notes, with a face value of US $225 million and a market value of US $177 million,[7] represents

an additional US $93 million of OID (the "**Notes OID**") in favor of the Prepetition Second Lien

Lenders.

144.     Critically, as part of the January 2016 Transactions, the Prepetition Second Lien

Lenders who previously held unsecured Old Notes received liens in the form of equity pledges

on 15 entities, the Prepetition Guarantors, which were not previously encumbered or obligated

on the Old Notes and all of which are now among the debtors in this proceeding.  These

Prepetition Guarantors also provided guarantees ("**Debtor Guarantees**") for the Prepetition

Second Lien Facilities.  SUNE's and the Prepetition Guarantors' obligations under the

Prepetition Second Lien Facilities are secured by second priority liens on, and security interests

in, the same Prepetition Collateral that secures the Prepetition First Lien Facility (the

"**Prepetition Second Lien Collateral**").

145.     SUNE did not receive reasonably equivalent value in making the Debtor

Guarantees or granting the Prepetition Second Lien Collateral.  Moreover, in making the Debtor

Guarantees and granting the Prepetition Second Lien Collateral, SUNE acted with the actual

intent to hinder, delay or defraud SUNE's existing and future unsecured creditors.

146.     Pursuant to the terms of the security agreements for both the Prepetition First Lien

Facility and the Prepetition Second Lien Facilities (the "**Prepetition Security Agreements**"),

certain categories of collateral are expressly excluded from the Prepetition Collateral, including

35% of the voting equity interests in first tier foreign subsidiaries (the "**Foreign Equity Pledge**

**Limitation**"), equity interests in certain unrestricted subsidiaries, certain non–wholly owned

---

[6]Market value is based on Deutsche Bank Converts Desk pricing records on January 7, 2016.
[7]Market value is based on Deutsche Bank Converts Desk pricing records on January 8, 2016.

subsidiaries and non-recourse subsidiaries and "intent-to-use" trademarks. In addition, all assets

owned by entities that are not Prepetition Guarantors are not part of the Prepetition Collateral (all

assets described in this paragraph, collectively, the "**Excluded Assets**").

147.    While the Prepetition Second Lien Facilities may have resulted in an illusory

delay of the day of reckoning for Management's financial improprieties, the Prepetition Second

Lien Facilities were not, in form or substance, an out-of-court workout.  The Prepetition Second

Lien Lenders appear to have been misled about SUNE's true financial situation, and SUNE

remained saddled with unsustainable debt, corrupt management, a lack of critical financial

processes and controls, and no realistic hope of relief.

148.    In executing the Prepetition Second Lien Facilities, SUNE acted with the actual

intent to hinder, delay or defraud SUNE's existing and future unsecured creditors.

### 2.    The Prepetition First Lien Security Agreement Amendments Fraudulently Transfer First Lien Creditors An Expanded Package Of Collateral And Guarantees.

149.    In connection with the Prepetition Second Lien Facilities, SUNE also expanded

the collateral package securing the US $750 million senior secured first lien letter of credit

facility, dated as of February 28, 2014, (the "**Prepetition First Lien Facility**" and the lenders

thereunder the "**Prepetition First Lien Lenders**," and together with the Prepetition Second Lien

Lenders, the "**Prepetition Lender Defendants**").  The Prepetition First Lien Facility was

guaranteed by certain of SUNE's domestic subsidiaries (the "**Prepetition Guarantors**").

150.    The Prepetition First Lien Lenders supported the onerous Prepetition Second Lien

Facilities because they were able to extract better terms for the Prepetition First Lien Facility in

exchange for no consideration, other than approving the Prepetition Second Lien Facilities.  The

second lien deal expanded the collateral package underpinning the Prepetition First Lien Credit

Facility and allowed the Prepetition First Lien Lenders to negotiate many "lender friendly" terms and protection.

151.    Pursuant to the security agreement for the Prepetition First Lien Facility (the "**Prepetition First Lien Security Agreement**"), which was executed on February 28, 2014, SUNE's obligations and the Prepetition Guarantors' obligations under the Prepetition First Lien Facility were initially secured by first priority liens on and security interests in substantially all present and future assets of SUNE and the Prepetition Guarantors, including a pledge of the capital stock of certain domestic and foreign direct subsidiaries (including TERP) (all such collateral, collectively, the "**Prepetition First Lien Collateral**").  However, the First Lien Security Agreement contained an explicit general exclusion for pledges of equity interests in all Unrestricted Subsidiaries, except for certain enumerated Unrestricted Subsidiaries (including TERP).

152.    On October 6, 2014, the First Lien Security Agreement was amended to add equity pledges of certain additional unrestricted subsidiaries to the Prepetition First Lien Collateral, including the GLBL shares (the "**2014 First Lien Security Agreement Amendment**"). On January 11, 2016, concurrently with the January 2016 Transactions, the Prepetition First Lien Security Agreement was further amended to include, among other things, equity pledges of SunEdison Utility Holdings and each Warehouse Entity (as defined in the credit agreement for the Prepetition First Lien Facility) (the "**2016 First Lien Security Agreement Amendment**") , and together with the 2014 First Lien Security Agreement Amendment, the "**Prepetition First Lien Security Amendments**") to the Prepetition First Lien Collateral (and together with the Prepetition Second Lien Collateral, collectively, the "**Prepetition Collateral**").

153.    SUNE did not receive reasonably equivalent value in exchange for the Prepetition First Lien Security Amendments.  Moreover, by agreeing to the Prepetition First Lien Security Amendments SUNE acted with the actual intent to hinder, delay, or defraud its existing and future unsecured creditors.

154.    These collateral "top-up" transactions resulted in substantial assets of SUNE that were previously unencumbered becoming subject to liens.  Upon information and belief, SUNE entered into the Prepetition First Lien Security Amendments when it was insolvent and with the actual intent to hinder, delay or defraud SUNE's existing and future unsecured creditors.

**E.    THE MUSIC STOPS AND SUNE FILES FOR BANKRUPTCY**

155.    While the true state of SUNE's financial situation was unknown publicly at the time, the January 2016 Transactions left SUNE saddled with hundreds of millions of dollars of additional debt and set it on a course to an inevitable bankruptcy filing.  The January 2016 Transactions had little or no impact on SUNE ultimately avoiding a bankruptcy filing.

156.    Shortly after closing the January 2016 Transactions, and as a result of the control and influence they achieved over SUNE through those Transactions, SUNE's secured creditors began to understand the true state of SUNE's liquidity crisis.  In a February 13, 2016 email, the chief executive officer of one of the holders of the second lien debt came to believe that SUNE's stock was "wildly overvalued" and that "the entire market is focused on SUNE and nobody has any clue what is really going on."

157.    Legal troubles accelerated SUNE's financial decline.  On January 12, 2016, Appaloosa Investment LP I filed a stockholder derivative suit against SUNE in Delaware on behalf of TERP for alleged "breaches of fiduciary duty" in connection with certain proposed transactions between TERP and SUNE related to SUNE's plans to acquire Vivint.  The issue

later became moot when Vivint terminated the merger agreement following SUNE's failure to close the transaction. In addition, LAP shareholders sued for failure to close the transaction. On February 12, 2016, a New York court issued a Temporary Restraining Order prohibiting SUNE and TERP from "concealing, transferring or removing their assets, accounts or other property" without "fair consideration" in order to protect an "eventual international arbitration award" against SUNE with respect to the LAP transaction. *BTG Pactual Brazil Infrastructure Fund II, L.P. v. SunEdison, Inc.*, No. 650676-2016, Dkt. 61. SUNE's shares dipped below US $2.00 with the announcement of the LAP TRO. Shortly thereafter, SUNE reached a settlement with LAP.

158.    On February 29, 2016, SUNE announced that it was unable to file its 2015 financial results on time, due in part to an internal investigation tied to allegations that former SUNE executives made misstatements about the company's financial position and the lack of controls in monitoring cash flows. On March 8, 2016, Vivint filed suit against SUNE in Delaware for breach of the merger agreement.

159.    On March 16, 2016, SUNE publicly announced a delay in releasing its financials again due to "material weaknesses" in internal controls tied to "deficient information technology" – something Management had known internally for months.

160.    SUNE's misrepresentations regarding its financial position have been the subject of multiple investigations, including by the Board's Audit Committee. A few weeks before the Petition Date, the U.S. Department of Justice launched an investigation into, *inter alia*, SUNE's financing activities in connection with the previously proposed acquisition of Vivint and an investigation by the Board's audit committee. The U.S. Securities and Exchange Commission soon followed suit. And across the country, claims have been brought against SUNE's directors and officers alleging breaches of fiduciary duty and securities fraud arising out of, *inter alia*,

their failure to exercise good faith oversight over SUNE's operations and abdication of their

responsibility to ensure that SUNE maintained adequate internal controls.

161.    On April 4, 2016, GLBL initiated a lawsuit against SUNE in Delaware, alleging

breaches of fiduciary duty, a breach of contract, and unjust enrichment regarding GLBL's US

$231 million payment to SUNE with respect to completion of certain projects in India and

transfer of SUNE's equity interests in those projects to GLBL.

162.    As these events unfolded, Defendants used their leverage as secured creditors to

exercise control over SUNE in the weeks leading up to the bankruptcy filings.  Defendants, for

example, dictated the appointment of a chief restructuring officer, were involved in deciding

which entities would file for bankruptcy protection, and expressly acknowledged potential

preference liability in the event the filing was made within 90 days of the January 2016

Transactions.

163.    In addition to being intentionally and constructively fraudulent, Management and

at least some of the Defendants knew that certain aspects of the January 2016 Transactions,

including the Debt Exchange, constituted avoidable preferential transfers under section 547 of

the Bankruptcy Code.  Nonetheless, despite having received a letter from counsel to certain

unsecured creditors in April 2016 explaining that the 90-day preference period would apply to

the January 2016 Transactions and urging SUNE to file for bankruptcy protection precisely to

preserve any preference claim related to those transactions, upon information and belief, SUNE's

secured creditors influenced SUNE to delay filing for bankruptcy until after the 90-day

preference period had expired to insulate the Debt Exchange from avoidance.  Defendants did

this in order to protect themselves at the expense of SUNE and other creditors.

164.     The extent of Defendants' control over SUNE was particularly apparent in the

negotiations for post-petition financing that began in March 2016.  For instance, according to

Homer Parkhill, a Managing Director at Rothschild & Co., the financial advisor that assisted

SUNE in procuring postpetition financing, in early April 2016, SUNE reached an agreement in

principle with the D. E. Shaw group, which would have involved a "DIP to sale" of three groups

of projects, wherein the D. E. Shaw group would provide postpetition financing with the intent of

eventually purchasing the projects, but the deal fell apart because the Prepetition First Lien

Lenders and Prepetition Second Lien Lenders did not support it and instead wanted the projects

to be sold and to provide the DIP themselves for control and to roll-up their debt and maximize

their own recoveries to the detriment of SUNE and other creditors.  According to Parkhill, the D.

E. Shaw group deal would not have "change[d] our funding flexibility" in light of what the

Prepetition First Lien Lenders and Prepetition Second Lien Lenders "said the funds could be

used for or how the funds could be used."

165.     SUNE did not explore alternative sources of post-petition funding primarily

because SUNE did not believe the first and second lien creditors would allow that to happen.

According to Parkhill, "to the extent that an outside party was to come in and provide this

capital, that we would have a fight with our second lien lenders."  The Prepetition First Lien

Lenders and Prepetition Second Lien Lenders claimed they had structural priority over proceeds

from subsidiary assets and then used their superior position in the value chain to justify getting

liens over previously unencumbered assets.

166.     Altogether this control was so total that Defendants were functionally insiders.

### F.    LIEN IRREGULARITIES

167.    Beginning in June 2016, Plaintiff conducted an investigation of SUNE's

prepetition secured obligations.  As part of its investigation, Plaintiff obtained preliminary

discovery from numerous parties with knowledge of the prepetition secured transactions and the

events leading up the filing of the Debtors' chapter 11 cases.

168.    Over the course of the investigation, Plaintiff reviewed documents produced by

the Debtors, certain Prepetition Second Lien Lenders,[8] Wells Fargo Bank, National Association

in its capacity administrative agent under the Prepetition First Lien Facility, Wilmington Savings

Fund FSB in its capacity as administrative agent under the Prepetition Second Lien Term Loan,

Wilmington Trust, National Association in its capacity as trustee of the Prepetition Second Lien

Notes, TERP, GLBL, and certain Prepetition First Lien Lenders including Deutsche Bank AG

New York and Goldman Sachs Bank USA.

169.    Plaintiff's investigation is ongoing and thus far has revealed that the Lenders are

not perfected in the following categories of collateral:

(a)    Owned real property (one property in Sherman, TX), leasehold real
property (21 properties) and related fixtures (the "**Real Property Interests**");

(b)    Cash held in certain deposit and securities accounts, which are not
subject to control agreements (the "**Unperfected Cash**");

(c)    Rights under certain insurance policies, including policies
providing liability coverage to SUNE directors and officers ("**D&O Policies**");

(d)    Motor vehicles, aircraft, and vessels ("**Vehicular Interests**");

(e)    Letter of credit rights (the **"L/C Rights**"); and

(f)    Commercial tort claims, including potential claims against SUNE
directors and officers (the "**Commercial Tort Claims**" and together with the Real

---

[8] All capitalized terms not defined herein have the meaning set forth in the Final DIP Order.

Property Interests, Unperfected Cash, D&O Policies, Vehicular Interests, and L/C Rights, collectively, the "**Unperfected Collateral**").

170.    Furthermore, on Plaintiff's investigation, certain of the directors who signed certain unanimous written consents at the closing of the applicable transactions authorizing the guarantees and granting of liens may not have been the actual directors in place at the time of the financing as set forth in the organizational documents delivered to the administrative agents under the Prepetition First Lien Facility and the Prepetition Second Lien Term Loan.

171.    Upon information and belief, the pledge of the GLBL shares in favor of the Prepetition First Lien Lenders (which occurred on October 6, 2014, several months after the original closing date), as well as certain other equity pledges granted after the closing date, may not have been approved by the appropriate corporate authority as provided in the applicable organizational documents.  Failure to comply with a technical requirement in a company's organizational documents renders an act *ultra vires*.  As a result, the pledge of the GLBL shares in favor of the Prepetition First Lien Lenders (which occurred on October 6, 2014, several months after the original closing) date, as well as certain other equity pledges granted after the closing date, may not have been approved by the appropriate corporate authority as provided in the applicable organizational documents.[9]

## **FIRST CAUSE OF ACTION**
**(Objection to Allowance of Claims Due to Inclusion of Unmatured Interest)**
**(Notes OID)**

172.    Plaintiff repeats and re-alleges the allegations contained above in all prior paragraphs, as though fully set forth at length herein.

---

[9] The Committee's investigation into this potential claim remains ongoing.

173.    The exchange of the Old Notes, with a face value of US $336 million and market value of US $132 million, for the New Notes, with a face value of US $225 million and a market value of US $177 million, resulted in substantial OID, which remains unaccrued.

174.    Such unaccrued OID constitutes "unmatured interest" under section 502(b)(2) of the Bankruptcy Code.

175.    The holders of these notes were undersecured on the Petition Date.

176.    Under section 502(b)(2) of the Bankruptcy Code, if an objection is made to a claim, "the court, after notice and a hearing, shall determine the amount of such claim . . . as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that . . . (2) such claim is for unmatured interest."

177.    The Committee hereby objects, pursuant to sections 105, 502, and 506 of the Bankruptcy Code, to the allowance of claims in connection with the New Notes to the extent such claims include unmatured interest.

178.    Pursuant to the applicable provisions of the Bankruptcy Code, including without limitation section 502(d), and Bankruptcy Rules 3007, 3012, and 7001, each Prepetition Second Lien Notes claim asserted by Defendants should be disallowed to the extent such claim includes unmatured interest.

## SECOND CAUSE OF ACTION
### (Objection to Allowance of Claims Due to Inclusion of Unmatured Interest)
### (Warrant OID)

179.    Plaintiff repeats and re-alleges the allegations contained above in all prior paragraphs, as though fully set forth at length herein.

180.    The Tranche A-1 Term Loan and Tranche A-2 Term Loan and warrants were issued together in an original issuance, thus the consideration received by SUNE was allocated

between the loans and the warrants and the Tranche A-1 Term Loan and Tranche A-2 Term Loan were issued with US $84 million of OID (based on the fair market value of the warrants), most of which remains unaccrued.

181.    Such unaccrued OID constitutes "unmatured interest" under section 502(b)(2) of the Bankruptcy Code.

182.    The holders of these warrants were undersecured on the Petition Date.

183.    Under section 502(b)(2) of the Bankruptcy Code, if an objection is made to a claim, "the court, after notice and a hearing, shall determine the amount of such claim . . . as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that . . . (2) such claim is for unmatured interest."

184.    The Committee hereby objects, pursuant to sections 105, 502, and 506 of the Bankruptcy Code, to the allowance of claims in connection with the New Notes to the extent such claims include unmatured interest.

185.    Pursuant to the applicable provisions of the Bankruptcy Code, including without limitation section 502(d), and Bankruptcy Rules 3007, 3012, and 7001, each Prepetition Second Lien Term Loan claim asserted by Defendants should be disallowed to the extent such claim includes unmatured interest.

### THIRD CAUSE OF ACTION
**(Objection to Allowance of Claims Due to Inclusion of Unmatured Interest)**
**(Tranche A-1 OID)**

186.    Plaintiff repeats and re-alleges the allegations contained above in all prior paragraphs, as though fully set forth at length herein.

187.    Tranche A-1 of the Second Lien Term Loan was subject to an OID of 4.0% on the principal amount of US $500 million, or US $20 million, which remains unaccrued.

188.    Such unaccrued OID constitutes "unmatured interest" under section 502(b)(2) of the Bankruptcy Code.

189.    The holders of these notes were undersecured on the Petition Date.

190.    Under section 502(b)(2) of the Bankruptcy Code, if an objection is made to a claim, "the court, after notice and a hearing, shall determine the amount of such claim . . . as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that . . . (2) such claim is for unmatured interest."

191.    The Committee hereby objects, pursuant to sections 105, 502, and 506 of the Bankruptcy Code, to the allowance of claims in connection with the New Notes to the extent such claims include unmatured interest.

192.    Pursuant to the applicable provisions of the Bankruptcy Code, including without limitation section 502(d), and Bankruptcy Rules 3007, 3012, and 7001, each Prepetition Second Lien Tranche A1 Term Loan claim asserted by Defendants should be disallowed to the extent such claim includes unmatured interest.

## FOURTH CAUSE OF ACTION
### (Intentional Fraudulent Transfer – Prepetition Second Lien Notes)

193.    Plaintiff repeats and re-alleges the allegations contained above in all prior paragraphs, as though fully set forth at length herein.

194.    The Debtors incurred obligations pursuant to the Prepetition Second Lien Notes within two years prior to the Petition Date.

195.    The security interests and liens granted in connection with the Prepetition Second Lien Notes were to or for the benefit of Defendants holding Prepetition Second Lien Notes.

196.    The Debtors granted the security interests and liens in connection with the Prepetition Second Lien Notes with actual intent to hinder, delay, or defraud present or future creditors of the Debtors.

197.    As a direct and proximate result of the incurrence of the Prepetition Second Lien Notes and the grant of the liens and security interests in connection therewith, the Debtors and their respective creditors suffered losses amounting to at least the amount of the Prepetition Second Lien Notes and the value of the interests conveyed under the liens.

198.    Based upon the foregoing, the Prepetition Second Lien Notes constitute avoidable fraudulent transfers pursuant to section 548(a)(1)(A) of the Bankruptcy Code and, in accordance with section 550(a) of the Bankruptcy Code, obligations incurred and liens issued in connection with the Prepetition Second Lien Notes should be avoided, and automatically preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code.

### FIFTH CAUSE OF ACTION
### (Intentional Fraudulent Transfer –
### Debtor Guarantees of the Prepetition Second Lien Facilities)

199.    Plaintiff repeats and re-alleges the allegations contained above in all prior paragraphs, as though fully set forth at length herein.

200.    The Prepetition Guarantors granted the Debtor Guarantees pursuant to the Prepetition Second Lien Term Loan and the Prepetition Second Lien Notes within two years prior to the Petition Date.

201.    The Debtor Guarantees granted by the Prepetition Guarantors in connection with the Prepetition Second Lien Facilities were to or for the benefit of Prepetition Second Lien Lender Defendants.

202.    The Prepetition Guarantors granted the Debtor Guarantees in connection with the Prepetition Second Lien Term Loan and the Prepetition Second Lien Notes with actual intent to hinder, delay, or defraud present or future creditors of the Prepetition Guarantors.

203.    As a direct and proximate result of granting the Debtor Guarantees under the Prepetition Second Lien Term Loan and Prepetition Second Lien Notes, the Prepetition Guarantors and their respective creditors suffered losses amounting to at least the amount of the value of the interests conveyed under the Debtor Guarantees.

204.    Based upon the foregoing, the Debtor Guarantees constitute avoidable fraudulent transfers pursuant to section 548(a)(1)(A) of the Bankruptcy Code and, in accordance with section 550(a) of the Bankruptcy Code, the liens granted by the Debtor Guarantors in connection with the Prepetition Second Lien Term Loan and Prepetition Second Lien Notes should be avoided, and automatically preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code.

## SIXTH CAUSE OF ACTION
### (Intentional Fraudulent Transfer – Prepetition First Lien Facility)

205.    Plaintiff repeats and re-alleges the allegations contained above in all prior paragraphs, as though fully set forth at length herein.

206.    The Debtors incurred obligations pursuant to the First Lien Security Agreement within two years prior to the Petition Date.

207.    The liens and equity pledges granted in connection with the Prepetition First Lien Security Amendments were to or for the benefit of the Prepetition First Lien Lender Defendants.

208.    The Debtors granted the liens and equity pledges in connection with the Prepetition First Lien Security Amendments with actual intent to hinder, delay, or defraud present or future creditors of the Debtors.

209.     As a direct and proximate result of the incurrence of the Prepetition First Lien Security Amendments and the grant of the liens and equity pledges in connection therewith, the Debtors and their respective creditors suffered losses amounting to at least the amount of the value of the interests conveyed under the equity pledges.

210.     Based upon the foregoing, the liens and equity pledges granted in connection with the Prepetition First Lien Security Amendments constitute avoidable fraudulent transfers pursuant to section 548(a)(1)(A) of the Bankruptcy Code and, in accordance with section 550(a) of the Bankruptcy Code, the equity pledges should be avoided, and automatically preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code.

## SEVENTH CAUSE OF ACTION
### (Constructive Fraudulent Transfer – Prepetition Second Lien Notes)

211.     Plaintiff repeats and re-alleges the allegations contained above in all prior paragraphs, as though fully set forth at length herein.

212.     The Prepetition Second Lien Notes constitute transfers of interests in the Debtors' property.

213.     The Prepetition Second Lien Notes were transfers to or for the benefit of Defendants that held Old Notes.

214.     The Debtors received less than reasonably equivalent value in exchange for some or all of the Prepetition Second Lien Notes.

215.     Upon information and belief, the Debtors were insolvent, or became insolvent, and/or had unreasonably small capital in relation to its business or its transactions at the time or as a result of the issuance of the Prepetition Second Lien Notes.

216.     The Prepetition Second Lien Notes were transferred within two years prior to the Petition Date.

217.    Based upon the foregoing, the Debtors' transfer of the Prepetition Second Lien

Notes constitute avoidable fraudulent transfers pursuant to section 548(a)(1)(B) of the

Bankruptcy Code and, in accordance with section 550(a) of the Bankruptcy Code, the obligations

incurred and liens granted in connection with the Prepetition Second Lien Notes should be

avoided, and automatically preserved for the benefit of the Debtors' estates pursuant to section

551 of the Bankruptcy Code.

## EIGHTH CAUSE OF ACTION
### (Constructive Fraudulent Transfer – Debtor Guarantees of the Prepetition Second Lien Facilities)

218.    Plaintiff repeats and re-alleges the allegations contained above in all prior

paragraphs, as though fully set forth at length herein.

219.    The Debtor Guarantees constitute transfers of interests in the Debtors' property.

220.    The Debtor Guarantees were transferred to or for the benefit of the Prepetition

Second Lien Lender Defendants.

221.    The Debtors received less than reasonably equivalent value in exchange for some

or all of the Debtor Guarantees.

222.    Upon information and belief, the Debtors were insolvent, or became insolvent,

and/or had unreasonably small capital in relation to its business or its transactions at the time or

as a result of the Debtor Guarantees.

223.    The Debtor Guarantees were made within two years prior to the Petition Date.

224.    Based upon the foregoing, the Debtor Guarantees constitute avoidable fraudulent

transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code and, in accordance with

section 550(a) of the Bankruptcy Code, the liens granted by the Debtor Guarantors in connection

with the Prepetition Second Lien Term Loan and Prepetition Second Lien Notes should be

avoided, and automatically preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code.

## NINTH CAUSE OF ACTION
### (Constructive Fraudulent Transfer – Prepetition First Lien Facility)

225.    Plaintiff repeats and re-alleges the allegations contained above in all prior paragraphs, as though fully set forth at length herein.

226.    The Prepetition First Lien Security Amendments effectuate transfers of interests in the Debtors' property.

227.    The Prepetition First Lien Security Amendments effectuate transfers to or for the benefit of the Prepetition First Lien Lender Defendants.

228.    The Debtors received less than reasonably equivalent value in exchange for some or all of the Prepetition First Lien Security Amendments.

229.    Upon information and belief, the Debtors were insolvent, or became insolvent, and/or had unreasonably small capital in relation to its business or its transactions at the time or as a result of the Prepetition First Lien Security Amendments.

230.    Upon information and belief, at all times relevant hereto, there were actual creditors of the Debtors holding unsecured claims allowable within the meaning of 11 U.S.C. §§ 502 and 544(b).

231.    Based upon the foregoing, the Prepetition First Lien Security Amendments constitute avoidable fraudulent transfers pursuant to sections 544, 548(a)(1)(B), and 550 of the Bankruptcy Code and applicable state fraudulent transfer law, and, in accordance with section 550(a) of the Bankruptcy Code, the liens issued in connection with the Prepetition First Lien Facility should be avoided, and automatically preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code.

## TENTH CAUSE OF ACTION
### (Preferential Transfer – Prepetition Second Lien Facility)

232.    Plaintiff repeats and re-alleges the allegations contained above in all prior paragraphs, as though fully set forth at length herein.

233.    Sections 547(b) and 550(a) of the Bankruptcy Code empower the trustee (or estate representative such as the Committee standing in its shoes), for the benefit of the estate, to avoid and recover a transfer to a creditor of an interest in the debtor in property if the requirements set forth therein are met.

234.    The trustee (or estate representative such as the Committee standing in its shoes) may avoid any transfer of an interest of the debtor in property to or for the benefit of a creditor for an "antecedent debt owed by the debtor" that was made while the debtor was insolvent within 90 days before the bankruptcy filing date or within one year before the bankruptcy filing date if the creditor was an insider of the debtor that enabled such creditor to receive more than such creditor would receive if the case were a case under chapter 7 of the Bankruptcy Code, the transfer had not been made, and such creditor received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

235.    As described above, Defendants were at all relevant times an "insider" of the Debtors under the definition set forth in section 101(31) of the Bankruptcy Code and under applicable non-statutory law.

236.    During the one year period prior to the Petition Date, the Debtors entered into the Prepetition Second Lien Term Loan and issued the Prepetition Second Lien Notes (collectively, the "Transfers").

237.     The Transfers were on account of antecedent debts owed by the Debtors to Defendants that held Old Notes and the 2015 Prepetition Second Lien Term Loan Defendants (together, the "Transfer Defendants") before such transfers were made.

238.     The Transfers to the Transfer Defendants were made when the Debtors were insolvent, or the Debtors were rendered insolvent by making the Transfers.

239.     The Transfers enabled the Transfer Defendants to recover more than it would have received if this case were in chapter 7 of the Bankruptcy Code, the Transfers had not been made, and Transfer Defendants had received payment of their debt to the extent provided under the Bankruptcy Code.

240.     For all of the foregoing reasons, the Transfers should be avoided and set aside as preferential and the money transferred should be returned to the Debtors' bankruptcy estate.  The Committee is entitled to a judgment pursuant to sections 547(b) and 550 of the Bankruptcy Code (i) setting aside the Transfers, and (ii) directing the Transfer Defendants to turn over to the Debtors' estate the sum of the Transfers in an amount to be determined at trial, plus interest thereon to the date of payment and the costs of this action.

## **ELEVENTH CAUSE OF ACTION**
### **(Equitable Subordination)**

241.     Plaintiff repeats and re-alleges the allegations contained above in all prior paragraphs, as though fully set forth at length herein.

242.     The equities in this case dictate that the amounts owed to the Defendants be equitably subordinated to the claims of the unsecured creditors.

243.     As described above, Defendants were at all relevant times an "insider" of the Debtors under the definition set forth in section 101(31) of the Bankruptcy Code and under applicable non-statutory law.

244.    Pursuant to section 510(c) of the Bankruptcy Code, the Court may, subordinate all or part of a claim to all or part of another claim when the claimant has engaged in inequitable misconduct that resulted in injury to creditors or provided an unfair advantage to the claimant.

245.    The conduct of the Defendants, as alleged above, constitutes inequitable conduct.

246.    Defendants' inequitable conduct gave it an unfair advantage as a claimant in these chapter 11 cases.

247.    By reason of Defendants' inequitable conduct: (a) the Defendants' collateral position substantially improved while the unsecured creditors were damaged; (b) the Debtors delayed commencing these chapter 11 cases earlier, to the detriment of the Debtors and their unsecured creditors.

248.    Allowing Defendants to receive payment on claims they purport to assert prior to or with the general unsecured creditors would be unfair and inequitable.  In particular, allowing Defendants to be paid prior to or with the general unsecured creditors would allow Defendants to reap the benefits of its inequitable conduct, as alleged herein.

249.    Defendants' inequitable conduct was committed to benefit Defendants.

250.    The excessive control Defendants exerted over the Debtors supports the Plaintiff's contention that the Court should apply special scrutiny to Defendants' conduct.

251.    Equitable subordination of the amounts owed to the Defendants is consistent with the provisions of the Bankruptcy Code.

252.    Because of the inequitable conduct described herein, Defendants' claims should be equitably subordinated to all general unsecured claims pursuant to section 510(c) of the Bankruptcy Code and their security interests, and the priority they would provide, should be declared null and void.

## TWELFTH CAUSE OF ACTION
### (Declaratory Judgment that Certain Purported Liens In Respect of the Prepetition First Lien Facility and the Prepetition Second Lien Facility Are Invalid)

253.    Plaintiff repeats and re-alleges the allegations contained above in all prior paragraphs, as though fully set forth at length herein.

254.    An actual, justiciable controversy exists between Plaintiff and Prepetition Lender Defendants as to whether the Prepetition Lender Defendants have, or are the beneficiaries of, liens or security interest in the Unperfected Collateral.

255.    As set forth above, upon information and belief the Prepetition Lender Defendants did not perfect their security interests in the Unperfected Collateral in accordance with applicable state law.

256.    Upon information and belief, the Prepetition Lender Defendants failed to properly perfect their purported liens on and security interests in the Real Property Interests because they did not file a mortgage or deed of trust, leasehold, or a fixture filing, as applicable, in the appropriate office of the recorder of deeds for the jurisdiction in which each property is located.

257.    Upon information and belief, the Prepetition Lender Defendants failed to properly perfect their purported liens on and security interests in the Unperfected Cash because they have failed to enter into account control agreements with the Debtors over certain deposit accounts and securities accounts of the Debtors, including certain deposit accounts and securities accounts with a balance less than US $2,000,000 individually and US $10,000,000 in the aggregate which were explicitly carved out from the Prepetition Collateral ("**Excluded Accounts**"). In addition, certain control agreements were entered into within the 90-day preference period, and therefore should be avoided.

258.    Upon information and belief, the Defendants failed to properly perfect their purported liens on and security interests in the D&O Policies because they failed to obtain an endorsement from each applicable issuer.

259.    Upon information and belief, the Prepetition Lender Defendants failed to properly perfect their purported liens on and security interests in the Vehicular Interests because they failed to file notations on the certificates of title or otherwise make the required filings with the applicable state, federal or international registry.

260.    Upon information and belief, the Prepetition Lender Defendants failed to properly perfect their purported liens on and security interests in the L/C Rights because they failed to obtain issuer acknowledgments from each relevant issuer.

261.    Upon information and belief, the Prepetition Lender Defendants failed to properly perfect their purported liens on and security interests in the Commercial Tort Claims because they did not file a UCC-1 financing statement that sufficiently describes such claims with particularity in the appropriate filing offices.

262.    Accordingly, pursuant to 28 U.S.C. §§ 2201 and 2202, Plaintiff is entitled to a judgment that the Prepetition Lender Defendants do not have, and are not the beneficiaries of, valid liens or security interests in Unperfected Collateral.

### THIRTEENTH CAUSE OF ACTION
### (Avoidance of Invalid Liens in Respect of the Prepetition First Lien Facility and Prepetition Second Lien Facility)

263.    Plaintiff repeats and re-alleges the allegations contained above in all prior paragraphs, as though fully set forth at length herein.

264.    As set forth above, on information and belief, Prepetition Lender Defendants did not perfect their security interests in the Unperfected Collateral in accordance with applicable state law.

265.    Pursuant to sections 544(a)(1), (2), and (3) of the Bankruptcy Code and/or the

Final DIP Order, the Debtors and the Committee (acting on behalf of the estates) have the rights

and powers of (as of the commencement of these chapter 11 cases and without regard to any

knowledge of the Debtors, any trustee, or any other creditors), or may avoid any transfer of

property of the Debtors or any obligation incurred by the Debtors that is voidable by: (1) a

creditor that extends credit to the debtor at the time of the commencement of the case, and that

obtains, at such time and with respect to such credit, a judicial lien on all property on which a

creditor on a simple contract could have obtained such a judicial lien, whether or not such a

creditor exists; (2)  a creditor that extends credit to the debtor at the time of the commencement

of the case, and obtains, at such time and with respect to such credit, an execution against the

debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or (3) a

bona fide purchaser of real property, other than fixtures, from the debtor, against whom

applicable law permits such transfer to be perfected, that obtains the status of a bona fide

purchaser and has perfected such transfer at the time of the commencement of the case, whether

or not such a purchaser exists.

266.    Any and all liens and security interests granted to or for the benefit of the

Prepetition Lender Defendants in the Unperfected Collateral, are unperfected for the reasons set

forth above and are avoidable pursuant to sections 544(a)(1), (2), and (3) of the Bankruptcy

Code.

267.    Because Prepetition Lender Defendants do not have properly perfected liens on or

security interests in the Unperfected Collateral, any and all liens on and security interests in such

property asserted by the Prepetition Lender Defendants should be avoided pursuant to section

544 of the Bankruptcy Code, and such property or the value of such property, if previously

transferred should be recovered by the Debtors' estates pursuant to section 550(a) of the

Bankruptcy Code and/or automatically preserved for the benefit of the Debtors' estates pursuant

to section 551 of the Bankruptcy Code.

## FOURTEENTH CAUSE OF ACTION
### (Excluded Assets)

268.    Plaintiff repeats and re-alleges the allegations contained above in all prior

paragraphs, as though fully set forth at length herein.

269.    This cause of action arises under the Federal Declaratory Judgment Act, 28

U.S.C. § 2201.

270.    The Prepetition Lender Defendants dispute Plaintiff's assertion that the Excluded

Assets remain unencumbered by any lien or security interest.

271.    Specifically with respect to the Foreign Equity Pledge Limitation, because the

Prepetition Collateral includes a pledge of only 65% of the first tier foreign equity of each

foreign subsidiary, only 65% of the value of each such first tier foreign subsidiary would

constitute Prepetition Collateral, with the remaining 35% of the value constituting assets

unencumbered by the Prepetition First Lien Facility and Prepetition Second Lien Facilities.

272.    The Prepetition Security Agreements clearly state that the Excluded Assets are

not subject to any pledge, security interest or lien in favor of the Prepetition First Lien Facility or

the Prepetition Second Lien Facilities.

273.    The Court should determine that the Prepetition Lender Defendants did not

possess a lien on the Excluded Assets or the proceeds thereof as of the Petition Date.

## FIFTEENTH CAUSE OF ACTION
### (Aiding & Abetting Breach of Fiduciary Duty)

274.    Plaintiff repeats and re-alleges the allegations contained above in all prior

paragraphs, as though fully set forth at length herein.

275.    Defendants are each aware of the respective capacities in which the Board is related to the Debtors and that, in those capacities, the Board had fiduciary duties to the Debtors that preclude them from acting to further their self-interest to the prejudice of the Debtors.

276.    With knowledge of the Board's fiduciary duties, Defendants used their influence to induce, coerce, and substantially contribute to SUNE's avoiding filing for bankruptcy within the preference period. Defendants thus purposefully and knowingly aided and abetted a breach of the duties owed by the Board to the Debtors.

277.    Plaintiff suffered harm as a proximate and direct result of the breach of these fiduciary duties.

## PRAYER FOR RELIEF

**WHEREFORE**, by reason of the foregoing, the Committee requests that judgment be entered in its favor against the Defendants as follows:

1.    Finding that the New Notes resulted in OID and that, pursuant to the applicable provisions of the Bankruptcy Code, including without limitation section 502(d), and Bankruptcy Rules 3007, 3012, and 7001, each Prepetition Second Lien Notes claim asserted by Defendants are disallowed to the extent such claims include unmatured interest.

2.    Finding that the Tranche A-1 Term Loan and Tranche A-2 Term Loan were issued with OID (based on the fair market value of the warrants) and that, pursuant to the applicable provisions of the Bankruptcy Code, including without limitation section 502(d), and Bankruptcy Rules 3007, 3012, and 7001, each Prepetition Second Lien Term Loan claim asserted by Defendants are disallowed to the extent such claims include unmatured interest.

3.    Finding that the Tranche A-1 Term Loan was subject to an OID of 4.0% on the principal amount of $500 million and that, pursuant to the applicable provisions of the

Bankruptcy Code, including without limitation section 502(d), and Bankruptcy Rules 3007, 3012, and 7001, each Prepetition Second Lien Tranche A1 Term Loan claim asserted by Defendants are disallowed to the extent such claims include unmatured interest.

4.      Finding that Prepetition Second Lien Notes constitute avoidable fraudulent transfers pursuant to section 548(a)(1)(A) of the Bankruptcy Code and, in accordance with section 550(a) of the Bankruptcy Code, obligations incurred and liens issued in connection with the Prepetition Second Lien Notes should be avoided, and automatically preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code;

5.      Finding that the Debtor Guarantees constitute avoidable fraudulent transfers pursuant to section 548(a)(1)(A) of the Bankruptcy Code and, in accordance with section 550(a) of the Bankruptcy Code, the liens granted by the Debtor Guarantors in connection with the Prepetition Second Lien Term Loan and Prepetition Second Lien Notes should be avoided, and automatically preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code;

6.      Finding that the liens and equity pledges granted in connection with the Prepetition First Lien Security Amendments constitute avoidable fraudulent transfers pursuant to section 548(a)(1)(A) of the Bankruptcy Code and, in accordance with section 550(a) of the Bankruptcy Code, the liens and equity pledges should be avoided, and automatically preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code.

7.      Finding that the Prepetition Second Lien Notes constitute avoidable fraudulent transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code and, in accordance with section 550(a) of the Bankruptcy Code, the obligations incurred and liens granted in connection

with the Prepetition Second Lien Notes should be avoided, and automatically preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code.

8.      Finding that the Debtor Guarantees constitute avoidable fraudulent transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code and, in accordance with section 550(a) of the Bankruptcy Code, the liens granted by the Debtor Guarantors in connection with the Prepetition Second Lien Term Loan and Prepetition Second Lien Notes should be avoided, and automatically preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code.

9.      Finding that the Prepetition First Lien Security Amendments constitute avoidable fraudulent transfers pursuant to sections 544, 548(a)(1)(B), and applicable state fraudulent transfer law, and, in accordance with section 550(a) of the Bankruptcy Code, the liens issued in connection with the Prepetition First Lien Facility should be avoided, and automatically preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code.

10.     Finding in favor of the Committee pursuant to sections 547(b) and 550 of the Bankruptcy Code, setting aside the Transfers, and directing the Transfer Defendants to turn over to the Debtors' estate the sum of the Transfers in an amount to be determined at trial, plus interest thereon to the date of payment and the costs of this action.

11.     Finding that Defendants engaged in inequitable conduct and that their claims should be equitably subordinated to all general unsecured claims pursuant to section 510(c) of the Bankruptcy Code, and that the Defendants' security interests, and the priority they would provide, should be declared null and void.

12.     Declaring that the Committee is entitled to a judgment that the Prepetition Lender Defendants do not have, and are not the beneficiaries of, valid liens or security interests in Unperfected Collateral.

13.     Finding that any and all liens on and security interests in the Unperfected Collateral asserted by the Defendants should be avoided pursuant to section 544 of the Bankruptcy Code, and such property or the value of such property, if previously transferred should be recovered by the Debtors' estates pursuant to section 550(a) of the Bankruptcy Code and/or automatically preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code.

14.     Finding that the Defendants did not possess a lien on the Excluded Assets or the proceeds thereof as of the Petition Date;

15.     Finding that the Defendants purposefully and knowingly aided and abetted a breach of the duties owed by the Board to the Debtors, and awarding damages against the Defendants and in favor of the Committee in an amount to be determined at trial;

16.     Preserving the avoided liens, and collateral securing those liens, for the benefit of the Company's estate; and

17.     Ordering disgorgement of collateral or payments unjustly received by Defendants;

18.    Providing for such other relief as justice and equity may require.

Dated: November 22, 2016
New York, New York

_____

KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel +1 212 488 1200

Michael S. Kim
Jeremy C. Hollembeak
Benjamin J.A. Sauter
Sara B. Gribbon

*Special Counsel to Official
Committee of Unsecured Creditors*