Kobre & Kim LLP
800 Third Avenue
New York, New York 10022
Tel +1 212 488 1200
Michael S. Kim
Jeremy C. Hollembeak
Benjamin J.A. Sauter

*Special Counsel to Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | x | |
| In re: | : | |
| | : | Chapter 11 |
| SUNEDISON, INC., *et al.*, | : | Case No. 16-10992 (SMB) |
| | : | (Jointly Administered) |
| Debtors. [1] | : | |
| | : | |
| | x | |
| | : | |
| OFFICIAL COMMITTEE OF UNSECURED | : | |
| CREDITORS, on behalf of the estates of the Debtors, | : | |
| | : | |
| Plaintiff, | : | Adversary Proceeding |
| v. | : | No. 16-01228 (SMB) |
| | : | |
| WELLS FARGO BANK, N.A., *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | x | |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A); EverStream HoldCo Fund I, LLC (9564); Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757); SunE Minnesota Holdings, LLC (8926); SunE MN Development Holdings, LLC (5388); and SunE MN Development, LLC (8669).  The address of the Debtors' corporate headquarters is 13736 Riverport Dr., Maryland Heights, Missouri 63043.

**PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS**

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ............................................................................................................. 2

STANDARD OF REVIEW ................................................................................................. 6

ARGUMENT .................................................................................................................... 7

   I.   The Committee Has Stated Claims For Intentional Fraudulent Transfers ......................... 7

      A.  Applicable Pleading Standards For Intentional Fraudulent Conveyance ................... 7

      B.  The Committee Has Sufficiently Alleged The Debtors' Actual Intent To Hinder,
         Delay, Or Defraud Creditors ...................................................................... 9

      C.  Defendants' Scattershot Arguments For Why An Intentional Fraudulent Transfer
         Has Not Been Sufficiently Alleged Are Unavailing ................................................ 14

      D.  The Defendants' Section 548(c) Defense Is Premature ............................................ 17

  II.   The Committee Has Sufficiently Alleged Claims For Constructive Fraudulent Transfers
      19

      A.  Applicable Pleading Standards For Constructive Fraudulent Conveyance ............... 19

      B.  The Debtors Did Not Receive Reasonably Equivalent Value .................................. 20

      C.  The Amended Complaint Adequately Alleges Insolvency ...................................... 25

  III.   The Amended Complaint States A Claim For Preferential Transfer With Respect To The
      Prepetition Second Lien Notes And The Prepetition Second Lien Term Loan ................ 28

      A.  Applicable Pleading Standards For Preferential Transfers ........................................ 28

B.  The Amended Complaint Adequately Alleges That The Prepetition Second Lien

Defendants Were Insiders At The Time Of The January 2016 Transactions............ 29

C.  The Prepetition Second Lien Notes And Prepetition Second Lien Term Loans

Constitute A "Transfer" Under Section 547(b) ........................................................ 31

D.  The "Contemporaneous Exchange" Defense Is Inapplicable ................................... 33

IV.    546(e) Safe Harbor Does Not Apply ............................................................... 34

V.    The Committee Has Adequately Pled a Claim for Equitable Subordination.................... 36

A.  Applicable Pleading Standards For Equitable Subordination .................................. 37

B.  The Amended Complaint Satisfies the *Mobile Steel* Factors .................................... 37

C.  Defendants Were Insiders Of The Debtors................................................................ 39

D.  The Conduct Alleged In The Complaint Is Sufficient To State A Claim For Equitable

Subordination Even For An Outsider ........................................................................ 42

E.  Defendants Other Arguments Should Be Rejected ................................................... 43

VI.    The Committee Has Adequately Pled Claims For Avoidance Of Invalid Liens And

Excluded Assets ........................................................................................................... 44

A.  The Complaint Adequately Pleads That Certain Categories Of Collateral Are

Excluded From The Prepetition Collateral ............................................................... 47

VII.    The Amended Complaint States A Claim For Aiding And Abetting A Breach Of

Fiduciary Duty Under Both Missouri And Delaware Law ............................................... 47

A.  Missouri Law, To The Extent It Applies, Recognizes A Cause Of Action For Aiding

And Abetting A Breach Of Fiduciary Duty............................................................... 47

ii

B. The Amended Complaint Alleges That Defendants Aided And Abetted A Breach Of The Fiduciary Duty Owed By The Board ................................................................ 49

C. The Business Judgment Rule Is Not A Basis To Dismiss The Claim ...................... 52

D. The In Pari Delicto Defense Is Inapplicable To The Claim For Aiding And Abetting A Breach Of Fiduciary Duty In This Case .............................................................. 53

VIII.   Leave to Amend ........................................................................................................ 55

CONCLUSION ........................................................................................................ 57

<u>TABLE OF AUTHORITIES</u>

**Cases**

*Adelphia Comm. Corp. v. Bank of America, N.A. (In re Adelphia Comm. Corp.)*    25
365 B.R. 24 (Bankr. S.D.N.Y. 2007)

*Anand v. Nat'l Republic Bank of Chicago*    22
239 B.R. 511 (N.D. Ill. 1999)

*Am. Tissue, Inc. v. Donaldson*    9
351 F. Supp. 2d 79 (S.D.N.Y. 2004)

*Ashcroft v. Iqbal*    6
556 U.S. 662 (2009)

*Bell Atlantic Corp. v. Twombly*    6
550 U.S. 544 (2007)

*Benjamin v. Diamond* (*In re Mobile Steel Corp.*)    *passim*
563 F.2d 692 (5th Cir. 1977)

*Boston Trading Grp., Inc. v. Burnazos*    15
835 F.2d 1504 (1st Cir. 1987)

*Brown v. One Beacon Ins. Co.*    52
317 F. App'x. 915 (11th Cir. 2009)

*Bowery Opportunity Fund, L.P., et al. v. Antonio R. Alvarez, et al.*    11
Index No. 656642-2016 (N.Y. Sup. Ct. Dec. 20, 2016)

*Cede & Co. v. Technicolor, Inc.*    50
Del. Supr., 634 A.2d 345 (1993)

*Cuevas v. Hudson United Bank (In re M. Silverman Laces, Inc.)*    22
No. 01-6209 (DC), 2002 WL 31412465 (S.D.N.Y. Oct. 24, 2002)

*Floyd v. Hefner*    29
556 F. Supp. 2d 617 (S.D. Tex. 2008)

*Geltzer v. Artists Mktg. Corp. (In re Cassandra Group)*    9
338 B.R. 583 (Bankr. S.D.N.Y. 2006)

*Geron v. Palladin Overseas Fund, Ltd. (In re AppliedTheory Corp.)*    22
323 B.R. 838 (Bankr. S.D.N.Y. 2005)

*Goodman v. H.I.G. Capital, LLC (In re Gulf Fleet Holdings, Inc.)*   51
No. 11-05006, 2014 WL 4560441 (Bankr. W.D. La. Apr. 2, 2014)

*Gowan v. Wachovia Bank, N.A. (In re Dreier LLP)*   33,56
453 B.R. 499 (Bankr. S.D.N.Y. 2011)

*Gredd v. Bear, Sterns Sec. Corp. (In re Manhattan Inv. Fund. Ltd.)*   9,17
310 B.R. 500 (Bankr. S.D.N.Y. 2002)

*Halebian v. Berv*   52
644 F.3d 122 (2d Cir. 2011)

*In re 360networks (USA) Inc.*   33
338 B.R. 194 (Bankr. S.D.N.Y. 2005)

*In re A. Tarricone, Inc.*   30,38,40,42
286 B.R. 256 (Bankr. S.D.N.Y. 2002)

*In re Arbco Capital Mgmt., LLP*   35
498 B.R. 32 (Bankr. S.D.N.Y. 2013)

*In re Armstrong*   33
291 F.3d 517 (8th Cir. 2002)

*In re Bayou Grp., LLC*   8
439 B.R. 284 (Bankr. S.D.N.Y. 2010)

*In re Bernard L. Madoff Inv. Secs., LLC*   17,19
440 B.R. 243 (Bankr. S.D.N.Y. 2010)

*In re Bernard L. Madoff Inv. Secs. LLC*   6,37
458 B.R. 87 (Bankr. S.D.N.Y. 2011)

*In re Bernard L. Madoff Inv. Sec. LLC*   42
515 B.R. 117 (Bankr. S.D.N.Y. 2014)

*In re Broadstripe, LLC*   40
444 B.R. 51 (Bankr. D. Del. 2010)

*In re Chas. P. Young Co.*   29
145 B.R. 131 (Bankr. S.D.N.Y. 1992)

*In re Enron Corp.*   7,8,9
328 B.R. 58 (Bankr. S.D.N.Y. 2005)

*In re KDI Holdings*   40
277 B.R. 493 (Bankr. S.D.N.Y.1999)

*In re Lehman Bros. Hldgs. Inc.*                                                                                9
469 B.R. 415 (Bankr. S.D.N.Y. 2012)

*In re LightSquared Inc.*                                                                                       38
511 B.R. 253 (Bankr. S.D.N.Y. 2014)

*In re Lyondell Chem. Co.*                                                                                      33
No. 09-10023 (REG), 2015 WL 5560283 (Bankr. S.D.N.Y. Sept. 18, 2015)

*In re M. Fabrikant & Sons, Inc.*                                                                              22
394 B.R. 721 (Bankr. S.D.N.Y. 2008)

*In re MacMenamin's Grill Ltd.*                                                                                 36
450 B.R. 414 (Bankr. S.D.N.Y. 2011)

*In re Motors Liquidation Co.*                                                                                34,35
552 B.R. 253 (Bankr. S.D.N.Y. 2016)

*In re Northstar Dev. Corp.*                                                                                    38
465 B.R. 6 (Bankr. W.D.N.Y. 2012)

*In re Rural Metro Corp.*                                                                                       50
Del. Ch., 88 A.3d 54 (2014)

*In re SGK Ventures, LLC*                                                                                       37
521 B.R. 842 (Bankr. N.D. Ill. 2014)

*In re Sharp Int'l Corp.*                                                                                       15
403 F.3d 43 (2nd Cir. 2005)

*In re Solomon*                                                                                                 21
299 B.R. 626 (10th Cir. BAP 2003)

*In re Standard Stores, Inc.*                                                                                   31
124 B.R. 318 (Bankr. C.D. Cal. 1991)

*In re TOUSA, Inc.*                                                                                     23,24,25,46
680 F.3d 1298 (11th Cir. 2012)

*In re Tower Air*                                                                                               52
416 F.3d 229 (3d Cir. 2005)

*In re W.T. Grant Co.*                                                                                          42
699 F.2d 599 (2d Cir. 1983)

*Jo Ann Howard & Assocs., P.C. v. Cassity*                                                                      55
146 F. Supp. 3d 1089 (E.D. Mo. 2015)

*Kapila v. Bennett (In re Pearlman)*                                                                                 54
472 B.R. 115 (Bankr. M.D. Fla. 2012)

*Klein v. Tabatchnick*                                                                                                            25
610 F.2d 1043 (2d Cir. 1979)

*Lonergan v. Bank of America, N.A.*                                                                                   48
2013 WL 176024 (W.D. Mo. 2013)

*Malpiede v. Townson*                                                                                                           49
Del. Spr., 780 A.2d 1075 (2001)

*Nickell v. Shanahan*                                                                                                            48
2013 WL 2402852 (Mo. App. June 4, 2013)

*Nickell v. Shanahan*                                                                                                            48
2014 WL 3819442 (Mo. July 29, 2014)

*Official Comm. Of Unsecured Creditors of Champion Enters. V. Credit Suisse*          22,40
*(In re Champion Enters.)*
2010 WL 3522132 (Bankr. D. Del. Sept. 1, 2010)

*Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.*                                            55
170 F.R.D. 361 (S.D.N.Y. 1997)

*Pan Am Corp. v. Delta Air Lines, Inc.*                                                                        40
175 B.R. 438 (S.D.N.Y. 1994)

*Pereira v. Grecogas Ltd. (In re Saba Enters.)*                                                        8,10,12
421 B.R. 626 (Bankr. S.D.N.Y. 2009)

*Pfeifer v. Hudson Valley Bank, N.A. (In re Pfeifer)*                                                   22
No. 12-13852, 2013 WL 3828509 (Bankr. S.D.N.Y. July 23, 2013)

*Picard v. Katz*                                                                                                                   43
462 B.R. 447 (S.D.N.Y. 2011)

*Reis v. Hazlett Strip-Casting Corp.*                                                                             53
28 A.3d 442 (Del. Ch. 2011)

*Secs. Investor Protection Corp. v. Stratton Oakmont, Inc.*                                         9
234 B.R. 293 (Bankr. S.D.N.Y. 1999)

*Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.)*                         20,21
337 B.R. 791 (Bankr. S.D.N.Y. 2005)

*Slone v. Lassiter (In re Grove-Merritt)*                                      12
406 B.R. 778 (Bankr. D. Ohio 2009)

*Stewart v. Wilmington Trust SP Servs. Inc.*                                   53
112 A.3d 271 (Del. Ch. 2015)

*Swierkiewicz v. Sorema N.A.*                                                  20
534 U.S. 506 (2002)

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*                                 9
551 U.S. 308 (2007)

*Weisfelner v. Hofmann (In re Lyondell Chem. Co.)*                            12
554 B.R. 635 (S.D.N.Y. 2016)

## Other Authorities

11 U.S.C. § 101(31)                                                           42

11 U.S.C. § 101(54)                                                           32

11 U.S.C. § 510(c)                                                          36,37

11 U.S.C. § 510(c)(1)                                                         36

11 U.S.C. § 544                                                               54

11 U.S.C. § 546                                                               46

11 U.S.C. § 546(e)                                                    20,34,35,36

11 U.S.C. § 547                                                               37

11 U.S.C. § 547(b)                                                    28,29,31,32

11 U.S.C. § 547(c)                                                            33

11 U.S.C. § 547(c)(1)                                                         33

11 U.S.C. § 547(c)(4)                                                         33

11 U.S.C. § 547(c)(4)(A)                                                      33

11 U.S.C. § 547(c)(4)(B)                                                      33

11 U.S.C. § 548                                                          7,36,54

11 U.S.C. § 548(a)(1)(A) ........................................ 7,8,15,34

11 U.S.C. § 548(a)(1)(B) ........................................ 19,20,21,25

11 U.S.C. § 548(a)(1)(B)(ii)(I) ................................ 25,26

11 U.S.C. § 548(a)(1)(B)(ii)(III) ............................. 25,26

11 U.S.C. § 548(c) ................................................. 17,18,19

11 U.S.C. § 548(d)(2)(A) ....................................... 22

11 U.S.C. § 550(a)(1) ............................................ 46

11 U.S.C. § 741(7) ................................................ 34

11 U.S.C. § 741(7)(A) ............................................ 34

11 U.S.C. § 741(7)(A)(i) ......................................... 34

11 U.S.C. § 741(7)(A)(vii) ....................................... 34

11 U.S.C. § 741(7)(A)(xi) ........................................ 34

COLLIER ON BANKRUPTCY P 547.03 .......................... 32

COLLIER ON BANKRUPTCY P 548.05 .......................... 25

Fed. R. Civ. P. 8 .................................................... 6,20,29,45

Fed. R. Civ. P. 8(a) ............................................... 6

Fed. R. Civ. P. 8(a)(2) ........................................... 20

Fed. R. Civ. P. 9(b) ............................................... 6,8,9,20

Fed. R. Civ. P. 12(b)(6) .......................................... 52,55

RESTATEMENT (SECOND) OF TORTS § 876(b) ............... 48,49

S. REP. NO. 989, 95TH CONG., 2D SESS. 27 (1978) ....... 32

The Official Committee of Unsecured Creditors ("the **Committee**" or "**Plaintiff**") of

SunEdison, Inc. ("**SUNE**") and certain of its affiliates in the above-captioned chapter 11 cases,

as debtors and debtors in possession (collectively, the "**Debtors**"), on behalf of and as the

representatives of the Debtors' estates, submit this Omnibus Opposition to: (I) the Motion to

Dismiss the Amended Adversary Complaint ("**Amended Complaint**") [AP Dkt. No. 12, 13][2]

filed by certain Prepetition First Lien Lender Defendants[3] (collectively, the "**Prepetition First**

**Lien Defendants**") [AP Dkt. Nos. 17, 18];   and (II) the Motion to Dismiss the Amended

Complaint filed by certain Prepetition Second Lien Lender Defendants,[4] Wilmington Trust,

National Association ("**Wilmington Trust**")[5] and Wilmington Savings Fund, Society, FSB

("**Wilmington Savings**")[6]  (collectively, the "**Prepetition Second Lien Defendants**") [AP Dkt.

Nos. 24, 25].[7]

---

[2]	Citations to docket entries in this adversary proceeding, No. 16-01228 (SMB), are cited as "AP Dkt. No."  Citations to docket entries in the main bankruptcy case, No. 16-10992 (SMB), are cited as "Dkt. No."

[3]	The individual Prepetition First Lien Lender Defendants that joined the Motion to Dismiss are: Wells Fargo Bank N.A. ("**Wells Fargo**"), Goldman Sachs Bank USA ("**Goldman Sachs**"), KeyBank National Association ("**KeyBank**"), Morgan Stanley Senior Funding, Inc. ("**Morgan Stanley**"), and BBVA Compass Bank ("**Compass Bank**").

[4]	Akin Gump Strauss Hauer & Feld LLP ("**Akin Gump**") jointly represents the sixty-seven (67) Prepetition Second Lien Lender Defendants that joined the Motion to Dismiss identified in Schedule A to the *Declaration of Deborah J. Newman in Support of Second Lien Defendants' Motion to Dismiss* ("the **Newman Declaration**") [AP Dkt. No. 26].  Counsel made numerous requests of Akin Gump to fully disclose the members of its client group to ensure the appropriate Defendants were named in the Amended Complaint.  On December 22, 2016, Akin Gump filed a statement pursuant to Federal Rule of Bankruptcy Procedure 2019 in the underlying bankruptcy case [Dkt. No. 1977], which lists the names and holding information for a number of group members not party to this proceeding while failing to list similar information for a number of Defendants listed on Schedule A.  The Committee reserves all rights regarding naming potential additional Defendants and has asked Akin Gump to file a clarifying statement.

[5]	Wilmington Trust is the indenture trustee under the 5% Guaranteed Convertible Senior Secured Notes due 2018 Indenture dated as of January 11, 2016 and collateral trustee under the Pledge and Security Agreement dated as of January 11, 2016.

[6]	Wilmington Savings is the successor administrative agent under the Second Lien Credit Agreement dated as of January 11, 2016.

[7]	Capitalized terms not defined herein shall have the meaning assigned to those terms in the Amended Complaint.

## INTRODUCTION

The badges of fraud and inequitable conduct are substantial and well pled in the Amended Complaint. SUNE — as documented in many of its own emails — manipulated its books for several months leading up to the January 2016 Transactions. It did so at first because it lacked adequate financial controls to accommodate its failed acquisition strategy and needed funds to pay its bills. It did so later as part of a futile effort to hide its insolvency, and evade the detection of its financial manipulations. By December 2015, weeks before the primary transactions at issue in this case, SUNE management was projecting negative cash flows *through 2016*, yet instituted an internal rule to show substantial free cash on paper. SUNE began holding payments to creditors to, among other things, avoid triggering contract covenants. *See* Am. Compl. ¶¶ 121-31.

Hoping to circumvent the diligence that arm's-length lenders would perform before providing fresh capital, SUNE turned to a select group of its existing lenders for a cash infusion in early January 2016. While these lenders may not have known the true depths of SUNE's financial mismanagement, neither were they all naïve and unsuspecting. As one lender mused: the real reason SUNE was willing to enter a deal with its existing creditors with such onerous terms was that SUNE was trying to cover up its "shadiness" by avoiding having to raise money on the public markets, where SUNE would need to be more transparent about its finances. Am. Compl. ¶ 134. It was, in effect, a *quid pro quo*: the *quid* was that SUNE management would receive funds to conceal its problems for the time being without having to answer difficult questions; the *quo* was that SUNE's secured creditors would be able to weatherproof their existing debt and position in the capital structure by (a) swapping unsecured debt for substantially more valuable secured debt; and (b) bolstering their position with a suite of new guarantees and liens in exchange for inadequate consideration (in the case of the First Lien

2

Defendants, no consideration at all).  SUNE knew the true price of the January 2016 Transactions would be paid by its remaining unsecured creditors, unless those transactions were subsequently avoided, when SUNE's inevitable bankruptcy ensued.  Upon joining in this awareness, the Defendants exercised their dominion and control over the Debtors to make such avoidance as unlikely as possible.

The allegations in the Amended Complaint more than adequately establish that SUNE specifically intended to hinder, delay, or defraud.  *See* Am. Compl. ¶¶ 132-154.  The January 2016 Transactions saddled SUNE with hundreds of millions of dollars in new secured debt that had no hope of "curing" its self-inflicted liquidity crisis or keeping SUNE out of bankruptcy.  To keep its fraud in the dark for what turned out to be only a matter of weeks, SUNE agreed to terms and conditions with the Defendants that it knew with substantial certainty would — and, in fact, did — result in significant benefits for its existing and newly secured creditors at the expense of its creditors that remained unsecured.  For example, on January 10, 2016, the Debtors' aggregate secured debt was well under US $1 billion, which would have left hundreds of millions of dollars of value (at minimum) to fund substantial recoveries to unsecured creditors when SUNE eventually filed for bankruptcy.  In the wake of the January 2016 Transactions, however, the Prepetition Second Lien Defendants are poised to recover hundreds of millions of dollars of value traceable to the US $336 million in face amount of unsecured notes they held prior to January 11, 2016.  Meanwhile, the holders of another US $2.2 *billion* in face amount of those very same unsecured notes, as well as holders of US $357 million in unsecured trade debt, have been forced to stand behind more than $1.6 billion in allegedly legitimate prepetition secured debt and left "with the prospect of no return".  Second Lien Br. ¶ 3. Put simply, by preferentially collateralizing the Old Notes as well as extending new liens and guarantees to all Defendants significantly in excess of the new money they infused into SUNE's ongoing fraud,

3

the January 2016 Transaction gave away substantially all of the residual value of these Debtors within earshot of their bankruptcy filing.  *See* Am. Compl. ¶ 155.

Within weeks of the January 2016 Transactions, as a result of the enhanced control and influence obtained, Defendants began to wake up to the true state of SUNE's situation.  They recognized that "nobody [in the market] has any clue what is really going on."  Am. Compl. ¶ 156.  With their unique knowledge and control, the Defendants positioned for the impending bankruptcy at the expense of SUNE's unsecured creditors.  They dictated the appointment of a chief restructuring officer; they were involved in deciding which entities would file for bankruptcy protection; and they expressly acknowledged potential preference liability in the event the filing was made within 90 days of the January 2016 Transactions.  SUNE delayed filing for bankruptcy until just days after the 90-day window for preferential transfer claims closed.  SUNE's secured creditors also prevented SUNE from consummating a post-petition financing deal with another group of lenders because they wanted to maximize their leverage over the bankruptcy process.  *See* Am. Compl. ¶162-65.

The Committee has asserted six sets of claims:[8]

- Intentional fraudulent transfer claims against both the First and Second Lien Defendants (Counts 4-6);

- Constructive fraudulent transfer claims against both the First and Second Lien Defendants (Counts 7-9);

- A preferential transfer claim against the Second Lien Defendants and Goldman Sachs (Count 10);

---

[8]    Pursuant to Federal Rule of Bankruptcy Procedure 3007(b), the Committee included in the Amended Complaint its objections to allowance of portions of the claims filed on behalf of the Second Lien Defendants (Counts 1-3).  The parties subsequently agreed that the Committee would prosecute those objections by a separate contested matter in the underlying bankruptcy case.  *See* Stipulation and Agreed Order (I) Setting Briefing Schedule and Hearing Date on Defendants' Motions to Dismiss Amended Complaint; and (II) Granting Leave with Respect to Page Limitations [AP Dkt. No. 8].

- An equitable subordination claim against both the First and Second Lien Defendants (Count 11);

- Claims regarding the validity, scope, and avoidance of certain liens asserted by the Defendants (Counts 12-14); and

- A claim for aiding and abetting breach of fiduciary duty against the First and Second Lien Defendants (Count 15).

As discussed herein, the allegations in the Amended Complaint are specific and sufficient to sustain these claims.

To argue otherwise, the Defendants engage in an elaborate shell game in their motions to dismiss. First, they say that the January 2016 Transactions were not a fraudulent transfer because they were, "at most," a preferential transfer. *See, e.g.*, First Lien Br. at 13. Then, they say the Transactions should not be avoided as preferential transfers because they took place more than 90 days (101 to be exact) before the bankruptcy filing. *See, e.g.,* First Lien Br. at 26; Second Lien Br. ¶ 60. In response to the Committee's allegations that the Defendants were functionally SUNE insiders who themselves caused the delay in the bankruptcy filing (and thus that a one-year preference window should apply), the Defendants argue that their control did not arise until after the January 2016 Transactions. *See*, e.g. Second Lien Br. ¶ 61. Next, they argue that there should be no equitable subordination because their alleged control was just "superior bargaining power." Second Lien Br. ¶ 81. Finally, when confronted with the Committee's aiding and abetting claim, they close the loop by arguing that no cause of action exists at all. First Lien Br. at 36; Second Lien Br. ¶ 84. If credited, the Defendants' arguments would create a dangerous roadmap for favored lenders to extract liens on virtually all of a company's property on the eve of bankruptcy, intentionally delay the bankruptcy filing by just over 90 days, and then walk away fully secured while passing the buck to the company's remaining unsecured creditors. This is precisely the situation the claims asserted by the Committee in this case are

5

intended to prevent — yet under the Defendants' theories, it would simply slip through the cracks **as a matter of law**.

The Defendants' legal arguments are rebutted below, and the Defendants' Motions to Dismiss should be denied in their entirety.

## STANDARD OF REVIEW

The Committee does not need to detail the evidence underlying its case to survive a motion to dismiss. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Indeed, "a plaintiff need not provide specific facts to support its allegations." *In re Bernard L. Madoff Inv. Secs. LLC*, 458 B.R. 87, 113 (Bankr. S.D.N.Y. 2011). Instead, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Rule 8 of the Federal Rules of Civil Procedure ("**Rule 8**") requires that the plaintiff set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8 "does not require that 'a complaint [. . .] exhaustively present the facts alleged, as long as it gives each defendant fair notice of what the plaintiff's claim is and the facts upon which it rests.'" *In re Bernard L. Madoff*, 458 B.R. at 113 (citation omitted).

Rule 8 applies to all of the claims in the Amended Complaint except for the three intentional fraudulent transfer claims. *See, e.g., In re Bernard L. Madoff*, 458 B.R. at 111 (recognizing that "the Second Circuit has indicated that Rule 8(a) applies to constructive fraud claims even in cases where the courts consider the transferee's knowledge of the fraud and underlying conduct"). The Committee's intentional fraudulent transfer claims are subject to Rule 9(b) of the Federal Rule of Civil Procedure ("**Rule 9(b)**"), which requires pleading with particularity (but again, not detailing all of the evidence in support). As explained below, the Complaint meets these standards.

6

## ARGUMENT

### I.    The Committee Has Stated Claims For Intentional Fraudulent Transfers

Counts 4, 5, and 6 of the Amended Complaint allege intentional fraudulent transfers by the Debtors to or for the benefit of the Defendants.  Specifically, the Committee seeks to avoid as fraudulent transfers, pursuant to section 548(a)(1)(A) of the Bankruptcy Code, (i) the Prepetition Second Lien Notes (Count 4, Am. Compl. ¶ 198), (ii) the liens and guarantees granted in connection with the Prepetition Second Lien Facilities (Count 5, Am. Compl. ¶ 204), and (iii) the liens and equity pledges granted in connection with the Prepetition First Lien Facility (Count 6, Am. Compl. ¶ 210).[9]  The allegations in the Amended Complaint are more than sufficient to sustain these claims at the motion to dismiss stage.

### A.  Applicable Pleading Standards For Intentional Fraudulent Conveyance

Under Section 548(a)(1)(A), a transfer made or incurred on or within 2 years before the filing of the petition may be avoided if the debtor voluntarily or involuntarily made such transfer or incurred such obligation "with ***actual intent to hinder, delay, or defraud*** any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred [or] indebted[.]"  11 U.S.C. § 548(a)(1)(A) (emphasis added).  Thus, the crucial element of an intentional fraudulent transfer claim, and the element in dispute here, is the Debtors' "actual intent to hinder, delay, or defraud."  *In re Enron Corp.*, 328 B.R. 58, 73 (Bankr. S.D.N.Y. 2005) ("[A]s section 548(a)(1)(A) refers to 'hinder, delay or defraud' in the disjunctive,

---

[9]    The Prepetition Second Lien Defendants assert that Counts 4 and 5 (intentional fraudulent transfers) and 7 and 8 (constructive fraudulent transfers) are targeted only at obligations and not liens. *See* Second Lien Br. at 8 n.15.  The Committee disagrees with this mischaracterization of the Amended Complaint.  In any event, since the Prepetition Second Lien Defendants have purported to respond to each of these Counts "as if the Committee is seeking to avoid under Section 548" both the incurrence of obligations and the grant of liens, the issue is moot.  To the extent the Court nonetheless deems it necessary, the Committee respectfully requests leave to file a second amended complaint clarifying that it seeks to invalidate both the incurrence of obligations and the grant of liens in connection with the Prepetition Second Lien Facilities and the Prepetition First Lien Facility.

intending any of these results is sufficient to render a transfer fraudulent"). Intentional fraudulent conveyance claims "turn on the intent of the debtor in making the transfer; the state of mind of the transferee is irrelevant." *In re Bayou Grp., LLC*, 439 B.R. 284, 304 (Bankr. S.D.N.Y. 2010) ("[T]he state of mind of the transferee is irrelevant").

A fraudulent transfer claim under Section 548(a)(1)(A) is subject to Federal Rule of Civil Procedure 9(b). Rule 9(b) provides that "[m]alice, **intent**, knowledge, and other conditions of a person's mind **may be alleged generally**." *Id.* (emphasis added). An "inference of fraudulent intent may be established either (1) by alleging facts demonstrating that the Defendants had both the motive and the opportunity to commit fraud or (2) by alleging facts that 'constitute strong circumstantial evidence of conscious misbehavior or recklessness[.]'" *In re Saba Enters. Inc.*, 421 B.R. 626, 642 (Bankr. S.D.N.Y. 2009) (citation omitted). Alleging "badges of fraud" based on the "totality of the circumstances" is sufficient to satisfy the intent requirement of Section 548(a)(1)(A). *In re Enron Corp.*, 328 B.R. at 73-74. Established badges of fraud include, among others:

1)  a close relationship among parties to the transaction;

2)  a secret, questionable, or hasty transfer not in the usual course of business;

3)  the inadequacy of the consideration;

4)  the transferor's knowledge of other creditor's claims and the debtor's inability to pay them;

5)  the existence of a pattern or series of transactions or course of conduct after the onset of financial difficulties;

6)  the chronology of the events and transactions under inquiry, including whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred

8

*See In re Enron Corp.*, 328 B.R. at 73-74; *In re Lehman Bros. Hldgs. Inc.*, 469 B.R. 415, 447

(Bankr. S.D.N.Y. 2012); *Geltzer v. Artists Mktg. Corp. (In re Cassandra Group)*, 338 B.R. 583,

598 (Bankr. S.D.N.Y. 2006) (Finding that "where certain 'Badges of Fraud' are present, an

actual intent to hinder, delay or defraud either present or future creditors under section 276 of the

NYDCL is presumed. One of these 'Badges of Fraud' is a lack of consideration for a transfer").

Furthermore, courts "usually evaluate averments of fraud more liberally in the

bankruptcy context than in other civil actions." *Am. Tissue, Inc. v. Donaldson*, 351 F. Supp. 2d

79, 106 (S.D.N.Y. 2004) (citation omitted).  "Greater liberality in the pleading of fraud is

particularly appropriate in bankruptcy cases, because, as here, it is often the trustee, a third party

outsider to the fraudulent transaction, that must plead the fraud on secondhand knowledge for the

benefit of the estate and all of its creditors." *Secs. Investor Protection Corp. v. Stratton

Oakmont, Inc.*, 234 B.R. 293, 310 (Bankr. S.D.N.Y. 1999); *Gredd v. Bear, Sterns Sec. Corp. (In

re Manhattan Inv. Fund. Ltd.)*, 310 B.R. 500, 505 (Bankr. S.D.N.Y. 2002) (same).  If a

complaint describes the specific injury, the legal theories upon which it bases its claims, and

suffices to allow each defendant to prepare an effective answer or defense, it has met the

requirements of Rule 9(b).  *See Donaldson*, 351 F. Supp. 2d at 107.[10]

## B.  The Committee Has Sufficiently Alleged The Debtors' Actual Intent To Hinder, Delay, Or Defraud Creditors

The Amended Complaint alleges multitudinous badges of fraud that are sufficient to

(1) demonstrate that the Debtors had both the motive and the opportunity to commit fraud and

(2) provide circumstantial evidence of conscious misbehavior or recklessness.  *See In re Saba*,

---

[10]    The Prepetition First Lien Defendants erroneously invoke a pleading standard imposed by the Private Securities Litigation Reform Act on securities class action litigation.  *See* First Lien Br. at 9 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 323 (2007)).  That standard has no application to this case.

421 B.R. at 643. In fact, the Amended Complaint includes allegations establishing *every one* of the badges of fraud identified above. For example, based on information publicly available or only recently uncovered by the Committee during its pre-filing investigation, the Amended Complaint alleges:

- SUNE management extensively manipulated SUNE's financial reports and cash position leading up to the January 2016 Transactions to mask its woeful and declining economic position and to pay (or avoid paying) debts as they became due. *See* Am. Compl. ¶¶ 121-131.

- SUNE management compelled its employees to manipulate and fabricate SUNE's weekly forecasts in the time period leading up to the January 2016 Transactions to conceal SUNE's insolvency. *Id.* ¶¶ 129-130.

- SUNE management intentionally failed to implement sufficient capital controls, a decision designed to ensure the financial markets did not have an accurate view of SUNE's increasingly problematic liquidity position. *Id.* ¶¶ 122-124.

- Outside the ordinary course of business, SUNE offered its existing creditors a sweetheart deal in order to avoid having to raise money on the public markets and reveal the truth about its financial misconduct. *Id.* ¶ 134.

- At least one secured creditor recognized what was going on as "shadiness" on SUNE's part by avoiding having to raise money on the public markets — but still turned a blind eye. *Id.*

- The January 2016 Transactions provided for secret or hasty transfers that lacked transparency. Of the US $725 million in new funds provided by the Prepetition Second Lien Term Loan, US $174 million was used to pay off existing loans, leaving, approximately US $551 million unaccounted for. *Id.* ¶¶ 135, 138.

- The January 2016 Transactions also involved an unconscionable discrepancy between the value of the property transferred and the consideration received — it: (i) replaced unsecured Old Notes with substantially more valuable secured New Notes; (ii) provided Prepetition Second Lien Defendants equity pledges on the Prepetition Guarantors, which provided guarantees in return for less than equivalent value; and, (iii) granted the Prepetition First Lien Defendants an expanded collateral and guarantee package in return for effectively no consideration. *Id.* ¶¶ 132, 140, 144, 150.

- The quid pro quo for the January 2016 Transactions was that: (i) SUNE management could bury its misdeeds for a (short) time longer, while

(ii) SUNE's secured creditors could improve their own position within SUNE's capital structure and ensure they would effectively eliminate their risk of non-payment. *Id.* ¶¶ 133, 150.

- Unsurprisingly, the questionable and hasty January 2016 Transactions did nothing to stave off the Debtors' need to file for bankruptcy protection, which certain Defendants acknowledged just weeks later and, after being artificially delayed to avoid the 90-day preference window for non-insiders, became a reality a mere 101 days after the transactions closed. *Id.* ¶¶ 4, 147.

- The improprieties committed by SUNE management have given rise to a *criminal* inquiry by the Department, a regulatory investigation by the Securities and Exchange Commission, and an internal audit committee investigation. *Id.* ¶ 160.

- Across the country, claims have been brought against SUNE's directors and officers alleging breaches of fiduciary duty and securities fraud. *Id.*

- Within a matter of weeks following the closing of the January 2016 Transactions, the Debtors' management had effectively ceded their financial decision-making authority to secured creditors, which exploited their leverage over SUNE, exercising insider control by appointing a chief restructuring officer of their choosing, rejecting a competing post-petition financing DIP proposal (and preemptively dissuading any others from being received), and dictating which entities would file for bankruptcy protection and, most significantly, *when* such filing would occur in relation to the 90-day preference period provided under applicable bankruptcy law. *Id.* ¶¶ 162-163.[11]

---

[11]    In addition to the above, the Defendants have tried to insulate themselves from this litigation by effectively de-funding suits against them. For example, the Final DIP Order purports to prohibit funding for the Committee to prepare, initiate, or prosecute any claims against not only the DIP lenders, but also the Prepetition Secured Parties – in other words, the Defendants themselves — and provides for a budget of only US $175,000 for the Committee to investigate any such claims. *See Final Order (I) Authorizing Debtors to (A) Obtain Senior Secured, Superpriority, Postpetition Financing Pursuant to Bankruptcy Code Sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) And 364(e) And (B) Utilize Cash Collateral Pursuant to Bankruptcy Code Section 363, And (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to Bankruptcy Code Sections 361, 362, 363 and 364* (the "**Final DIP Orde**r"). [Dkt. No. 523]. That this was a step too far was confirmed when (as discussed below) on December 20, 2016, many of these same Defendants brought an action against former SUNE directors and officers on the basis that they "proceeded with the Second Lien Facility to defraud the Second Lien Lenders." *See* Summons and Complaint at ¶ 143, *Bowery Opportunity Fund, L.P., et al. v. Antonio R. Alvarez, et al.*, Index No. 656642-2016 (N.Y. Sup. Ct. Dec. 20, 2016) NYSCEF Doc. No. 01, attached as Exhibit A to the *Declaration of Jeremy C. Hollembeak In Support of Plaintiff's Omnibus Opposition to Defendants' Motions to Dismiss* (the "**Hollembeak Declaration**"). Having admitted the January 2016 Transactions were fraudulent, the Defendants' true motivation for the restrictions in the Final DIP Order becomes clear: to preserve the very benefits they obtained by that fraud to the detriment of the Debtors' estates.

11

Together, these allegations provide strong circumstantial evidence that SUNE management engaged in the January 2016 Transactions with actual intent to hinder, delay, or defraud its unsecured creditors. Numerous courts have sustained intentional fraudulent transfer claims on similar allegations. *See, e.g.*, *Weisfelner v. Hofmann (In re Lyondell Chem. Co.)*, 554 B.R. 635, 653 (S.D.N.Y. 2016) (finding that the Trustee adequately pleaded a claim that the debtor engaged in an intentional fraudulent transfer because "a 'very large proportion of [the debtor's] assets' became subject to liens; that the transfer was to an insider in the sense that directors received 'large' cash payments [. . .] and that the debtor became insolvent shortly after the transfer")[12]; *Pereira v. Grecogas Ltd. (In re Saba Enters.)*, 421 B.R. 626 (Bankr. S.D.N.Y. 2009) (finding that the Trustee adequately alleged actual fraudulent transfer claims where several badges of fraud were present, including inadequate consideration, a close relationship between the parties, and the timing of the transfers and the bankruptcy filing which supported an inference of actual fraud); *Slone v. Lassiter (In re Grove-Merritt)*, 406 B.R. 778, 801-802 (Bankr. S.D. Ohio 2009) (finding that the Trustee met burden under 548(a)(1)(A) where badges of fraud were established, including that the debtor either was insolvent or was rendered insolvent by the transfer; the debtor transferred substantially all assets through the transfer; and the debtor did not receive consideration that was reasonably equivalent to the value she transferred).

Finally, notwithstanding their position that the Amended Complaint contains insufficient allegations, the Defendants themselves concede that SUNE proceeded with the January 2016 Transactions to defraud its creditors. Specifically, on December 20, 2016, a group of Prepetition

---

[12]    Notably in *In re Lyondell*, the debtor company was able to survive outside of bankruptcy during the onset of a global financial crisis for more than a year following the allegedly fraudulent transaction, in stark contrast to the (artificially prolonged) 101 days between the closing of the January 2016 Transactions and the Debtors' chapter 11 filing.

Second Lien Lenders (including approximately *two dozen* of the Defendants named in the Amended Complaint) commenced an action in Supreme Court of the State of New York (County of New York) asserting claims against certain former directors, officers, and executives of SUNE for fraudulent inducement, fraudulent concealment, aiding and abetting fraud, negligent misrepresentation, and gross negligence in connection with the January 2016 Transactions. *See* Exhibit A to Hollembeak Declaration at ¶¶ 159-193.  To support these claims, the Prepetition Second Lien Lender Plaintiffs allege, among other things, that SUNE continued an ongoing practice[13] of issuing materially false statements and omissions to obtain new financing via the January 2016 Transactions, that such transactions would have been delayed if the Defendants had known of the ongoing audit committee investigation, and that such transactions would have been "doomed" altogether if the Defendants had known SUNE's true financial condition.[14] Those allegations speak in the same voice and tell the exact same story as the allegations in the Amended Complaint.  They cannot plausibly be taken to support claims that SUNE engaged in the January 2016 Transactions with an intent to hinder, delay, or defraud the Defendants but not also the rest of its existing creditors who were sent to the back of the line behind the US $ 950 million in secured claims those fraudulent transactions created.  Thus, Defendants' assertions that the Amended Complaint does not and cannot adequately allege the Debtors' intent to hinder, delay or defraud their creditors generally is at best distraction and at worst hypocrisy.

---

[13]    *See. e.g.,* Exhibit A to Hollembeak Declaration at ¶ 100 (alleging SUNE agreed, and then failed, to disclose outsized fees and interest in connection with the August 2015 Prepetition Second Lien Term Loan from Defendant Goldman Sachs Bank USA).

[14]    *Id.* ¶¶ 128-132, 139-143.  Of course, what the Defendants actually knew before lending US $725 million of new money into SUNE's "liquidity crisis", what they should have known, and why there was knowledge "gap" are all questions of fact for discovery and trial if Defendants persist to assert their 548(c) defense. *See infra* Argument I(D).

**C. Defendants' Scattershot Arguments For Why An Intentional Fraudulent Transfer Has Not Been Sufficiently Alleged Are Unavailing**

The Defendants have advanced various arguments for why the detailed allegations of fraud described above are insufficient. All of these arguments should be rejected.

First, the Defendants label the Committee's allegations as "conclusory" and "unsupported" and "skeletal" and a mere "pleading tactic." First Lien Br. at 11; Second Lien Br. ¶¶ 45, 88. However, as described above, the allegations are specific and, as evidenced by the numerous redactions in the publicly filed version of the Amended Complaint, based on records produced by the Debtors and Defendants themselves that were created contemporaneous to the alleged fraudulent activities. The allegations describe, on a nearly day-by-day basis, the Debtors' descent into financial mismanagement and insolvency — in other words, their motive, opportunity and reckless misbehavior. *See* Am. Compl. ¶ 115-131. That the U.S. Department of Justice, the SEC, the SUNE Audit Committee and private litigants are all expending substantial resources investigating SUNE is further corroboration of the numerous *indicia* of fraud in this case. Of course, the Committee is not required to ***prove*** its claims at this juncture. The pleading standards simply require the Committee to allege circumstantial evidence of fraudulent intent, and the Committee has done so.

Second, the Defendants raise disputed factual arguments that either mischaracterize or go beyond the scope of the Amended Complaint. For example, the Prepetition First Lien Defendants opine without any basis at all that the January 2016 Transactions allowed SUNE to "create value for all stakeholders — including the unsecured creditors." First Lien Br. at 16. The Prepetition Second Lien Defendants pontificate on the purported "common element[s] of corporate finance" and claim the "most plausible inference" regarding the Subsidiary Guarantors is that they "***did*** receive reasonably equivalent value as a result of the January Financing."

14

Second Lien Br. ¶¶ 39, 49 (emphasis in original).  No court has relied on this type of rank speculation by legal counsel in deciding a motion to dismiss.  In any event, based on the allegations in the Amended Complaint, the inference that SUNE management used the new money provided by the January 2016 Transactions to create value disproportionately (and likely only) for themselves and their preferred creditors (*i.e.*, the Defendants) is more plausible than any other.

Third, the Prepetition First Lien Defendants argue that even if the January 2016 Transactions were intended to hinder, delay, or defraud SUNE's unsecured creditors, there would be no fraudulent transfer under Section 548(a)(1)(A) as long SUNE's secured creditors profited at their expense.  *See* First Lien Br. at 13 (asserting Amended Complaint fails to allege harm to *all* creditors instead of just those that remained unsecured following the January 2016 Transactions).  This does not make sense on several levels.  The statutory language of Section 548(a)(1)(A), provides that a transfer or obligation may be avoided if it was made with actual intent to hinder, delay, or defraud "***any entity***" to which the debtor was or became indebted.  11 U.S.C. § 548(a)(1)(A) (emphasis added).  Here, the unsecured creditors indisputably were "any entity" to which SUNE was indebted, and the Amended Complaint details how they were defrauded.  Thus, the plain language of Section 548(a)(1)(A) applies regardless of whether SUNE's secured creditors may have profited at the expense of the unsecured creditors.[15]

Fourth, the Prepetition First Lien Defendants assert that there was no fraudulent "transfer" because they purportedly "already had liens on the assets" that were pledged to them

---

[15]     The Prepetition First Lien Defendants rely on a First Circuit case interpreting Massachusetts law, which, unlike the Bankruptcy Code, requires intent to "hinder, delay or defraud [. . .] ***creditors***." *Boston Trading Grp., Inc. v. Burnazos*, 835 F.2d 1504, 1511 (1st Cir. 1987) (emphasis added).  The Second Circuit case on which the Prepetition First Lien Defendants rely, *In re Sharp*, likewise was interpreting New York law, not the Bankruptcy Code.  Nor does the case help them because it holds that a transfer that is more advantageous for one creditor over the other is "a ***preference between creditors***." *In re Sharp Int'l Corp.*, 403 F.3d 43, 54 (2nd Cir. 2005) (emphasis added).

15

in connection with the January 2016 Transactions.  First Lien Br. at 10-11, 31.  To arrive at this conclusion, the Prepetition First Lien Defendants raise numerous questions of fact that cannot be resolved at this stage.  *Id.*  Furthermore, the Prepetition First Lien Defendants acknowledge elsewhere in their brief — consistent with the Amended Complaint and contrary to their prior argument — that the January 2016 Transactions "***granted*** or reaffirmed ***additional*** liens to the First Lien Agent[.]"  First Lien Br. at 18 (emphasis added).  There is clearly an issue of fact as to whether the Prepetition First Lien Defendants received "additional" collateral in connection with the January 2016 Transactions for virtually nothing in exchange, as the Amended Complaint alleges. *See* Am. Compl. ¶ 152.

Fifth, the Prepetition Second Lien Defendants assert that the Court cannot infer that the Debtors "consummated the January Financings to place assets outside of creditors' reach" because the Amended Complaint lacks allegations that the funds from the January 2016 Transactions "were used for anything other than the Debtors' and their creditors' benefit." Second Lien Br. ¶ 51.  To the contrary, the Committee made allegations concerning management's manipulation of the Debtors' financial health for a significant period of time prior to January 2016, including by internal shuffling of moneys in support of inaccurate forecasting to give the impression externally that the company was financially stable.  In other words, the wheels of the Debtors' fraud were already turning and the Court can infer from these allegations that the addition of new funds merely greased the gears.  The Committee also alleged that proceeds from the US $725 million Second Lien Term Loan were used to pay off US $174 million of existing indebtedness [Am. Compl. ¶ 138], but did not make allegations regarding the other 75% of the proceeds because they apparently remain ***unaccounted*** for and may well have been diverted to other improper ends such as, for example, a preferential transfer to TERP and GLBL.  *See Notice of Motion of Official Committee of Unsecured Creditors For (I)*

*Leave, Standing and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of Debtors' Estates And (II) Settlement Authority* ("**YieldCo Standing Motion**") [Dkt. No. 1557]. Beyond repeating management's contemporaneous (and conclusory) assertion that such funds were used for "general corporate purposes" — none of the Defendants has addressed this glaring discrepancy despite having the ability to do so given their involvement in the transaction and assertion that every dollar lent that was used to retire legitimate antecedent debt is *per se* shielded from avoidance as a fraudulent or preferential transfer. *See* Second Lien Br. ¶¶ 7, 39, 41, 71; Exhibit E to Newman Declaration. Accordingly, based on the record presented, it would be improper for the Court to infer that the proceeds were ultimately used to benefit SUNE or its creditors.

### D.  The Defendants' Section 548(c) Defense Is Premature

Next, Defendants attempt to argue that they are entitled to an affirmative defense under Section 548(c), because they purportedly received the alleged fraudulent transfers and obligations "for value and in good faith." First Lien Br. at 17-18; Second Lien Br. ¶ 54. This argument is premature. Section 548(c) "designates the transferee's good faith as an *affirmative defense* which may be raised and proved by the transferee at trial." *Gredd v. Bear, Stearns Secs. Corp. (In re Manhattan Inv. Fund, Ltd.)*, 310 B.R. 500, 508 (Bankr.S.D.N.Y.2002) (emphasis in original). The Committee need not plead lack of good faith as an element of its claims. *In re Bernard L. Madoff Inv. Secs., LLC*, 440 B.R. 243, 256 (Bankr. S.D.N.Y. 2010) ("As such, the Moving Defendants' arguments under section 548(c) of the Code are irrelevant to the Trustee's pleading requirements, and thus ineffective in dismissing the Trustee's Code-based actual fraud claims").

The Defendants' suggestion that the Amended Complaint affirmatively establishes their receipt "for value and in good faith" is misplaced. First Lien Br. at 18; Second Lien Br. ¶ 54.

For one, as alleged in the Amended Complaint, the Prepetition First Lien Defendants received an expanded collateral package in connection with the January 2016 Transactions, yet effectively provided no value at all. *See* Am. Compl. ¶¶ 149-150. While the Prepetition First Lien Defendants try to bootstrap this collateral to the funding provided by the Prepetition Second Lien Defendants, *see* First Lien Br. at 18, that funding — of which the aggregate value, if any, is hotly disputed — was provided by the Prepetition Second Lien Defendants and not the Prepetition First Lien Defendants.

Furthermore, nothing in the Amended Complaint suggests that any defendant entered into the January 2016 Transactions "in good faith." To argue otherwise, the Defendants use a proverbial "sleight of hand," falsely equating an allegation that the Defendants themselves have stated that they lacked contemporaneous awareness of the Debtors' fraud, with an admission by the Committee that the Defendants extracted effectively all residual value from the Debtors "for value and in good faith", as required for application of Section 548(c) to apply. *See* First Lien Br. at 4, 15, 18, 38; Second Lien Br. at 39 no.23, ¶ 52. The Committee has made no such admission. To the contrary, the Amended Complaint clearly alleges, among other things, that Defendants "did realize that they were receiving an abnormally favorable deal" and that at least one secured creditor believed that SUNE was willing to enter into a deal with such onerous terms because "SUNE was trying to cover up its 'shadiness' by avoiding having to raise money on the public markets, where SUNE would need to be more transparent about its finances." Am. Compl. ¶ 134. The Amended Complaint further alleges that, shortly after the closing of the January 2016 Transactions, the Chief Executive Officer of one of the holders of second lien debt emailed that SUNE's stock was "wildly overvalued" and that "the entire market is focused on SUNE and nobody has any clue what is really going on." Am. Compl. ¶ 156. That the secured creditors entered into the January 2016 Transactions by turning a blind eye to the "shadiness"

18

and with knowledge that they were receiving an "abnormally favorable deal" negates any good faith defense at the motion to dismiss stage.  Am. Compl. ¶ 134.  That the Defendants may have also been misled by the Debtors or believed that SUNE would quickly rebound from its financial state is consistent with these allegations and does not establish any Defendant's "good faith" as a matter of law.  At most, good faith under Section 548(c) is a factual issue for trial.  *See In re Bernard L. Madoff*, 440 B.R. at 256 ("The element of good faith under section 548(c) of the Code, bearing upon a transferee's motivations, is 'indisputably a factual question' that 'may not be determined on the face of [a] complaint'").

## II.    The Committee Has Sufficiently Alleged Claims For Constructive Fraudulent Transfers

Counts 7, 8, and 9 of the Amended Complaint allege constructive fraudulent transfers by the Debtors to or for the benefit of the Defendants.  Specifically, the Committee seeks to avoid as constructive fraudulent transfers, pursuant to section 548(a)(1)(B) of the Bankruptcy Code, essentially the same aspects of the January 2016 Transactions discussed above: (i) the Prepetition Second Lien Notes (Count 7, Am. Compl. ¶ 217), (ii) the liens and guarantees granted in connection with the Prepetition Second Lien Facilities (Count 8, Am. Compl. ¶ 224), and (iii) the liens and equity pledges granted in connection with the Prepetition First Lien Facility (Count 9, Am. Compl. ¶ 231).

### A.  Applicable Pleading Standards For Constructive Fraudulent Conveyance

Under § 548(a)(1)(B), a transfer or obligation incurred by the debtor made or incurred on or within 2 years before the date of the filing of the petition may be avoided, if the debtor voluntarily or involuntarily:

(i)      received less than reasonably equivalent value in exchange for such transfer or obligation; and, among other things;

(ii)     either (a) was insolvent on the date that such transfer was made or such
obligation was incurred, (b) became insolvent as a result of such transfer
or obligation; or (c) intended to incur, or believed that the debtor would
incur, debts that would be beyond the debtor's ability to pay as such debts
matured.

*See* 11 U.S.C. § 548(a)(1)(B).

Unlike the intentional fraudulent transfer claims discussed above, claims for constructive

fraudulent transfer are not subject to the heightened pleading requirements of Rule 9(b).  These

claims are governed by Rule 8.  *See, e.g.*, *Silverman v. Actrade Capital, Inc. (In re Actrade Fin.*

*Techs. Ltd.)*, 337 B.R. 791, 802 (Bankr. S.D.N.Y. 2005).  Rule 8 requires only that the plaintiff

set forth a "short and plain statement of the claim" showing that the plaintiff is entitled to relief.

Fed. R. Civ. P. 8(a)(2).  The allegations need only "give the defendant fair notice of what the

plaintiff's claim is and the grounds upon which it rests."  *Swierkiewicz v. Sorema N.A.*, 534 U.S.

506, 995 (2002) (citation omitted).

In this case, as the Amended Complaint sets forth in detail, SUNE is alleged to have

received less than reasonably equivalent value in exchange for the January 2016 Transactions.

Furthermore, SUNE is alleged to have (a) been insolvent on the date of the transfers and

obligations at issue, or (b) become insolvent as a result of those transfers and obligations, or

(c) intended to incur, or believed it would incur, debts that would be beyond its ability to pay as

such debts matured.  Finally, the safe harbor exception under 546(e) of the Bankruptcy Code

does not apply in this case, and particularly not at this stage in the proceedings.

**B.  The Debtors Did Not Receive Reasonably Equivalent Value**

As set forth in the Amended Complaint, the January 2016 Transactions (i) replaced the

Debtors' outstanding unsecured notes with substantially more valuable second lien secured notes

(Count 7, Am. Compl. ¶ 217); (ii) granted the Debtors' second-lien creditors a substantially

expanded package of liens on and guarantees by fifteen of SUNE's previously unencumbered

20

subsidiaries (Count 8, Am. Compl. ¶ 224); and (iii) granted the Debtors' existing first-lien creditors an expanded package of liens on previously unencumbered subsidiaries in exchange for nothing more than consenting to the improper transactions described in points (i) and (ii) above (Count 9, Am. Compl. ¶ 231). *See, e.g.*, Am. Compl. ¶¶ 132, 140-45, 149-54. The Amended Complaint expressly alleges that these transfers were made and obligations incurred for less than reasonably equivalent value. *See* Am. Compl. ¶¶ 142-145, 153-54. While defendants may dispute whether the value was reasonably equivalent, that is a fact-intensive dispute for discovery and trial. *See In re Actrade Fin. Techs., Ltd.*, 337 B.R. 791, 804 (Bankr. S.D.N.Y. 2005) (recognizing that the question of "reasonably equivalent value" is fact intensive and "usually cannot be determined on the pleadings").

Defendants seek to invoke a purported *per se* rule that any lien granted to secure a preexisting debt constitutes "reasonably equivalent value" as a matter of law and therefore beyond the reach of Section 548(a)(1)(B). First Lien Br. at 19-22; Second Lien Br. ¶¶ 29, 32-33.[16] The premise of this rule, as the Defendants would apply it, is that a lien effectively has no value. No Second Circuit decision has adopted such a principle, and at least one Bankruptcy Appellate Panel has rejected it in a well-reasoned decision. *See In re Solomon*, 299 B.R. 626, 636-37 (10th Cir. BAP 2003) (declining to follow *per se* antecedent debt rule). Nor does the purported *per se* rule make sense: if two parties freely negotiate debt with particular terms, and then sometime later the borrower provides additional liens to secure that debt for nothing in exchange, it simply cannot be said that the liens were provided for "reasonably equivalent" value. The new liens necessarily have a market value at the time they are granted — particularly

---

[16]     Defendants do not suggest that such a rule would operate to bar constructive fraudulent transfer claims based on the Debtor Guarantees or other obligations at issue. In fact, the Prepetition Second Lien Defendants admit that "the question of whether a debtor received reasonably equivalent value for guaranteeing the debt of its affiliate may present a disputed fact[.]" Second Lien Br. ¶ 36.

when the lender, as in this case, is experiencing substantial liquidity problems and is approaching

bankruptcy.  The Bankruptcy Code explicitly recognizes this by defining "value" to include

"securing of a present or antecedent debt of the debtor".  11 U.S.C. § 548(d)(2)(A).  Thus, if a

debtor grants liens to secure antecedent debt that its creditor already agreed to and did, in fact,

lend without being secured by such liens, it *must* receive something of reasonably equivalent

value in return or be subject to avoidance as a constructively fraudulent transfer.

Here, whether the Defendants gave *something* at all, and if so, what *value* that something

had are disputed issues of fact.  Prior to the January 2016 Transactions, neither of the existing

Prepetition First or Second Lien Facilities were in default, nor were the Prepetition First Lien

Defendants or the 2015 Prepetition Second Lien Term Loan Defendant preparing to exercise

remedies in anticipation of a default or take any action for which their forbearance could be

considered material consideration supporting a transfer of value from the Debtors.[17]  Thus, by the

January 2016 Transaction, SUNE extracted no value from the Prepetition First Lien Lenders

(*e.g.*, additional credit or an extended maturity) and repaid the 2015 Prepetition Second Lien

Term Loan seven months before its maturity date of August 11, 2016 purely as a matter of

discretion.  The only purported "value" the Prepetition First Lien Lenders can point to in

exchange for the expansion of their collateral package to include previously unencumbered

assets is their permission to the Debtors to incur additional indebtedness secured by the same

---

[17]      By contrast, in the decisions cited by the Defendants, the debtors were in default on their antecedent debt and therefore gave liens to secure such debt in exchange for their creditors' forbearing from an exercise of remedies and continuing to lend the debtor additional funds.  *See Official Comm. of Unsecured Creditors of Champion Enters. v. Credit Suisse* (*In re Champion Enters.*), 2010 WL 3522132 at *2 (Bankr. D. Del. Sept. 1, 2010) (underlying debt in default when additional lien granted); *Anand v. Nat'l Republic Bank of Chicago*, 239 B.R. 511, 513 (N.D. Ill. 1999) (same); *Pfeifer v. Hudson Valley Bank, N.A.* (*In re Pfeifer*), No. 12-13852, 2013 WL 3828509, at *5 (Bankr. S.D.N.Y. July 23, 2013) (same); *In re M. Fabrikant & Sons, Inc.*, 394 B.R. 721, 727-36 (Bankr. S.D.N.Y. 2008) (same); *Geron v. Palladin Overseas Fund, Ltd.* (*In re AppliedTheory Corp.*), 323 B.R. 838, 839 (Bankr. S.D.N.Y. 2005) (same); *Cuevas v. Hudson United Bank* (*In re M. Silverman Laces, Inc.*), No. 01-6209 (DC), 2002 WL 31412465, at *1, 6 (S.D.N.Y. Oct. 24, 2002) (same).

collateral **on an entirely subordinated basis** to the Prepetition First Lien Facility. In fact, far from giving any value away, several of the Prepetition First Lien Lenders stood to profit handsomely for acting as arrangers for the Second Lien Term Loan.[18]

The Prepetition Second Lien Defendants also attempt to shoehorn this defense around the Debt Exchange, recasting it as a mere "modification of antecedent debt", and thereby arguing the grant of liens to secure that debt was reasonably equivalent value *per se*. Second Lien Br. ¶¶ 27, 31-33. But the shoe does not fit — the Old Notes were not in default, the vast majority did not mature until 2020 or after, and in any event, they structured the transaction as an issuance of New Notes. The Prepetition Second Lien Defendants cannot invoke a purported *per se* rule that applied to the collateralization of existing indebtedness when that is not how they structured the January 2016 Transactions. Moreover, *none* of SUNE's subsidiaries that guaranteed the New Notes were obligors on the Old Notes, and therefore the pledge of their assets to secure the New Notes was not the collateralization of *their* antecedent debt.

The Prepetition Second Lien Defendants' remaining arguments regarding the proceeds of the Second Lien Facilities and the Debt Exchange underscore that the parties should be allowed to test the factual disputes around reasonable equivalence through discovery and trial. *See In re TOUSA, Inc.*, 680 F.3d 1298, 1311 (11th Cir. 2012) ("It has long been established that '[w]hether fair consideration has been given for a transfer is largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts'"). Dismissal cannot be premised on the mere platitude that raising new money "to cure the Debtors' liquidity problems and right the ship" rendered the issuance of the Subsidiary Guarantees and Liens and the consummation of

---

[18]       *See* Second Lien Credit Agreement § 2.09, Exhibit 4 to the *Declaration of Christopher Harris* ("the **Harris Declaration**") in the *Prepetition First Lien Administrative Agent's and Lenders' Memorandum of Law In Support of Motion to Dismiss* [AP Dkt. No. 18] at page 224 of 458 (promising potentially substantial Fronting Compensation Fees to Defendants Deutsche Bank Securities Inc., Barclays Bank PLC, Macquarie Capital (USA) Inc. and KeyBanc Capital Markets Inc.).

the Notes Exchange "necessary". Second Lien Br. ¶ 49. "A corporation is not a biological entity for which it can be presumed that any act which extends its existence is beneficial to it." *In re TOUSA, Inc.*, 680 F.3d at 1311 (citation omitted). The Amended Complaint contains more than adequate allegations to establish that SUNE was engaged in fraud before, during, and after consummation of the January 2016 Transactions. Under the circumstances, the Court plausibly can infer that the new money received in those transactions did not go to pay legitimate corporate expenses or otherwise benefit SUNE's existing creditors. Tellingly, of the US $725 million new money provided, the Prepetition Second Lien Defendants point the Court to merely US $174 million in alleged value flowing to SUNE's subsidiaries in exchange for their liens, pledges and guarantees. Second Lien Br. ¶ 56.[19]

Likewise, the Court plausibly can infer that the value exchanged in the Notes Exchange was far from reasonably equivalent. The very fact that the Prepetition Second Lien Defendants were unwilling to lend new money without guarantees and liens on substantially all assets belies the suggestion that they should be credited dollar-for-dollar value for each unsecured Old Note. Indeed, the incredulous assertion that they provided *more* than reasonably equivalent value because the face amount of unsecured convertible notes they surrendered (*i.e.*, the Old Notes) exceeded the face amount of the New Notes they received (Second Lien Br. ¶ 30) wholly ignores the reality that within a few months of the January 2016 Transaction — and as a direct result thereof — over $2 billion in face amount of the same unsecured convertible notes stood to receive pennies on the dollar (if that) in these bankruptcy cases.

---

[19]      *Cf. In re TOUSA, Inc.*, 680 F.3d at 1308, 1311 ("Through the transaction, these lenders essentially converted their unsecured loans to the [the debtor's predecessor] into secured loans to [the debtor] and the Conveying Subsidiaries […] [F]or the Conveying Subsidiaries, the almost certain costs of the transaction of July 31 far outweighed the perceived benefits").

Accordingly, the Court should decline to adopt any contrived *per se* rules proposed by the Defendants in this case, and allow the parties to proceed with discovery on the fact-intensive issue of whether the Defendants provided the Debtors with reasonably equivalent value in the January 2016 Transactions. *See, e.g., In re TOUSA, Inc.*, 680 F.3d at 1303 (affirming findings and conclusions made by bankruptcy court after 13-day trial including extensive fact and expert testimony and 1800 admitted exhibits, that targeted transactions provided debtor with less than reasonably equivalent value).

### C.  The Amended Complaint Adequately Alleges Insolvency

Under Section 548(a)(1)(B), a transfer may be avoided if the debtor (a) was insolvent on the date that such transfer was made or such obligation was incurred, (b) became insolvent as a result of such transfer or obligation, or (c) intended to incur, or believed it would incur, debts that would be beyond its ability to pay as such debts matured.  11 U.S.C. § 548(a)(1)(B)(ii)(I), (III). The question of insolvency, like reasonably equivalent value, is a fact-intensive one.  *See Klein v. Tabatchnick*, 610 F.2d 1043, 1048 (2d Cir. 1979).  Calculating insolvency "is often technical and will require expert testimony as to the value of the assets and the exposure on the liabilities." COLLIER ON BANKRUPTCY P 548.05.  Because of its factual nature, a determination of insolvency is not appropriate for resolution on a motion to dismiss.  *See Adelphia Comm. Corp. v. Bank of America, N.A. (In re Adelphia Comm. Corp.)*, 365 B.R. 24, 37 (Bankr. S.D.N.Y. 2007).  While it is premature to determine whether SUNE was in fact insolvent at the time of the transfers, the Amended Complaint more than adequately alleges that it was.

The Amended Complaint includes specific allegations that SUNE was unable to pay routine business debts as they became due in the months and days leading up to the January 2016 Transactions.  For example, the Amended Complaint alleges:

25

- "SUNE's accounts payable quickly became a favorite lever used to manipulate SUNE's finances after it became clear to Management [. . .] that SUNE faced serious liquidity problems and could not pay all of its obligation as they became due." Am. Compl. ¶ 125.

- "[A]s early as July 2015, Senior Vice President of Finance Manavendra Sial told Mr. Wuebbels and Chief Executive Officer Ahmad Chatila that individual teams has been directed to free up trapped cash that had already been committed to projects." *Id.*

- "In August 2015, after one employee complained about a freeze on payments to vendors, Mr. Manavendra was asked to silence the employee and remind him not to send emails on the subject." *Id.*

- One SUNE employee "acknowledged that [an overdue tax payment] was the result of SUNE's cash crisis." *Id.*

- "By mid-September 2015, Management had acknowledged that it could not continue running the business in this manner. [. . .] A freeze was placed on all cash movement other than payroll or debt covenant payments through the end of the quarter; contractors were not paid as obligations became due." *Id.* ¶ 126.

- "In Early December 2015, Management knew that cash flow would be substantially negative through the end of 2016, yet plotted ways to 'push' and manipulate its cash flow forecast in order to achieve a minimum balance of US $50 million on paper." *Id.* ¶ 130

- "On December 29, 2015, just days before the January 2016 Transactions, Mr. Avenier told a subordinate to hold payments committed to a project because of concerns about breaking a contract covenant." *Id.*

These allegations are based on the Debtors' own internal correspondence and give rise to a strong inference of insolvency.  11 U.S.C. § 548(a)(1)(B)(ii)(I).  Furthermore, in light of the Debtors' inability to make even these routine payments as they came due, these allegations also give rise to a strong inference that the Debtors believed or intended that the hundreds of millions of dollars in debt they incurred in the January 2016 Transactions would likewise be beyond their "ability to pay as such debts matured." 11 U.S.C. § 548(a)(1)(B)(ii)(III).  Conversely, in the face of allegations that they had already gutted the Debtors' internal financial controls, it is not plausible to infer the Debtors' management reasonably believed the influx of additional funds

26

would legitimately resolve the liquidity problems their own fraud had created. Thus, the allegations in the Amended Complaint are sufficient to defeat the Defendants' motion to dismiss on this ground.

The Defendants seek to distract by emphasizing that the Amended Complaint has not provided extremely specific and technical facts regarding the assets and liabilities of SUNE and its individual subsidiaries at the time of the January 2016 Transactions. *See* First Lien Br. at 22; Second Lien Br. ¶¶ 37-39. This criticism is not reflective of the applicable pleading standard on a motion to dismiss. This Court should reject Defendants' invitation to review the Amended Complaint as if it were a summary judgment motion. For example, the Prepetition Second Lien Defendants reference the Committee's pre-filing investigation in the underlying bankruptcy to wrongly imply that the Committee has been afforded the opportunity to fully exhaust its rights of discovery and, therefore, any claim in the Amended Complaint requiring further factual support should not survive a motion to dismiss. *See* Second Lien Br. ¶ 104. No court has held that a Complaint need contain detailed factual information based merely on the fact that the Committee conducted some pre-filing investigation.

In any event, the Committee has made sufficient allegations in this regard. The Amended Complaint alleges that by July 2015, senior SUNE management "recognized the need to manipulate the accounts payable to mask the insolvency, and were each involved in the decisions to do so." Am. Compl. ¶ 125. It also makes clear that the bankruptcy filing was accelerated, and likely caused in part, by these Transactions. As the Amended Complaint sets out in detail, after the Debtors were painted into a corner to accept the new onerous terms (receiving less than reasonably equivalent consideration), the Transactions resulted in substantial assets of SUNE that were previously unencumbered becoming subject to liens. *See* Am. Compl. ¶ 154. The January 2016 Transactions "left SUNE saddled with hundreds of millions of dollars of additional

27

debt and set it on a course to an inevitable bankruptcy filing." *Id.* ¶ 155. And, as set forth in the Amended Complaint, the January 2016 Transactions set SUNE on a path to bankruptcy.

Finally, the Prepetition First Lien Defendants argue that the Debtors must have been solvent based on "market data" and "widespread market acceptance that SUNE was solvent." First Lien Br. at 23-24. Not only is this argument far beyond the scope of the Amended Complaint, but it also ignores the allegations that the Debtors were misrepresenting their true financial position to the world. *See* First Lien Br. at 23-24. To point to the very financial figures that the Committee alleges were falsified as evidence of the Debtors' solvency borders on the absurd.

III.    **The Amended Complaint States A Claim For Preferential Transfer With Respect To The Prepetition Second Lien Notes And The Prepetition Second Lien Term Loan**

Count 10 of the Amended Complaint seeks to avoid preferential transfers made by the Debtors in connection with the January 2016 Transactions, including (a) the grant of the security interest in the New Notes to the Prepetition Second Lien Defendants on account of the unsecured Old Notes; and (b) the payment of US $169 million to Goldman Sachs from the proceeds of the Prepetition Second Lien Term Loan on account of the 2015 Prepetition Second Lien Term Loan. *See* Am. Compl. ¶¶ 237, 240.

A.    **Applicable Pleading Standards For Preferential Transfers**

Section 547(b) of the Bankruptcy Code allows a trustee in bankruptcy to avoid any transfer of an interest of the debtor in property provided that five conditions are met: (i) it was made to or for the benefit of a creditor; (ii) it was made on account of an antecedent debt owed by the debtor before the transfer; (iii) the debtor was insolvent at the time of the transfer; (iv) the transfer was made within 90 days of the bankruptcy filing — or, if the creditor to whom the

transfer was made was an insider of the debtor at the time of the transfer, within one year of the petition date; and (v) the transfer enables the recipient to receive more than such creditor would have received in a liquidation under Chapter 7 of the Bankruptcy Code had such transfer not been made. *See* 11 U.S.C. § 547(b). Preferential transfer claims are subject to the pleading standards of Rule 8.

The Prepetition Second Lien Defendants do not appear to contest that the first, second, and fifth elements are adequately pleaded. *See* Second Lien Br. ¶¶ 26-28. The third element is satisfied for the reasons explained *supra* Argument II(C). The parties' dispute thus focuses on the fourth element: whether the Defendants are alleged to be "insiders" of the Debtors and are therefore subject to a one-year (as opposed to 30-day) preference window. A "determination of insider status is a question of fact. On that basis alone, the issue of insider status is not particularly suited to disposition by summary judgment." *In re Chas. P. Young Co.*, 145 B.R. 131, 137–38 (Bankr. S.D.N.Y. 1992); *see also Floyd v. Hefner*, 556 F. Supp. 2d 617, 658 (S.D. Tex. 2008) ("Insider status is ultimately a question of fact"). Given that the question of insider status is ill-suited even for summary judgment, it is *a fortiori* even less well suited to disposition by motion to dismiss. Because the Defendants are sufficiently alleged to be insiders of the Debtors, the Defendants' motion to dismiss Count 10 should be denied.

### B. The Amended Complaint Adequately Alleges That The Prepetition Second Lien Defendants Were Insiders At The Time Of The January 2016 Transactions

There is no dispute that the Amended Complaint is replete with allegations that the Prepetition Second Lien Defendants were "functionally insiders" of the Debtors. *See* Second Lien Br. at 28 (acknowledging Am. Compl. ¶¶ 156, 162, 164, 166). However, the Second Lien Defendants contend that these allegations are insufficient to establish insider status with respect to the preference claim because they tend to show that the Prepetition Second Lien Defendants

29

were insiders as a result of the January 2016 Transactions, rather than at the time of those Transactions. *Id.* This argument misapprehends both the allegations in the Amended Complaint and the nature of the insider inquiry.

Contrary to the Prepetition Second Lien Defendants' assertion, the Amended Complaint directly alleges that the Prepetition Second Lien Defendants were insiders at the time of the January 2016 Transaction. *See* Am. Compl. ¶ 235. Moreover, the Amended Complaint backs up that allegation with additional factual heft. The touchstone of the insider inquiry is based on two factors: "(1) the closeness of the relationship between the debtor and the transferee, and (2) whether the transactions between the transferee and the debtor were conducted at arm's length." *In re A. Tarricone, Inc.*, 286 B.R. 256, 262 (Bankr. S.D.N.Y. 2002). Under this standard, Plaintiff has alleged facts sufficient to support a plausible inference that the Prepetition Second Lien Defendants were insiders prior to and at the time of the January 2016 Transactions.

First, there is no dispute that the Prepetition Second Lien Defendants had an existing and long-standing relationship with the Debtors. Indeed, the Amended Complaint alleges that is the reason that the Debtors solicited them to participate in the January 2016 Transactions, rather than seeking lenders on the open market. *See* Am. Compl. ¶ 134 (alleging that "at least one secured creditor surmised that the real reason SUNE was willing to enter into a deal with such onerous terms was that SUNE was trying to cover up its 'shadiness' by avoiding having to raise money on the public markets, where SUNE would need to be more transparent about it finances").

Second, the allegations in the Amended Complaint regarding the depth of the Debtors' financial improprieties and the effect of their dire financial situation on the January 2016 Transactions plausibly suggest that those Transactions were not arm's length. The Amended Complaint alleges that the Debtors engaged in a series of fraudulent and bad faith accounting practices throughout the time period leading up to the January 2016 Transactions. *See* Am.

30

Compl. ¶¶ 121-131.  The ultimate effect of these practices was to leave the Debtors insolvent and

with a liquidity crisis.  As alleged in the Amended Complaint, this untenable situation was the

impetus for the Debtors to hastily arrange the January 2016 Transactions.  *Id.* ¶ 132.  Knowing

that they could not raise money elsewhere without exposing their improprieties, the Debtors were

constrained to get their existing lenders to extend further credit in exchange for a superior

position in the capital structure.  *Id.* ¶ 134.  The secured creditors, recognizing this, were able to

extract an "abnormally favorable deal."  *Id.*  Bearing these allegations in mind, it is more than

plausible that the January 2016 Transactions between (a) a debtor facing a liquidity crisis and

desperate to conceal its fraudulent behavior and (b) the sole potential source of financing were

not arm's-length.[20]  Together with the Amended Complaint's allegations concerning the pre-

existing relationship between the Debtors and the Prepetition Second Lien Defendants, the

Amended Complaint adequately pleads that the Prepetition Second Lien Defendants were

effectively insiders at the time of those transactions, such that the one-year window applies to the

Committee's preference claim.  *See* Am. Compl. ¶¶ 162-166.

### C.  The Prepetition Second Lien Notes And Prepetition Second Lien Term Loans Constitute A "Transfer" Under Section 547(b)

The Prepetition Second Lien Defendants assert that the Prepetition Second Lien Term

Loan and the Prepetition Second Lien Notes fall outside the scope of Section 547(b) because

they do not represent "transfers of an interest of the [D]ebtor[s] in property.'"  Second Lien Br.

---

[20]     The Prepetition Second Lien Defendants assert that the allegations in the Amended Complaint
regarding the fact that they themselves were misled by the Debtors affirmatively preclude Plaintiff's
preference claim.  *See* Prepetition Second Lien Br. ¶ 61.  This is wrong as a matter of law, as a plaintiff
alleging a preferential transfer "is not required to prove that the transferee knew or should have known:
(1) that the transfer was preferential; (2) that the debtor was insolvent at the time of the transfer; or (3)
any other pertinent factor."  *In re Standard Stores, Inc.*, 124 B.R. 318, 324 (Bankr. C.D. Cal. 1991).
Moreover, the Amended Complaint also alleges that the Prepetition Second Lien Defendants had at least
some idea that they were getting an abnormally good deal from the Debtors.  *See* Am. Compl. ¶ 134.

¶ 59.  The argument appears to be that the Prepetition Second Lien Notes and Prepetition Second Lien term Loans purportedly are "obligations rather than transfers."  *Id.* at 8 n.15.

The Prepetition Second Lien Defendants mischaracterize the nature of the Committee's preference claim.  As discussed above, in Count 10, the Committee seeks to avoid (i) the preferential transfer of the security interest in the New Notes and (ii) the payment of US $169 million to Goldman Sachs.  *See* Am. Compl. ¶¶ 138, 144, 237.  These clearly are "transfers" within the meaning of Section 547(b).  *See* 11 U.S.C. § 547(b) (defining "preferential transfer" as: "any transfer of an interest of the debtor in property"); 11 U.S.C. § 101(54) (defining "transfer" as "(A) ***the creation of a lien***; (B) the retention of title as a security interest; … or (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with (i) property; or (ii) an interest in property") (emphasis added).  Indeed, the definition of "transfer" as used in section 547(b) "'is as broad as possible.'"[21]

Finally, the Prepetition First Lien Defendants do address in their brief the Committee's preference claim with respect to the US $169 million payment to Goldman Sachs.  *See* First Lien Br. at 26.  The arguments raised by the Prepetition First Lien Defendants to dismiss this claim are unavailing and are addressed *supra* Argument VII (preference window), *supra* Argument V (insider status), and *supra* Argument II (debtor insolvency).

---

[21]     COLLIER ON BANKRUPTCY P 547.03[1] 16th Ed. (2016) (citing S. Rep. No. 989, 95th Cong., 2D Sess. 27 (1978)).  To the extent the Court deems it necessary, the Committee respectfully requests leave to file a second amended complaint clarifying that Count 10 seeks to avoid preferential transfers made by the Debtors in connection with the January 2016 Transactions, including (a) the grant of the security interest in the New Notes to the Prepetition Second Lien Defendants on account of the unsecured Old Notes; and (b) the payment of $169 million to Goldman Sachs from the proceeds of the Prepetition Second Lien Term Loan on account of the 2015 Prepetition Second Lien Term Loan.

### D.   The "Contemporaneous Exchange" Defense Is Inapplicable

The Prepetition Second Lien Defendants assert that the transactions are protected by the "contemporaneous exchange" defense found at 11 U.S.C. § 547(c)(1).[22]  This provision protects otherwise preferential transfers provided that three criteria are met:  "(i) the transfer must be for new value given to the debtor; (ii) the transfer must be intended to be a contemporaneous exchange; and (iii) the transfer must be in fact a substantially contemporaneous exchange."  *In re 360networks (USA) Inc.*, 338 B.R. 194, 204 (Bankr. S.D.N.Y. 2005).   "The purpose of the exception is to encourage creditors to continue to deal with troubled debtors, and transfers protected under § 547(c)(1) are not preferential because other creditors are not adversely affected if the debtor's estate receives new value."  *Id.* (Internal quotation marks and citations omitted).

The Prepetition Second Lien Defendants' defense fails for two reasons.   First, the contemporaneous exchange defense is typically not applicable to credit transactions, as "courts have consistently held that payments on account of an antecedent debt are not contemporaneous exchanges."  *Id.* at 206.   Second, "[t]he critical inquiry in determining whether there has been a contemporaneous exchange for new value is whether the parties intended such an exchange."  The existence of such an intent is a question of fact[.]"  *In re Armstrong*, 291 F.3d 517, 525 (8th Cir. 2002) (internal citations omitted); *see also In re Lyondell Chem. Co.*, No. 09-10023 (REG), 2015 WL 5560283, at *5 (Bankr. S.D.N.Y. Sept. 18, 2015) ("The intent of the parties [with respect to contemporaneous exchange] is a question of fact.").   This issue is not susceptible to decision on a motion to dismiss.[23]

---

[22]      The Prepetition Second Lien Defendants describe their argument as arising under the "new value" defense of section 547(c). That defense, codified at 11 U.S.C. § 547(c)(4), does not apply where, as here, the new value is secured by an avoidable security interest and for receipt of which the debtor engaged in an avoidable transfer. *See* 11 U.S.C. § 547(c)(4)(A) and (B).

[23]      The Prepetition Second Lien Defendants cite *Gowan v. Wachovia Bank, N.A. (In re Dreier LLP)*, 453 B.R. 499, 515 (Bankr. S.D.N.Y. 2011) for the proposition that the contemporaneous value defense

## IV.    546(e) Safe Harbor Does Not Apply

Section 546(e) provides that a trustee "may not avoid a transfer [. . .] that is a transfer made by or to (or for the benefit of) a [. . .] financial institution [or] financial participant [. . .] in connection with a securities contract, as defined in section 741(7) [. . .] that is made before the commencement of the case, except under section 548(a)(1)(A)[.]"  11 U.S.C. § 546(e).  In relevant part, Section 741(7)(A) defines a "securities contract" as (i) "a contract for the ***purchase, sale, or loan of a security*** [. . .]; (vii) "any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph"; and (xi) any security agreement or arrangement or other credit enhancement related to any agreement or transaction referred to in this subparagraph.  11 U.S.C. § 741(7)(A)(i), (vii), (xi) (emphasis added).[24]  The fraudulent and preferential transfers (and obligations) at issue do not fit within the Section 546(e) safe harbor for several reasons:

First, the transfers at issue were not made in connection with, and are not similar or related to, any contract for the "purchase, sale, or loan of a security."  They were instead made in connection with (a) a new private term loan (b) new private notes.  These transactions did not constitute and did not resemble a purchase, sale, or loan of any securities; they were simply debt raises.  As Judge Glenn recently recognized after surveying Second Circuit law, "no existing case law supports" the application of 546(e) to transfers made in connection with promissory notes.  *In re Motors Liquidation Co.*, 552 B.R. 253, 277 (Bankr. S.D.N.Y. 2016).  All of the Defendants' arguments ignore this fundamental reality.

---

can be applied at the motion to dismiss phase "if the defense appears on the face of the complaint."  The Prepetition Second Lien Defendants conveniently neglect to mention that the Amended Complaint contains no allegations that the parties intended a contemporaneous exchange for new value.

[24]    Neither the Prepetition First Lien Defendants nor the Prepetition Second Lien Defendants contend that the alleged constructive fraudulent transfers or preferences constitute "settlement payments" within the meaning of Section 546(e).

If Congress had intended to exempt constructive fraudulent transfer and preference claims in connection with private term loans and notes like those in this case, there would have been no need for Congress to refer to the "purchase, sale, or loan" of securities. Congress could have simply cloaked all debt raises under the safe harbor, but instead chose a more limited approach. Accordingly, every single one of the cases cited by the Defendants involved agreements concerning the actual purchase or sale of existing securities. *See* First Lien Br. at 24-25; Second Lien Br. ¶¶ 63-72. No such agreements are at issue here.

While the Prepetition Second Lien Defendants analogize the Debt Exchange to a purchase or sale within the meaning of Section 546(e) (*see* Second Lien Br. ¶ 68), this is, at best, a disputed issue of fact on which ***they*** will have the ultimate burden of proof. *See In re Motors Liquidation*, 552 B.R. at 281-82 (denying motion to dismiss preferential transfer claim based on payments made in connection with a "Term Loan and accompanying note" because Section 546(e) defense was "premature"). Indeed, the Prepetition Second Lien Defendants themselves characterize the Debt Exchange as merely a "modification of antecedent debt, with a new note issued to reflect the modified terms[.]" Second Lien Br. ¶ 27. This alone raises a disputed issue of fact about whether the Debt Exchange constitutes a purchase or sale within the meaning of Section 546(e), or whether it was merely a "modification of antecedent debt."

Second, even if the January 2016 Transactions were "similar" to a purchase, sale, or loan of a security — which they are not — they would still be beyond the scope of Section 546(e). Courts have recognized that Section 546(e) does not apply when a transferee is alleged to have engaged in "willful blindness" or "conscious avoidance" of the underlying fraud. *In re Arbco Capital Mgmt., LLP*, 498 B.R. 32, 43-44 (Bankr. S.D.N.Y. 2013) (denying motion to dismiss where willful blindness is alleged). The reason is that a creditor "should not be permitted to hide behind its own knowing and purposeful lack of action." *Id.* Here too, the Defendants may not

35

take advantage of Section 546(e) because they are alleged to have been willfully blind to the Debtors' fraudulent transfers. *See* Am. Compl. ¶ 134 (alleging that secured creditors realized "that they were receiving an abnormally favorable deal" and that at least one "surmised that the real reason SUNE was willing to enter into a deal with such onerous terms was that SUNE was trying to cover up its 'shadiness' by avoiding having to raise money on the public markets, where SUNE would need to be more transparent about its finances").

Finally, Section 546(e) has no application to the Committee's fraudulent and preferential transfer claims directed at avoiding the Debtors' guarantees and obligations. The Prepetition Second Lien Defendants affirmatively argue that Counts 7 and 8 of the Amended Complaint seek to avoid "***obligations*** rather than ***transfers***." Second Lien Br. at 8 n.15 (emphasis in original).[25] However, Section 546(e) "does not, by its plain terms, extend the safe harbor to the trustee's avoidance of the incurrence of an obligation." *In re MacMenamin's Grill Ltd.*, 450 B.R. 414, 428-29 (Bankr. S.D.N.Y. 2011) (denying motion for summary judgment). Here, the Debtor Guarantees are alleged to be "obligations" of SUNE and certain Prepetition Guarantors and therefore are beyond the reach of Section 546(e) on a motion to dismiss. *See* Am. Compl. ¶ 144.

## V.   The Committee Has Adequately Pled a Claim for Equitable Subordination

Count 11 of the Committee's Amended Complaint seeks equitable subordination of Defendants' claims to all general unsecured claims pursuant to section 510(c) of the Bankruptcy Code. Am. Compl. ¶ 252.

---

[25]    The Prepetition Second Lien Defendants assert that Counts 4, 5, 7, and 8 are targeted only at obligations and not liens. *See* Second Lien Mot. at 8 n.15. The Committee disagrees with this mischaracterization. In any event, since the Prepetition Second Lien Defendants have purported to respond to each of these Counts "as if the Committee is seeking to avoid under Section 548" both the incurrence of obligations and the grant of liens under the Prepetition Second Lien Notes and Debtor Guarantees, the issue is moot. To the extent the Court nonetheless deems it necessary, the Committee respectfully requests leave to fine an amended complaint clarifying that it seeks to invalidate both the incurrence of obligations and the grant of liens under the Prepetition Second Lien Notes and Debtor Guarantees.

### A. Applicable Pleading Standards For Equitable Subordination

Section 510(c) provides that a court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim." 11 U.S.C. § 510(c)(1). Under the well-established *Mobile Steel* framework, a complaint must satisfy three prongs to successfully plead a claim for equitable subordination: "(1) that the [Defendants] engaged in inequitable conduct, (2) that the misconduct caused injury to the creditors or conferred an unfair advantage on the defendant-claimant, and (3) that bestowing the remedy of equitable subordination is not inconsistent with bankruptcy law." *In re Bernard L. Madoff Inv. Secs.*, 458 B.R. 87, 121 (Bankr. S.D.N.Y. 2011) (citing *Benjamin v. Diamond (In re Mobile Steel Corp.)*, 563 F.2d 692, 699-700 (5th Cir. 1977)).

### B. The Amended Complaint Satisfies the *Mobile Steel* Factors

The Amended Complaint satisfies all three *Mobile Steel* criteria. First, with respect to inequitable conduct, the Committee alleges that, among other things, Defendants, knowing that the January 2016 Transactions constituted preferential transfers under section 547 of the Bankruptcy Code, directed the Debtors to delay filing their bankruptcy petition until after the 90-day window applicable to such claims had elapsed to insulate their claims from preferential avoidance. Am. Compl. ¶ 163. This action alone is sufficient to satisfy the first prong of the *Mobile Steel* test. *See, e.g.*, *In re SGK Ventures, LLC*, 521 B.R. 842, 863 (Bankr. N.D. Ill. 2014) (plaintiff adequately pled equitable subordination where recipients of preferential transfers caused debtor to conceal those transfers until claims were time-barred). Moreover, the Amended Complaint further alleges that Defendants chose which entities would file for bankruptcy (*See* Am. Compl. ¶ 162), dictated the debtors' appointment of a chief restructuring officer (*id.*), and forced the debtors to forgo competing bids for DIP financing so that they could extend their control over the course of the bankruptcy (*id.* ¶¶ 164-165).

37

Second, the same allegations are more than sufficient to satisfy the "unfair advantage" prong of the *Mobile Steel* test. Indeed, the Amended Complaint alleges that Defendants' actions in directing the Debtors not to file for bankruptcy during the preference window were taken "in order to protect themselves at the expense of SUNE and other creditors." *Id.* ¶ 163; s*ee In re Northstar Dev. Corp.*, 465 B.R. 6, 17 (Bankr. W.D.N.Y. 2012) (delaying the filing of the debtor's bankruptcy petition "gave to the defendant an unfair advantage over other creditors who were similarly attempting to recover legitimate claims").

> Insiders pose special problems. Insiders will be the first to recognize that the firm is in a downward spiral. If insiders and outsiders had the same preference-recovery period, insiders who lent money to the firm could use their knowledge to advantage by paying their own loans preferentially, then putting off filing the petition in bankruptcy until the preference period had passed […] With a long [preference recovery] period for insiders, even the prescient managers who first see the end coming are unlikely to be able to prefer themselves in distribution.

*In re A. Tarricone, Inc.*, 286 B.R. at 260 (citation omitted).

The same is true of the other allegations of inequitable conduct in the complaint. In particular, the Amended Complaint alleges that Defendants scuttled a DIP deal with a competing lender in order to "maximize their own recoveries to the detriment of SUNE and other creditors." Am. Compl. ¶ 164. Similarly, there is a plausible explanation for why Defendants had an interest in dictating to the Debtors who the chief restructuring officer would be and which entities would file for Chapter 11: these decisions were critical for Defendants to ensure maximum recovery for themselves at the expense of SUNE's other creditors.

Finally, Defendants do not suggest — and the Committee does not believe — that equitable subordination in this context is inconsistent with the provisions of the Bankruptcy Code. Indeed, since the codification of the equitable subordination doctrine into the Bankruptcy Code itself, Courts have noted that "the third prong of the *Mobile Steel* doctrine warrants little attention." *In re LightSquared Inc.*, 511 B.R. 253, 352 (Bankr. S.D.N.Y. 2014).

### C. Defendants Were Insiders Of The Debtors

Defendants do not argue that the allegations in the complaint are *per se* insufficient to state a claim for equitable subordination. Instead, both the Prepetition First Lien Defendants and Prepetition Second Lien Defendants focus most of their attention on arguing that the complaint fails to allege that they were "insiders" of the debtor, and that therefore Plaintiff must meet a higher standard in alleging inequitable conduct. *See* First Lien Br. at 27-29; Second Lien Br. ¶¶ 74-83.

Defendants are incorrect. The Amended Complaint makes this specific allegation multiple times. *See* Am. Compl. ¶¶ 166, 243. Moreover, the Committee's well-pleaded factual allegations are clearly sufficient to back up that conclusion. Among other things, the Amended Complaint alleges that (1) the January 2016 Transactions were not conducted at arm's-length, and Defendants were able to get exceptionally favorable terms because the Debtors did not have any viable financing alternatives due to their ongoing financial improprieties (*id.* ¶ 134); (2) the January 2016 Transactions foreseeably positioned the Defendants to protect those transactions from avoidance by functionally acting as the Debtors' only source of further financial support, a position the Defendants exploited once it became clear a bankruptcy filing was imminent by preventing the Debtors from pursuing third-party DIP financing in lieu of their own proposal which *rolled-up over $1 billion outstanding under the Prepetition Facilities* in exchange for just $300 million of new money (*id.* ¶ 165); (3) Defendants were able to dictate critical aspects of the Debtors' operations in the run-up to bankruptcy, including the appointment of key personnel, the decision as to which entities would eventually file for bankruptcy (*id.* ¶ 162); and (4) the Defendants were actually able to determine the date on which Debtors' bankruptcy petition would be filed (*id.* ¶ 163). "Control sufficient to merit insider status may be established by facts showing that the lender [. . .] made decisions for the debtor regarding replacement of

management *or filing for bankruptcy*." *In re Champion Enterprises, Inc.*, No. 09-14014 KG, 2010 WL 3522132, at *6 (Bankr. D. Del. Sept. 1, 2010) (emphasis added); *see also In re A. Tarricone Inc.*, 286 B.R. 256, 266 (Bankr. S.D.N.Y. 2002) (recognizing that "insiders have the power to influence or even control the date of filing for bankruptcy in relation to the dates of repayment themselves").

In the face of these allegations, the Prepetition Second Lien Defendants are reduced to conclusory arguments that the allegations do not demonstrate the requisite level of "dominion and control" over the Debtors.    Second Lien Br. ¶ 79.    But the Prepetition Second Lien Defendants fail to engage with the question of what kinds of allegations *do* meet that standard. Courts consider various factors in determining a creditor's insider status, including, among others, whether the creditor:

1. *attempted to influence decisions made by the debtor*;

2. *selected new management for the debtor*;

3. *was the debtor's sole source of financial support*;

4. exercised managerial control, including *personnel decisions* and *decisions as to which creditors should be paid*; and

5. *whether the relationship between the debtor and lender was the result of an arm's-length transaction*.

*See In re Broadstripe, LLC*, 444 B.R. 51, 80 (Bankr. D. Del. 2010); *see also In re KDI Holdings*, 277 B.R. 493, 512 (Bankr. S.D.N.Y.1999); *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 500 (S.D.N.Y. 1994).    All of these criteria have been met by the allegations here.    The Amended Complaint therefore raises questions of fact as to whether Defendants were insiders of the Debtor that the Committee is entitled to explore in discovery.

In an effort to short-circuit the inquiry outlined above, both the Prepetition First and Prepetition Second Lien Defendants claim that the allegations in the Amended Complaint are

insufficient to establish that they were insiders because Defendants' control over the Debtors was the result of "superior bargaining power" (Second Lien Br. ¶ 81) and "contractual rights" (First Lien Br. at 28, 30) stemming from an "arm's length" negotiation (First Lien Br. at 28; Second Lien Br. ¶ 79). This argument is unavailing for at least two reasons.

First, the "contractual rights" invoked by Defendants have little or nothing to do with the allegations in the Amended Complaint regarding Defendants' insider status. The Prepetition First Lien Defendants point to Sections 7.01(u) and 7.03(t) of the 2014 Credit Agreement. *See* First Lien Br. at 30. The first of these provisions merely forbids the Debtors from granting more than US $37.5 million of liens while the First Lien Credit Agreement remains in effect.[26] It says nothing about any "contractual right" to appoint a chief restructuring officer, decide which SUNE entities would file for bankruptcy, or dictate the date of that bankruptcy filing. The Prepetition Second Lien Defendants, for their part, point to sections 6.20 and 8.01 of the Senior Secured Superpriority Debtor-in-Possession Credit Agreement dated April 26, 2016. While this provision does provide that the Debtors' chief restructuring officer must be "reasonably satisfactory" to the DIP lenders, it does not give them the right to select that officer. Nor does it have anything to say about the form and timing of the bankruptcy filing itself.[27]

---

[26]     The second provision does not appear to exist — at least not in the form cited by the Prepetition First Lien Defendants.

[27]     The Prepetition Second Lien Defendants also argue that Plaintiff's allegations regarding the timing of the bankruptcy are insufficient because they fail to allege various facts about the "who" "how" and "why" of the decision to file on the petition date. *See* Second Lien Br. ¶ 80. To the extent the Committee is not at this time privy to that information, that is a product of the extremely limited terms of the DIP agreement regarding the Committee's ability to investigate potential claims — conditions imposed *by the Defendants*. Moreover, Defendants are wrong to say that no plausible inference regarding Defendants' role in the selection of the petition date can be drawn from the allegations in the Amended Complaint. *Id* ¶ 81. The complaint could not be more clear that Defendants (and the Debtors) were on notice of a potential preference claim (*see* Am. Compl. ¶ 163), that the Debtors were urged to file within the preference window, and that the Debtors nonetheless waited a mere ten days after the window had closed to file.

41

Second, Defendants' arguments ignore the various allegations in the Amended Complaint that the Debtors had no ability to seek financing outside of their existing lenders due to their financial improprieties — and that those lenders knew (or at least suspected) that was the case. *See* Am. Compl. ¶ 133.  A deal worked out under such circumstances is hardly at arm's length. *See In re A. Tarricone, Inc.,* 286 B.R. 256, 266 (Bankr. S.D.N.Y. 2002) (finding that "[c]ourts in this circuit have taken the view that '[a] creditor who does not deal at arms [sic] length with the debtor, but who has a special relationship with the debtor through which it can compel payment of its debt, has sufficient control over the debtor to be deemed an insider'") (citation omitted); s*ee also Tarricone* at 265 (finding that "[t]he nature of the relationships listed in all of the subparts of Section 101(31) are such that influence can be assumed, and it is therefore unnecessary to prove that there is actual control if such a relationship has been established").

### D.  The Conduct Alleged In The Complaint Is Sufficient To State A Claim For Equitable Subordination Even For An Outsider

Even if the Court found that the allegations in the Amended Complaint do not suffice to show that Defendants were insiders of the Debtors, Defendants claims should *still* be equitably subordinated.  In the context of a non-insider creditor, the Second Circuit has held that "[t]he permissible parameters of a [non-insider] creditor's efforts to seek collection from a debtor are generally those with respect to voidable preferences and fraudulent conveyances proscribed by the Bankruptcy Act[.]"  *In re W.T. Grant Co.,* 699 F.2d 599, 610 (2d Cir. 1983).  Put differently, "[a non-insider] creditor may generally improve his position *vis-a-vis* the other creditors provided he does not receive a preference or fraudulent transfer."  *In re Bernard L. Madoff Inv. Sec. LLC*, 515 B.R. 117, 158 (Bankr. S.D.N.Y. 2014) (citation omitted).  Of course, that is *exactly* the allegation here: that by controlling (or even influencing) the petition date, Defendants insulated themselves from liability for what would have otherwise been an avoidable preferential

transfer — even after they were on notice that the January 2016 Transactions could be challenged as such. *See* Am. Compl. ¶ 163. Moreover, the Amended Complaint also alleges that at lease one Defendant was aware of the Debtors' "shadiness" as or around the time the January 2016 Transactions was executed (*id.* ¶ 134), and consequently was on notice that those transactions were potentially fraudulent transfers. As alleged in the Amended Complaint, Defendants' actions in taking advantage of those transactions anyway were sufficiently egregious to satisfy the inequitable conduct standard for a non-insider. *See, e.g.*, *Picard v. Katz*, 462 B.R. 447, 456 (S.D.N.Y. 2011) ("Because the Amended Complaint adequately alleges that the defendants did not receive fraudulent transfers in good faith, it also adequately alleges that they engaged in inequitable conduct).

### E. Defendants Other Arguments Should Be Rejected

Defendants offer two additional arguments for why the Amended Complaint fails to state a claim for equitable subordination. Both are meritless.

The Prepetition First Lien Defendants argue that Plaintiff has failed to adequately allege the second prong of the *Mobile Steel* test — that Defendants' inequitable conduct conferred upon them an unfair advantage or otherwise injured Plaintiff. *See Mobile Steel*, 563 F.2d at 700. Their rationale is two-fold: (1) that because the Amended Complaint fails to adequately allege that the Prepetition First Lien Defendants received any additional property or value as a result of the January 2016 Transactions, they could not have gained an unfair advantage by virtue of those transactions (First Lien Br. at 31); and (2) because the Committee's preference claim is alleged only against the Prepetition Second Lien Defendants, Defendants' alleged control of the petition date is irrelevant to claims against the Prepetition First Lien Defendants. *Id.* The Prepetition First Lien Defendants' first argument is wrong for the reasons articulated *supra* Argument II, and also because they admit that the January 2016 Transactions "***granted*** or reaffirmed ***additional***

liens to the First Lien Agent[.]"  First Lien Br. at 18 (emphasis added).  And their second argument is wrong because it ignores all of the other allegations — including their decision regarding which entities would file, appointment of the chief restructuring officer, and refusal to allow the Debtors to consider alternative DIP financing — that also had the effect of injuring Plaintiff and bestowing an unfair advantage on all of the defendants.

The Prepetition Second Lien Defendants additionally argue that, because they purportedly have defenses to Plaintiff's preference claim other than the expiration of the preference period, Plaintiffs' allegations as to their control of the petition date are irrelevant. Second Lien Br. at 37-38.  Of course, this argument depends on the Prepetition Second Lien Defendants having valid defenses to Plaintiff's preference claim which, for the reasons explained *supra* Argument III, they do not.  Moreover, even if the Prepetition Second Lien Defendants are right about the preference claim, Plaintiff's allegations of inequitable conduct and unfair advantage go well beyond their allegations regarding Defendants' control of the petition date. Consequently, even if the Prepetition Second Lien Defendants are right about this argument, Plaintiffs' equitable subordination claim should survive.

VI.    **The Committee Has Adequately Pled Claims For Avoidance Of Invalid Liens And Excluded Assets**

The Amended Complaint seeks a declaratory judgment that certain purported liens in respect of the Prepetition First Lien Facility and Prepetition Second Lien Facility are invalid (Count 12, Am. Compl. ¶¶ 253-262), and to avoid such liens in respect of these facilities and preserve them for the benefit of the estate because Defendants did not perfect their security interests in underlying collateral (*i.e.* the Unperfected Collateral) (Count 13, Am. Compl. ¶¶ 263-267).  The Amended Complaint also seeks a declaratory judgment that 35% of the value of each first tier foreign equity of each foreign subsidiary constitutes excluded assets, unencumbered by

the Prepetition First Lien Facility or the Prepetition Second Lien Facility (*i.e.*, the Foreign Equity Pledge Limitation) (Count 14, Am. Compl. ¶¶ 268-273). Each of these claims is sufficiently pled.

As set forth in the Amended Complaint, the Debtors have failed to properly perfect certain categories of collateral. These categories of Unperfected Collateral are described in some detail, including certain owned and leased real estate and fixtures (*i.e.*, Real Property Interests), deposit and security accounts (*i.e.*, Unperfected Cash), insurance policies (*i.e.*, the D&O Policies), motor vehicles, aircraft, and vessels (*i.e.,* Vehicular Interests), letter of credit rights (*i.e.* L/C Rights), and commercial tort claims, including claims against SUNE directors and offices (*i.e.*, Commercial Tort Claims). *See* Am. Compl. ¶ 170.

As a threshold matter, Defendants argue the Committee has failed to describe the Unperfected Collateral with sufficient particularity to meet the broad pleading standards of Rule 8. Second Lien Br. 46-47. In so arguing, Defendants seek to go beyond the Rule 8 pleading standard, requiring only a "short and plain statement of the claim showing that the pleader is entitled to relief." To the extent that Defendants claim to be unaware of the unperfected collateral referred to in the Amended Complaint, this argument fails. First, the Committee based these claims on documents produced by the Debtors and Defendants themselves. *See* Am. Compl. ¶ 168. Second, most of the identified Unperfected Collateral specify a *category* of collateral in which the Committee believes the Prepetition Facilities are not property perfected to which a finite number of tangible or intangible assets below. The Defendants cannot plausibly claim "an inability to answer and prepare for trial" (Second Lien Br. ¶ 101) because, for example, the Amended Complaint does not contain specific D&O Policy numbers or individual Unperfected Cash account numbers.

45

Similarly, the Court should reject the suggestion by the Prepetition First Lien Defendants that the Amended Complaint should be dismissed because it does not allege which state law should apply for each and every unperfected lien. First Lien Br. at 34-35. Notably, this allegedly fatal lack of specificity did not prevent Defendants from raising a number of specific counter-arguments under the Uniform Commercial Code with respect to certain of these categories of Unperfected Collateral. *See* First Lien Br. at 32-33.

Next, the Prepetition First Lien Defendants state that there is "no basis for these claims to proceed against [individual defendants] because no such party holds directly any liens in respect of the First Lien Facility." First Lien Br. at 8. Instead, they argue, the liens were granted to the First Lien Agent, and not the lenders. Put simply, that plainly conflicts with the applicable statutory language and should be rejected. *See, e.g., In re TOUSA, Inc.*, 680 F.3d at 1311 ("If a transfer is avoided under section 546 or one of several other provisions of the Bankruptcy Code, section 550(a)(1) allows the recovery of the property transferred or its value from the initial transferee or from an 'entity for whose benefit such transfer was made'") (citing 11 U.S.C. § 550(a)(1)).

Finally, Defendants argue based on allegedly applicable provisions of the Uniform Commercial Code that, as a matter of law, they are perfected in the Unperfected Cash and the L/C Rights.[28] While the Committee disagrees with these arguments, at best, they raise issues of fact that are premature to address at this stage.

---

[28] Notably, the Defendants do not specifically argue that they have perfected security interests in the Real Property Interests, D&O Policies, Vehicular Interests, or Commercial Tort Claims, nor do they contest the Committee's assertion of the Foreign Equity Pledge Limitation.

### A. The Complaint Adequately Pleads That Certain Categories Of Collateral Are Excluded From The Prepetition Collateral

As discussed above, the Prepetition First Lien Defendants state baldly that the liens in question were granted to the First Lien *Agent*, and not to the lenders. *See* First Lien Br. at 8. This is the Prepetition First Lien Defendants' only response to Count 14 of the Amended Complaint. That is a fact issue that is premature to resolve at this stage. The Prepetition Second Lien Defendants ignore the Committee's allegations regarding excluded assets completely.

### VII. The Amended Complaint States A Claim For Aiding And Abetting A Breach Of Fiduciary Duty Under Both Missouri And Delaware Law

In Count 15, the Committee alleges that the Defendants aided and abetted breaches of fiduciary duty owed by the SUNE board to the Debtors by failing to file for bankruptcy within the 90-day preference window. As alleged in the Amended Complaint, the Defendants influenced and controlled SUNE to delay a bankruptcy filing to further their own interests to the detriment of SUNE and its unsecured creditors. The various arguments made by the Prepetition First Lien Defendants (*see* First Lien Br. at 35-39) and the Prepetition Second Lien Defendants (*see* Second Lien Br. ¶¶ 85-100) in seeking to dismiss this claim are meritless.

### A. Missouri Law, To The Extent It Applies, Recognizes A Cause Of Action For Aiding And Abetting A Breach Of Fiduciary Duty

Defendants first argue that the Court should apply Missouri law in evaluating the Committee's claim for aiding and abetting a breach of fiduciary duty. As the Prepetition First Lien Defendants and Prepetition Second Lien Defendants acknowledge, whether or not the law of Missouri as opposed to that of some other state applies to the claim for aiding and abetting, a breach of fiduciary duty depends upon which of three approaches this Court chooses to take in determining this choice-of-law question. They further do not deny that the application of certain of the approaches may be premature at this stage because further discovery may be needed to

47

determine where the effects of the alleged tortious conduct were felt or where such conduct could be said to have occurred.

Without conceding at this stage whether Missouri law applies, in any event application of Missouri law would make no difference regarding the viability of the Committee's aiding and abetting claim. Contrary to what the Prepetition First Lien Defendants and Prepetition Second Lien Defendants assert, Missouri law permits a claim for aiding and abetting a breach of fiduciary duty. In Missouri, a "claim for aiding and abetting a breach of fiduciary duties is a recognized cause of action." *Nickell v. Shanahan*, 2013 WL 2402852, *7 (Mo. App. June 4, 2013) (recognizing cause of action for aiding and abetting breach of fiduciary duty), *vacated on other grounds*, 2014 WL 3819442 (Mo. July 29, 2014). Liability arises from the harm "to a third person from the tortious conduct of another" if the defendant "knows that the other's conduct constitutes a breach of duty and gives substantial assistance." *Id.*

The *Nickell* court reasoned that Missouri recognizes a cause of action for aiding and abetting another in the commission of a tort based on Section 876(b) of the RESTATEMENT (SECOND) OF TORTS, which provides that "[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he [. . .] knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." *Id.* (citation omitted). The court further rejected the defense's argument that "the recognized tort for aiding and abetting should apply exclusively to claims alleging a defendant aided and abetted an underlying physical tort such as negligence, assault, or battery, but not apply when the underlying tort that is being aided and abetted is a breach of fiduciary duties." *Id.* (citing *Lonergan v. Bank of America*, N.A., 2013 WL 176024 at *12 (W.D. Mo. 2013) (finding no "principled reason why aiding and abetting would exist for [trespass, assault, or battery], but not for at least other intentional torts, like fraud and misrepresentation")).

48

Accordingly, the *Nickell* court held "that a claim for aiding and abetting a breach of fiduciary duties is a recognized cause of action" under Missouri law. *Id.*

While the Defendants cite various federal cases where a court rejected or was unwilling to accept the notion that Missouri law recognizes a claim for aiding and abetting the tort of breach of fiduciary duty under Section 876(b) of the RESTATEMENT (SECOND) OF TORTS, none of the cases make reference to *Nickell*, which provides the most direct review by a Missouri state court of the law on this subject and clearly holds that Missouri does recognize that claim. Given that this Court is tasked with applying state law, the construction by a state appellate court should take precedence over any federal court seeking to predict whether Missouri courts would adopt such a claim.

## B. The Amended Complaint Alleges That Defendants Aided And Abetted A Breach Of The Fiduciary Duty Owed By The Board

As the Prepetition First Lien Defendants and the Prepetition Second Lien Defendants concede, to the extent that Missouri would recognize a cause of action for aiding and abetting a breach of fiduciary duty, it would adopt the same elements as those used under Delaware law, which are derived from Section 876(b) of the RESTATEMENT (SECOND) OF TORTS. Under Delaware law, to state a cause of action against a corporate entity for aiding and abetting a fiduciary's breach of his or her duty of loyalty, a plaintiff must allege (1) knowledge of the fiduciary's breach and (2) substantial participation in (i.e. assistance in or encouragement of) the breach. *See Malpiede v. Townson*, Del. Spr., 780 A.2d 1075, 1097 (2001).

The Amended Complaint satisfies the elements of a claim for aiding and abetting a breach of fiduciary duty. First, it alleges an underlying breach of the duties of care, loyalty, and good faith by the SUNE Board. Under Delaware law, which governs the fiduciary duties of the directors of a Delaware corporation such as SUNE, corporate directors have duties of "good

faith, loyalty or due care." *Cede & Co. v. Technicolor, Inc.*, Del. Supr., 634 A.2d 345, 361 (1993); *see also In re Rural Metro Corp.*, Del. Ch., 88 A.3d 54, 82-83 (2014) (upholding aiding and abetting breach of fiduciary duty claim and recognizing that "[t]hrough this examination, the court seeks to assure itself that the board acted reasonably, in the sense of taking a logical and reasoned approach for the purpose of advancing a proper objective, and to thereby smoke out mere pretextual justifications for improperly motivated decisions"); *id.* at 90 ("Because of the central role played by [financial advisors] in the evaluation, exploration, selection, and implementation of strategic alternatives, directors must act reasonably to identify and consider the implications of the [financial advisors'] compensation structure, relationships, and potential conflicts").

SUNE's directors breached their fiduciary duties when, despite being on notice from SUNE's unsecured creditors that the 90-day preference window would apply to the January 2016 Transactions (*see* Am. Compl. ¶ 163), they instead waited until after that window to cause SUNE to file for bankruptcy, thus jeopardizing SUNE's ability to pursue valuable preferential transfer claims against its prepetition secured lenders. Importantly, there appears to have been no rational or legitimate business purpose for delaying SUNE's bankruptcy filing until after the 90-day window closed. SUNE had engaged Skadden Arps, its current bankruptcy counsel, to begin preparing for a bankruptcy filing as early as February 2016. Second Lien Br. at 41 n.24. On April 7, 2016 — still well within the 90-day preference window — Deutsche Bank was replaced by defendant Wilmington Savings as Administrative Agent under the Prepetition Second Lien Term Loan, *see* Second Lien Br. ¶ 11, signaling that as of that date the negotiations and documentation regarding DIP financing had substantially concluded and that Deutsche Bank was

prepared to assume its current role as DIP Agent.[29]  In short, the Amended Complaint adequately alleges that, before the 90-day preference window had closed, the Debtors had made the decision to file for bankruptcy[30] and either were ready to do so or could have been, but for the actions of the Defendants.  These circumstances strongly suggest the purpose for further delay in filing for bankruptcy was the highly-conflicted purpose of assisting SUNE's prepetition secured creditors in evading preferential transfer claims.  Such self-serving decision making at the potential cost of a valuable legal claim does not satisfy the standards imposed by Delaware law.  The Amended Complaint and undisputed record thus raises a highly plausible inference that SUNE's Board failed to act reasonably, loyally, and in good faith — and also was grossly negligent and wasted corporate assets — in the face of the significant conflicts of interest posed by SUNE's secured creditors, all to the detriment of SUNE and its unsecured creditors.

---

[29]    Indeed, none of the "Events Leading to Debtors' Chapter 11 Filing" described in the *Declaration of Patrick M. Cook Pursuant to Local Bankruptcy Rule 1007-2 And In Support of Chapter 11 Petitions and First Day Pleadings* (the "**Cook Declaration**") [Dkt. No. 4] is dated after April 4, 2016 (Cook Decl. ¶ 49-74), and the description therein regarding DIP financing is conspicuously absent of any dates at all. In any event, given that the Defendants themselves were the parties across the table from the Debtors in those DIP negotiations, whether the DIP financing was, in fact, finalized on or before April 10, 2016 is not dispositive of whether it could have been had the Debtors properly exercised their fiduciary duties. Notably, the Akin Gump Steering Committee of Prepetition Second Lien Defendants that was a central party to those negotiations was formed on March 3, 2016, or *49 days* before the bankruptcy filing.  *See Verified Statement Pursuant to Bankruptcy Rule 2019* (the "**2019 Statement**") [Dkt. 1977], ¶ 1.  By comparison, SUNE and the Defendants were able to negotiate and consummate the January 2016 Transactions in approximately *30 days* (which included the Christmas and New Year holidays).

[30]    Here, because the Debtors had already decided to file for bankruptcy, their directors and officers owed duties of good faith, care, and loyalty with respect to the manner they carried out that decision — just as they would if they had decided to sell the company or engage in any other activity that in the first instance they owed no obligation to engage in.  Thus, Defendants' citations to case law supporting the proposition that a debtor has no fiduciary duty to file for bankruptcy are beside the point.  *See* First Lien Br. at 38 n.26; Second Lien Br. ¶ 88-90.  To the extent any of those decisions held that it was proper for a debtor to delay its bankruptcy filing, it did so under a different — and less egregious — set of underlying facts.  For example, the Defendants cannot plausibly claim that the decision here to delay the filing from April 10, 2016 to April 21, 2016 was "consistent with an effort to stabilize [the debtor] and possibly avoid an immediate bankruptcy filing […]"  Second Lien Br. at 40-41 (citing *Goodman v. H.I.G. Capital, LLC (In re Gulf Fleet Holdings, Inc.)*, No. 11-05006, 2014 WL 4560441, at *7-*8 (Bankr. W.D. La. Apr. 2, 2014)).

Second, the Amended Complaint alleges the Defendants knew of the Board's breaches of duty. Indeed, it alleges that the Defendants were the proximate cause of these breaches because they "influenced SUNE to delay filing for bankruptcy until after the 90-day preference period had expired to insulate the Debt Exchange from avoidance." Am. Compl. ¶ 163. The Amended Complaint also alleges that the secured creditors "dictated the appointment of a chief restructuring officer, were involved in deciding which entities would file for bankruptcy protection, and expressly acknowledged potential preference liability in the event the filing was made within 90 days of the January 2016 Transactions." *Id.* ¶ 162.

Third, for virtually the same reasons, the allegations establish that the Defendants substantially participated in, encouraged, and assisted the breach. Indeed, the Defendants are alleged to have been the masterminds of those breaches. For all of these reasons, the Amended Complaint adequately states a claim for aiding and abetting breach of fiduciary duty.

## C. The Business Judgment Rule Is Not A Basis To Dismiss The Claim

The Defendants seek to characterize this conduct by the Debtor's board as a reasonable exercise of "business judgment" for purposes of benefitting SUNE and its affiliates. But the business judgment rule is not a basis for dismissal at the pleading stage. Courts will not rely on an affirmative defense such as the business judgment rule to trigger dismissal of a complaint under Rule 12(b)(6) unless it is apparent on the face of the complaint without additional evidentiary facts that the rule would apply. *See, e.g., Halebian v. Berv*, 644 F.3d 122, 132–33 (2d Cir. 2011) (holding that the district court must adjudicate the claim within the framework of summary judgment); *Brown v. One Beacon Ins. Co.*, 317 F. App'x. 915, 916–17 (11th Cir. 2009) (generally, the existence of an affirmative defense will not support a motion to dismiss); *In re Tower Air*, 416 F.3d 229, 238 (3d Cir. 2005) (Delaware law).

52

For the reasons stated above, it cannot be said here that the applicability of the business judgment rule appears on the face of the Amended Complaint. The Committee has alleged facts that rebut the presumption behind the rule by accusing the Debtor's board of acting without good faith or an honest and reasonable belief that delaying the bankruptcy filing beyond the 90-day preference window was in SUNE's best interests. *See Reis v. Hazlett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011) (describing presumption behind business judgment rule).[31]

### D. The In Pari Delicto Defense Is Inapplicable To The Claim For Aiding And Abetting A Breach Of Fiduciary Duty In This Case

The Prepetition Second Lien Defendants argue that the Committee is barred from asserting aiding and abetting breach of fiduciary duty claims under the doctrine of *in pari delicto*, because the Committee stands in the shoes of the Debtors in asserting these claims. The Prepetition Second Lien Defendants cite to Delaware law, which embraces "to some extent" the *in pari delicto* doctrine. Second Lien Br. ¶ 98. However, they simply ignore Delaware law authorizing claims for aiding and abetting breach of fiduciary duty in the face of *in pari delicto* arguments.[32]

In *Stewart v. Wilmington Trust SP Servs. Inc.*, 112 A.3d 271 (Del. Ch. 2015), the Delaware Chancery Court held that the *in pari delicto* doctrine should ***not*** bar aiding and abetting claims against defendants "like auditors." *Id.* at 319. The court considered whether the

---

[31]    The Prepetition Second Lien Defendants state that the Committee "appears to concede that ***the Debtors***, as opposed to the Committee, suffered no damages as a result of the Debtors' delay in filing." Second Lien Br. ¶ 97. The Committee has made no such concession, nor does the argument make sense. Every preferential transfer, by definition, benefits one group of creditor over another. Moreover, SUNE, on the eve of bankruptcy, was harmed in the exact same way as its unsecured creditors to the extent its Board failed to preserve a legal claim that would have the effect of unencumbering substantial collateral.

[32]    That courts have rejected the *in pari delicto* defense in the context of claims for aiding and abetting breach of fiduciary duty makes perfect sense. The defense and the claim are mutually exclusive. Because Delaware recognizes the ability of a company to sue third parties for aiding and abetting breaches of its directors' fiduciary duties, it cannot also be the case that those third parties have a perfect defense based on the attribution of the directors' breaches to the company itself.

fiduciary duty exception to the doctrine, which ensures that creditors have a remedy for the wrongdoing that caused the harm and bars an *in pari delicto* defense in a suit by a corporation against its own fiduciaries, should be expanded to cover auditor defendants. The court reasoned that "non-fiduciaries like auditors, who occupy a position of trust and materially participate in the traditional insiders' discharge of their fiduciary duties," may play a "gatekeeper" role for the entities in question. *Id.* at 320.

While the Defendants here are not "auditors," they are similar to the type of defendant the Delaware Chancery Court was seeking to bar from invoking the *in pari delicto* defense. As discussed *supra* Argument IV(C), the Defendants acted as functional insiders of the Debtors, including discharging critical aspects of the Debtors' operations leading up to bankruptcy, appointing key personnel, and controlling the decision as to which entities would eventually file for bankruptcy and when. Defendants should not now be able to hide behind the *in pari delicto* doctrine when they effectively took over significant decision making-responsibilities from the Board.

As a final matter, declining to apply the *in pari delicto* defense in this case would be entirely consistent with bankruptcy policy. The *in pari delicto* defense cannot be raised against fraudulent transfer claims brought by a bankruptcy trustee on behalf of creditors of a debtor pursuant to 11 U.S.C. §§ 544 or 548. *See, e.g.*, *Kapila v. Bennett (In re Pearlman)*, 472 B.R. 115, 123 (Bankr. M.D. Fla. 2012) ("[A]voidance actions by a trustee under §§ 544 and 548 are not barred by the *in pari delicto* defense"). While Count 15 asserts a state law claim for aiding and abetting a breach of fiduciary duty, the purpose of this claim is, like the Committee's other claims, to protect the unsecured creditors who were wronged along with the Debtor by the secured creditors. It is also noteworthy that Missouri law (to the extent it governs the aiding-and-abetting fiduciary breach claim) would not recognize the application of the doctrine of *in*

54

*pari delicto* under the circumstances here. *See, e.g.*, *Jo Ann Howard & Assocs., P.C. v. Cassity*, 146 F. Supp. 3d 1089, 1096-99 (E.D. Mo. 2015) (Missouri's doctrine of *in pari delicto* was not applicable as a bar to action by special deputy receiver for breach of duty relating to fraudulent scheme to siphon funds from a trust). For all of these reasons, the Court should find that the equitable doctrine of *in pari delicto* is inapplicable to Count 15 of the Amended Complaint.

## VIII.   Leave to Amend

To the extent the Court dismisses any of the Committee's claims — and the Committee believes that it should not — the Committee respectfully requests that the Court enter an order dismissing those claims with leave to file an amended complaint. "Where a complaint is dismissed for failure to state a claim upon which relief can be granted under Rule 12(b)(6), it is the 'usual practice' to allow leave to replead." *Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.*, 170 F.R.D. 361, 370 (S.D.N.Y. 1997) (citations omitted).

In this case, the Committee has amended its complaint only once. That amendment, done before any party was served with summons (or was obligated to be served), was only to add parties, not to amend the substance of the complaint. Additionally, Defendants hinge many of their arguments on allegations that the Committee has pled "no facts" to support its claims. *See, e.g.*, First Lien Br. at 19 n.10, at 22, 27, 31; Second Lien Br. ¶¶ 50, 53, 91, 94. While the Committee has provided clear evidence to the contrary, to the extent there are facts that have not yet been pled, their absence is not the fault of the Committee. Neither the Committee nor any of its members were party to the transactions in question in the Amended Complaint. The Committee has undertaken tremendous efforts with respect to numerous complex transactions, claims, and requests for relief to ensure the interests of all unsecured creditors are being protected, in a short timeframe. Indeed, as discussed *supra* Argument I, it is *Defendants* who

have actively hamstrung the Committee and prevented it from conducting a thorough investigation at this stage.  Defendants, in their role as DIP Lenders, have placed severe limitations on the Committee.  For example, while Defendants argue that the Committee has had "ample time" to investigate its claims (Second Lien Br. ¶ 104), the challenge period (imposed by Defendants) limited the Committee to a six-month investigation period – a mere fraction of the minimum two-year period statutorily afforded by section 108(a) of the Bankruptcy Code – during which a limited number of parties produced a limited scope of documents in response to Committee requests and no depositions were taken.  *See* Dkt. No. 523; Dkt. No. 1272.  In fact, the case the Second Lien Defendants cite to for the proposition that a court may take into account that "the plaintiff has had ample time to investigate its claims" in deciding whether to dismiss with prejudice is one in which the Trustee had the full two-year period to prepare her complaint.  *Gowan v. Wachovia Bank, N.A. (In re Dreier LLP)*, 453 B.R. 499 at 518 (Bankr. S.D.N.Y. 2011).  For these reasons, the Amended Complaint should not be dismissed with prejudice.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## **CONCLUSION**

For the reasons stated, the Defendants' Motions to Dismiss should be denied.


Dated: December 27, 2016
New York, New York

Respectfully submitted,

KOBRE & KIM LLP

By: /s/ Michael S. Kim
Michael S. Kim
Jeremy C. Hollembeak
Benjamin J.A. Sauter
Joseph W. Slaughter
Sara B. Gribbon

800 Third Avenue
New York, New York 10022
Tel +1 212 488 1200

*Special Counsel to Official*
*Committee of Unsecured Creditors*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing *Plaintiff's Omnibus Opposition to Defendants' Motions to Dismiss* was served upon all counsel of record (a) on the 26th day of December 2016, via electronic mail in accordance with the parties' agreement set forth in the *Stipulation and Agreed Order (I) Setting Briefing Schedule and Hearing Date on Defendants' Motions to Dismiss Amended Complaint; and (II) Granting Leave with Respect to Page Limitations* [AP Dkt. No. 8], and (b) on the 27th day of December 2016, using the Court's CM/ECF system.

KOBRE & KIM LLP

By: /s/ Michael S. Kim
Michael S. Kim
Jeremy C. Hollembeak
Benjamin J.A. Sauter
Joseph W. Slaughter
Sara B. Gribbon

800 Third Avenue
New York, New York 10022
Tel +1 212 488 1200

*Special Counsel to Official
Committee of Unsecured Creditors*