AKIN GUMP STRAUSS HAUER &
FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
David M. Zensky
Erik Preis
Deborah J. Newman

*Counsel to the Second Lien Lender Defendants*

PILLSBURY WINTHROP
SHAW PITTMAN LLP
1540 Broadway
New York, New York 10036
(212) 858-1000 (Telephone)
Leo T. Crowley
Daniel S. Brown

*Counsel to Wilmington Savings Fund Society,
FSB, in its capacity as successor
Administrative Agent under the Second Lien
Credit Agreement*

WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8800 (Telephone)
(212) 230-8888 (Facsimile)
Andrew Goldman
Charles C. Platt
Benjamin Loveland (admitted *pro hac vice*)
Lauren Lifland

*Counsel for Wilmington Trust, National
Association, in its capacity as Indenture
Trustee under the Second Lien Indenture and
Collateral Trustee under the Security
Agreement*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------ x
                                                             :
In re:                                                       :
                                                             :   Chapter 11
SUNEDISON, INC., et al.,                                     :   Case No. 16-10992 (SMB)
                                                             :   (Jointly Administered)
                                 Debtors.                    :
                                                             :
                                                             :
------------------------------------------------------------ x
                                                             :
OFFICIAL COMMITTEE OF UNSECURED                              :   Adversary Proceeding
CREDITORS, on behalf of the estates of the Debtors,          :   No. 16-01228 (SMB)
                                                             :
                                 Plaintiff,                  :
                                                             :
            v.                                               :
                                                             :
WELLS FARGO BANK, N.A., et al.,                              :
                                                             :
                                 Defendants.                 :
------------------------------------------------------------ x
```

**JOINT REPLY OF
THE SECOND LIEN DEFENDANTS
IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS**

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ..........................................................................................................................3

I.   The Committee Fails to State a Claim for Constructive Fraudulent Transfer (Counts 7 and 8) ................................................................................................................................3

   A.   The Committee Has Failed to Adequately Allege that SUNE Received Less Than Reasonably Equivalent Value in Exchange for the SUNE Obligations and Liens Associated with the Second Lien Notes (Count 7)....................................................................................3

   B.   The Committee Fails to Allege That the *Subsidiary Guarantors* Received Less Than Reasonably Equivalent Value in Exchange for the Subsidiary Liens and Guarantees or Were Insolvent at the Time, or as a Result, of the January Financing (Counts 7 and 8) .................7

II.  The Committee Fails to State a Claim for Intentional Fraudulent Transfer (Counts 4 and 5) ..............................................................................................................................10

III. The Committee Fails to State a Claim for Preferential Transfer (Count 10)......................13

IV. The Committee Cannot Evade the Application of the Section 546(e) Safe Harbor to Its Constructive Fraudulent Transfer and Preference Claims (Counts 7, 8 and 10) ......................17

V.  The Committee Fails to State a Claim for Equitable Subordination of the Second Lien Lender Defendants' Claims (Count 11).......................................................................................22

   A.   Standard Commercial Conduct and Arm's-Length Bargaining Power Cannot Support a Claim for Insider Status ..............................................................................................................22

   B.   The Committee Does Not Satisfy the Standard for Equitable Subordination of Non-Insiders ....................................................................................................................................25

VI. The Complaint Fails to State a Cause of Action for Aiding and Abetting a Breach of Fiduciary Duty (Count 15)..........................................................................................................27

   A.   Even if Delaware Law Applies, the Complaint Does Not State a Claim for Aiding and Abetting a Breach of Fiduciary Duty......................................................................................27

   B.   The Aiding and Abetting Claim Is Barred by *In Pari Delicto*.........................................29

VII.      The Committee Relies on Impermissible Group Pleading ...........................................30

VIII.     The Committee's Blanket Allegations Fail to Sufficiently Identify the Assets Alleged to Be Subject to Unperfected Liens (Counts 12 and 13) .........................................................30

CONCLUSION........................................................................................................................31

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*,
    365 B.R. 24 (Bankr. S.D.N.Y. 2007) ....................................................................10

*AP Servs. LLP v. Silva*,
    483 B.R. 63 (S.D.N.Y. 2012) ..............................................................................19

*Bank of N.Y. v. Epic Resorts (In re Epic Capital, Corp.)*,
    307 B.R. 767 (D. Del. 2004) ...............................................................................25

*Bear, Stearns Sec. Corp. v. Gredd*,
    275 B.R. 190 (S.D.N.Y. 2002) ............................................................................10

*Boston Trading Grp., Inc. v. Burnazos*,
    835 F.2d 1504 (1st Cir. 1987) .............................................................................10

*Boyer v. Crown Stock Distrib., Inc.*,
    1:06-CV-409RM, 2009 WL 418275 (N.D. Ind. Feb. 17, 2009), *aff'd in part*,
    587 F.3d 787 (7th Cir. 2009) .................................................................................4

*Brown v. One Beacon Ins. Co. Inc.*,
    317 F. App'x 915 (11th Cir. 2009) ......................................................................28

*Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*,
    447 B.R. 170 (Bankr. S.D.N.Y. 2011) ................................................................14

*Citicorp N. Am., Inc. v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.)*,
    680 F.3d 1298 (11th Cir. 2012) ........................................................................8, 9

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
    699 F.2d 599 (2d Cir. 1983) ................................................................................26

*Cuevas v. Hudson United Bank (In re M. Silverman Laces, Inc.)*,
    No. 01 Civ. 6209, 2002 WL 31412465 (S.D.N.Y. Oct. 24, 2002) ...........................5

*Cyganowski v. Lapides (In re Batavia Nursing Home, LLC)*,
    No. 11-13223 K, 2013 WL 3934237 (Bankr. W.D.N.Y. July 29, 2013)................19

*K.D. ex rel. Duncan v. White Plains School Dist.*,
    921 F. Supp. 2d 197 (S.D.N.Y. 2013) .................................................................23

*In re Kaplan Breslaw Ash, LLC*,
   264 B.R. 309 (Bankr. S.D.N.Y. 2001) .................................................................5

*FMS Bonds, Inc. v. Bank of N.Y. Mellon*,
   No. 15-civ-9375-ER, 2016 WL 4059155 (S.D.N.Y. July 28, 2016) .......................15

*Geltzer v. Mooney (In re MacMenamin's Grill Ltd.)*,
   450 B.R. 414 (Bankr. S.D.N.Y. 2011) ...............................................................21

*Geron v. Palladin Overseas Fund Ltd. (In re AppliedTheory Corp.)*,
   323 B.R. 838 (Bankr. S.D.N.Y. 2005) ...............................................................5, 6

*Geron v. Palladin Overseas Fund Ltd. (In re AppliedTheory Corp.)*,
   330 B.R. 362 (S.D.N.Y. 2005) ...........................................................................5

*Global Link Liquidating Trust v. Avantel, S.A. (In re Global Link Telecom Corp.)*,
   327 B.R. 711 (Bankr. D. Del. 2005) ...............................................................7, 10

*Gold v. Kubicki (In re Red Way Cartage Co.)*,
   84 B.R. 459 (Bankr. E.D. Mich. 1988) ...............................................................3

*Goodman v. H.I.G. Capital LLC (In re Gulf Fleet Holdings, Inc.)*,
   No. 11-05006, 2014 WL 4560441 (Bankr. W.D. La. Apr. 2, 2014)...................27, 28

*Gowan v. Wachovia Bank, N.A. (In re Dreier LLP)*,
   453 B.R. 499 (Bankr. S.D.N.Y. 2011) (Bernstein, J.) ...........................................4

*Gray v. Chace (In re Boston Publ'g Co.)*,
   209 B.R. 157 (Bankr. D. Mass. 1997) ...........................................................16, 22

*Halebian v. Berv*,
   644 F.3d 122 (2d Cir. 2011)...............................................................................28

*Hirsch v. Tarricone (In re A. Tarricone, Inc.)*,
   286 B.R. 256 (Bankr. S.D.N.Y. 2002) .......................................................16, 23, 24

*Hunter v. Babcock (In re Babcock Dairy Co. of Ohio, Inc.)*,
   70 B.R. 657 (Bankr. N.D. Ohio 1986) ...............................................................16

*Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.)*,
   281 B.R. 535 (Bankr. D. Del. 2002) ....................................................................4

*Lippe v. Bairnco Corp.*,
   249 F. Supp. 2d 357 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004).......13

*In re Magic Circle Energy Corp.*,
   64 B.R. 269 (Bankr. W.D. Okla. 1986) ...............................................................3

*Marwil v. Oncale (In re Life Fund 5.1 LLC)*,
    No. 10-A-42, 2010 WL 2650024 (Bankr. N.D. Ill. June 30, 2010)..............................7, 10, 24

*Motors Liquidation Co. Avoidance Action Trust v. JPMorgan Chase Bank, N.A.*
    *(In re Motors Liquidation Co.)*,
    552 B.R. 253 (Bankr. S.D.N.Y. 2016) ........................................................................18, 19, 31

*O'Connell v. Penson Fin. Servs., Inc. (In re Arbco Capital Mgmt., LLP)*,
    498 B.R. 32 (Bankr. S.D.N.Y. 2013) ......................................................................................20

*O'Toole v. Karnani (In re Trinsum Grp.)*,
    460 B.R. 379 (Bankr. S.D.N.Y. 2011) ..............................................................................7, 10

*Official Comm. of Unsecured Creditors of Lehman Bros. Holdings Inc. v.*
    *JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.)*,
    469 B.R. 415 (Bankr. S.D.N.Y. 2012) ..............................................................................21, 22

*Official Comm. of Unsecured Creditors of Quebecor World (USA) Inc. v. Am.*
    *United Life Ins. Co. (In re Quebecor World (USA) Inc.)*,
    719 F.3d 94 (2d Cir. 2013)......................................................................................................19

*Official Comm. of Unsecured Creditors v. Austin Fin. Servs., Inc. (In re KDI*
    *Holdings)*,
    277 B.R. 493 (Bankr. S.D.N.Y. 1999) ....................................................................................24

*Official Comm. of Unsecured Creditors v. Blomen (In re Hydrogen, L.L.C.)*,
    431 B.R. 337 (Bankr. S.D.N.Y. 2010) ......................................................................................7

*Official Comm. of Unsecured Creditors v. Credit Suisse (In re Champion Enters.)*,
    No. 10–50514, 2010 WL 3522132 (Bankr. D. Del. Sept. 1, 2010) ................................ *passim*

*Official Comm. of Unsecured Creditors v. Goldman Sachs Credit Partners, L.P.*
    *(In re Fedders N. Am., Inc.)*,
    405 B.R. 527 (Bankr. D. Del. 2009) ......................................................................................27

*Official Comm. of Unsecured Creditors v. JP Morgan Chase Bank, N.A. (In re M.*
    *Fabrikant & Sons Inc.)*,
    394 B.R. 721 (Bankr. S.D.N.Y. 2008) (Bernstein, J.) ..............................................................5

*Official Comm. of Unsecured Creditors v. Leucadia Nat'l Corp. (In re Vivaro*
    *Corp.)*,
    524 B.R. 536 (Bankr. S.D.N.Y. 2015) ..........................................................................7, 8, 10

*Official Comm. of Unsecured Creditors v. McConnell (In re Grumman Olson*
    *Indus., Inc.)*,
    329 B.R. 411 (Bankr. S.D.N.Y. 2005) ....................................................................................16

*Official Comm. of Unsecured Creditors v. Nat'l Amusements Inc. (In re Midway Games Inc.),*
  428 B.R. 303 (Bankr. D. Del. 2010) ............................................................27

*Official Comm. of Unsecured Creditors v. NewKey Grp., LLC (In re SGK Ventures, LLC),*
  521 B.R. 842 (Bankr. N.D. Ill. 2014) .........................................24, 26, 27

*Official Unsecured Creditors' Comm. v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC),*
  444 B.R. 51 (Bankr. D. Del. 2010) ............................................................24

*Pan Am Corp. v. Delta Air Lines, Inc.,*
  175 B.R. 438 (S.D.N.Y. 1994).............................................................24, 25

*Pereira v. Dow Chem. Co. (In re Trace Int'l Holdings, Inc.),*
  301 B.R. 801 (Bankr. S.D.N.Y. 2003) (Bernstein, J.), *vacated on other grounds*, No. 04 Civ. 1295 (KMW), 2009 WL 1810112 (S.D.N.Y. June 25, 2009) ..........................................................................................................4, 6

*Pereira v. Grecogas Ltd. (In re Saba Enters., Inc.),*
  421 B.R. 626 (Bankr. S.D.N.Y. 2009)........................................................13

*Picard v. Ida Fishman Revocable Tr. (In re Bernard L. Madoff Inv. Sec. LLC),*
  773 F.3d 411 (2d Cir. 2014).......................................................................17

*Picard v. Katz,*
  462 B.R. 447 (S.D.N.Y. 2011)....................................................................26

*Picard v. Legacy Capital Ltd. and Khronos LLC (In re Bernard L. Madoff Inv. Sec. LLC),*
  548 B.R. 13 (Bankr. S.D.N.Y. 2016)..........................................................21

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC),*
  515 B.R. 117 (Bankr. S.D.N.Y. 2014)........................................................26

*Schubert v. Lucent Tech., Inc. (In re Winstar Commc'ns, Inc.),*
  554 F.3d 382 (3d Cir. 2009)........................................................................15

*Sharp Int'l Corp. v. State St. Bank & Tr. Co. (In re Sharp Int'l Corp.),*
  403 F.3d 43 (2d Cir. 2005)....................................................................10, 11

*SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.),*
  No. 12 MC 115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ............20, 21

*Slone v. Lassiter (In re Grove-Merritt),*
  406 B.R. 778 (Bankr. S.D. Ohio 2009)........................................................13

*Stanziale v. DMJ Gas-Mktg. Consultants, LLC (In re Tri-Valley Corp.),*
   No. 14-50446, 2015 WL 110074 (Bankr. D. Del. Jan. 7, 2015)............................................31

*Stanziale v. Heico Holdings, Inc. (In re Conex Holdings, LLC),*
   514 B.R. 405 (Bankr. D. Del. 2014) ....................................................30

*Stanziale v. Nachtomi (In re Tower Air, Inc.),*
   416 F.3d 229 (3d Cir. 2005)....................................................28

*Stewart v. Wilmington Trust SP Servs. Inc.,*
   112 A.3d 271 (Del. Ch. 2015)....................................................29, 30

*Stillwater Nat'l Bank and Trust Co. v. Kirtley (In re Solomon),*
   299 B.R. 626 (B.A.P. 10th Cir. 2003) ....................................................5

*In re TBR USA, Inc.,*
   429 B.R. 599 (Bankr. N.D. Ind. 2010)....................................................16

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.,*
   906 A.2d 168 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Trust v.*
   *Billett,* 931 A.2d 438 (Del. 2007) ....................................................27

*Weisfelner v. Hofmann (In re Lyondell Chem. Co.),*
   554 B.R. 635 (S.D.N.Y. 2016)....................................................10, 13

**Statutes**

11 U.S.C. § 546(e) ....................................................17

11 U.S.C. § 548(d)(2)(A)....................................................4

11 U.S.C. § 741(7)(A)(vii)....................................................18

**Other Authorities**

5 Collier on Bankruptcy ¶ 548.04 (16th Ed. 2010) ....................................................10

Fed. R. Civ. P. 12(b)(6)....................................................8

The Second Lien Defendants, by and through their undersigned attorneys, hereby file this joint reply brief in response to *Plaintiff's Omnibus Opposition to the Defendants' Motions to Dismiss* [AP Doc. 35] (the "Committee's Brief" or "Comm. Br.") and in further support of the Second Lien Defendants' Motion to Dismiss the Committee's Complaint.[1]

## PRELIMINARY STATEMENT

1.     The Complaint tells a story that is commonplace in many respects, and remarkable in others.  In January 2016, the Debtors were experiencing a liquidity crisis and needed cash to fund their business.  As many struggling companies do, they turned, at least in part, to certain of their existing creditors.  These creditors agreed to participate in lending $725 million in new financing to SUNE, and to forgive approximately $356 million in SUNE's unsecured debt, in exchange for $225 million in Second Lien Notes issued by SUNE and guaranteed by certain of its subsidiaries, and SUNE common stock.  The remainder of the $725 million was also secured on a second lien basis, and guaranteed by the same subsidiaries.

2.     Here, the Committee's story takes an unusual twist.  Less than three months later, SUNE approached these Second Lien Lenders again.  This time, however, it was to tell them that notwithstanding their $725 million cash infusion only months earlier, the Debtors were nearly out of cash, and on the verge of a bankruptcy filing.  In the weeks that followed, the Second Lien Lenders realized that the Debtors' management had likely misrepresented the Debtors' financial condition in order to induce them into participating in the January Financing.

3.     Under these difficult circumstances, the Debtors sought to procure debtor-in-possession financing from the Second Lien Lenders.  These negotiations ultimately culminated in a debtor-in-possession credit agreement, which included the types of protections on which

---

[1] Capitalized terms not defined herein have the meanings ascribed to them in the *Joint Memorandum of Law of the Second Lien Defendants in Support of Their Motion to Dismiss* [AP Doc. 25] (the "Second Lien Moving Brief" or "2L Mov. Br.").

lenders to distressed debtors often insist.  The Debtors filed for bankruptcy protection 101 days after the January Financing had closed.

4.    Perhaps the most remarkable aspect of this tale is that the Committee now seeks to avoid the prepetition liens and claims of the Second Lien Lenders—who the Committee alleges were themselves defrauded by the Debtors into providing $725 million in new financing—under theories of constructive and intentional fraudulent conveyance (Counts 4, 5, 7, and 8), preference (Count 10), and equitable subordination (Count 11), and to hold them liable for aiding and abetting alleged breaches of fiduciary duty (Count 15).  Yet the Committee is unable to cite to a ***single case*** where such claims survived a motion to dismiss based on allegations similar to these.

5.    To the contrary—and unsurprisingly, given the Bankruptcy Code's policy of encouraging lending to distressed companies and out-of-court workouts—applicable precedent uniformly holds, as a matter of law, that:

    (i)    where, as here, debtors provide claims or liens in exchange for debt forgiveness in an equal or greater face amount or to secure antecedent debt, such claims and liens cannot be avoided as constructive fraudulent transfers;

    (ii)    in order to state a claim to avoid a subsidiary guarantee as a constructive fraudulent transfer, a plaintiff must allege that the subsidiary did not receive direct or indirect benefits in exchange for the guarantee, which the Committee does not do here;

    (iii)    debt may be avoided as an intentional fraudulent transfer only where the debtors acted with actual intent to place assets outside of creditors' reach, which is not alleged and did not happen here; and

    (iv)    the ordinary lending relationship between the Second Lien Lenders and the Debtors does not create insider status, or give rise to a claim for equitable subordination or aiding and abetting.

Counts 4, 5, 7, 8, 10–13 and 15 of the Complaint are wholly without basis.  The Second Lien Defendants respectfully request that these counts be dismissed, with prejudice.

# ARGUMENT[2]

## I.    The Committee Fails to State a Claim for Constructive Fraudulent Transfer (Counts 7 and 8)

6.    The Committee argues that the Debtors did not receive reasonably equivalent value in connection with the Second Lien Debt and liens, because the January Financing (i) "replaced the Debtors' outstanding unsecured notes with substantially more valuable second lien secured notes," which is apparently based on the alleged trading prices of the Unsecured Notes and Second Lien Notes, and (ii) "granted the Debtors' second-lien creditors a substantially expanded package of liens on and guarantees by fifteen of SUNE's previously unencumbered subsidiaries."  Comm. Br. at 20–21.  These arguments fail as a matter of law.

### A.    The Committee Has Failed to Adequately Allege that SUNE Received Less Than Reasonably Equivalent Value in Exchange for the SUNE Obligations and Liens Associated with the Second Lien Notes (Count 7)

7.    SUNE incurred the $225 million obligation on the Second Lien Notes either (i) to reflect a $111 million reduction to the $336 million that SUNE owed the Second Lien Noteholders on the Unsecured Notes, or (ii) in exchange for the Second Lien Noteholders' forgiveness of that $336 million.  2L Mov. Br. ¶¶ 26–33.  Either way, SUNE received reasonably equivalent value, as it is well-settled that (i) the issuance of a new note to reflect a consensual reduction in principal does not vitiate the value provided to the debtor at the inception of the loan, (ii) the "satisfaction of a present or antecedent debt" constitutes value under the Bankruptcy Code, and (iii) "debts should be measured at their face value and not at market value" for purposes of evaluating reasonably equivalent value.  *See id.* ¶¶ 26–30.[3]  The Committee fails to

---

[2] As noted in the Second Lien Moving Brief, Wilmington Trust and WSFS appear to be named in the Complaint only as nominal defendants. To the extent that the Complaint seeks to assert any claims against Wilmington Trust and/or WSFS in their individual capacities, they join in the arguments asserted below.

[3] Citing *Gold v. Kubicki (In re Red Way Cartage Co.)*, 84 B.R. 459, 461 (Bankr. E.D. Mich. 1988) (holding that a promissory note issued upon the default of an existing debt "merely provided documentary evidence of the amount of the antecedent debt" and a timetable for its payment, but did not create new debt); *In re Magic Circle*

address, or even to acknowledge, this law and precedent, which collectively foreclose the

Committee's claim to avoid SUNE's obligations on the Second Lien Notes.

8.      The Committee's efforts to avoid the *liens* granted by SUNE to secure the Second

Lien Notes are similarly at odds with the Bankruptcy Code and applicable precedent.  In the first

instance, the Bankruptcy Code states expressly that "the securing of a present or antecedent debt

of the debtor" is "value."  11 U.S.C. § 548(d)(2)(A).  Regardless of whether the Second Lien

Notes evidence a modified debt or a new debt, the liens were issued to secure either an

antecedent debt or a present debt, respectively.  Again, either way, SUNE received reasonably

equivalent value in exchange for the liens as a matter of law.

9.      The Committee seems to believe that if the Second Lien Notes are treated as a

new note issuance, then the liens cannot have been granted in exchange for reasonably

equivalent value.  *See* Comm. Br. at 23.  Plainly, however, SUNE's grant of liens to secure $225

million in new notes that were issued in exchange for $336 million in debt forgiveness cannot be

challenged for lack of reasonably equivalent value.  *See Gowan v. Wachovia Bank, N.A. (In re*

*Dreier LLP)*, 453 B.R. 499, 508 (Bankr. S.D.N.Y. 2011) (Bernstein, J.) (dismissing constructive

fraudulent conveyance claim, where lien was granted to secure new debt); *Boyer*, 2009 WL

418275, at *10 (debts are "measured at their face value and not at market value").

10.      Liens granted to secure an antecedent debt are similarly protected from such an

attack.  As set forth in the Second Lien Moving Brief, courts within this district, including this

---

*Energy Corp.*, 64 B.R. 269, 273 (Bankr. W.D. Okla. 1986) ("We do not accept the proposition that the consolidation of [debt] into a long-term promissory note wrought a metamorphosis wherein the nature of the debt was altered"); *Pereira v. Dow Chem. Co. (In re Trace Int'l Holdings, Inc.)*, 301 B.R. 801, 805–06 (Bankr. S.D.N.Y. 2003) (Bernstein, J.), *vacated on other grounds*, No. 04 Civ. 1295 (KMW), 2009 WL 1810112 (S.D.N.Y. June 25, 2009) ("Past consideration is good consideration.  An 'antecedent debt' satisfies the requirement of fair consideration and reasonably equivalent value"); *Boyer v. Crown Stock Distrib., Inc.*, 1:06-CV-409RM, 2009 WL 418275, at *10 (N.D. Ind. Feb. 17, 2009), *aff'd in part*, 587 F.3d 787 (7th Cir. 2009) (debts should be "measured at their face value and not at market value" for purposes of evaluating reasonably equivalent value in the fraudulent conveyance context) (quoting *Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.)*, 281 B.R. 535, 545 (Bankr. D. Del. 2002)).

Court, "consistently" apply the "*per se* rule" that "a debtor's grant of a security interest in its

assets to a lender who has previously given the debtor a cash loan may not be considered a

fraudulent conveyance." *Geron v. Palladin Overseas Fund Ltd. (In re AppliedTheory Corp.)*,

330 B.R. 362, 363 (S.D.N.Y. 2005) (cited at 2L Mov. Br. ¶ 32).[4]  The only decision cited by the

Committee in its efforts to refute this precedent is an out-of-circuit opinion involving the

inapposite situation in which the "debtor received no loan proceeds from the antecedent debt and

only provide[d] the security for a third party's antecedent debt."  *Stillwater Nat'l Bank and Trust

Co. v. Kirtley (In re Solomon)*, 299 B.R. 626, 637 (B.A.P. 10th Cir. 2003).  Indeed, *Applied

Theory* rejected *Solomon* for precisely this distinction, finding the difference to be "crucial."  *In

re AppliedTheory Corp.*, 323 B.R. at 843.

11.    The Committee also attempts to distinguish the cases applying the *per se* rule by

arguing that the rule applies only where "the debtors were in default on their antecedent debt and

therefore gave liens to secure such debt in exchange for their creditors' forbearing from an

exercise of remedies and continuing to lend the debtor additional funds."  Comm. Br. at 22 n.17.

But this is incorrect as well.  For example, although the debtors in *Applied Theory* had previously

defaulted, that default was remedied by a prior amendment to the debentures, and the debtors

were not in default when the liens at issue in that case were granted.  323 B.R. at 839–40.

Similarly, the debtor in *In re Kaplan Breslaw Ash, LLC*, also was not in default on the relevant

debt when the challenged liens were issued. 264 B.R. 309, 330 (Bankr. S.D.N.Y. 2001) ("If a

debtor gives a mortgage to secure a debt it already has . . . the giving of that mortgage may be a

---

[4] *See also Official Comm. of Unsecured Creditors v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant &
Sons Inc.)*, 394 B.R. 721, 732 (Bankr. S.D.N.Y. 2008) (Bernstein, J.); *Geron v. Palladin Overseas Fund Ltd. (In re
AppliedTheory Corp.)*, 323 B.R. 838, 841 (Bankr. S.D.N.Y. 2005); *Cuevas v. Hudson United Bank (In re M.
Silverman Laces, Inc.)*, No. 01 Civ. 6209, 2002 WL 31412465, at *6 (S.D.N.Y. Oct. 24, 2002).

preference, but it is not a fraudulent conveyance. As an obvious corollary, the underlying

antecedent debt does not disappear.").

12.    Moreover, it is plain that the *per se* rule is not premised on a lender's agreement

to forebear from exercising its rights upon default.  Were that the case, then the courts applying

the rule would have had to compare the value of the forbearance against the value of the liens

granted in all of these cases.  Neither *Applied Theory* nor *M. Fabrikant & Sons Inc*. conducted

such an analysis.  Rather, as the court in *Applied Theory* explained:

> [W]hen a debtor grants a security interest to a lender in respect of
> antecedent debt, the debtor must necessarily receive reasonably equivalent
> value or fair consideration in exchange . . . the value of the collateral [i]s
> not relevant in determining whether the debtor received reasonably
> equivalent value in exchange for its granting the security interest, because
> the rights of a secured creditor in collateral are always restricted by the
> amount of the debt.

323 B.R. at 841–42.  The Committee's assertion that this reasoning "does not make sense" falls

flat.  Comm. Br. at 21.  As this Court explained in *Pereira v. Dow Chem. Co. (In re Trace Int'l*

*Holdings, Inc.)*, "[p]ast consideration is good consideration," and "the payment of an existing

liability is not fraudulent."  301 B.R. at 805–06.

13.    The Committee urges the Court to hold that although SUNE could have simply

paid off the $336 million it owed to the Second Lien Noteholders on the Unsecured Notes

without exposing the Second Lien Noteholders to a constructive fraudulent transfer claim,

SUNE's reduction of that $336 million liability, and its grant of liens to secure the reduced

amount, enables the Committee to avoid the liens.  This is illogical and in direct conflict with the

Bankruptcy Code and applicable precedent.

**B.    The Committee Fails to Allege That the *Subsidiary Guarantors* Received Less Than Reasonably Equivalent Value in Exchange for the Subsidiary Liens and Guarantees or Were Insolvent at the Time, or as a Result, of the January Financing (Counts 7 and 8)**

14.    The Committee's claims to avoid the Subsidiary Guarantees and Liens as constructive fraudulent transfers should also be dismissed, because the Committee fails to adequately plead that the Subsidiary Guarantors (i) received less than reasonably equivalent value, or (ii) were insolvent at the time of or as a result of the January Financing.

15.    The only allegation in the Complaint that any of the Subsidiary Guarantors received less than reasonably equivalent value in exchange for the Subsidiary Liens and/or Subsidiary Guarantees is a rote recitation of the language of Section 548.  *See* 2L Mov. Br. ¶¶ 34–36.  The Committee fails to address, and expressly ignores, the many cases holding that such a threadbare, conclusory allegation is insufficient to overcome a motion under Rule 12(b)(6).  *Id.* ¶¶ 36–37.[5]

16.    In *In re Vivaro*, the court held that allegations that debtor subsidiaries did not receive reasonably equivalent value could not survive a motion to dismiss, notwithstanding an allegation that the debtors did not receive a direct benefit, because the "[p]laintiff failed to provide allegations ruling out [the] receipt of any 'indirect benefit,' such as corporate synergy or the enhanced financial health of its corporate parent trickling down the corporate structure."  524 B.R. at 557–59.  The Committee fails to distinguish *In re Vivaro* (nor could it), or any other case cited by the Second Lien Defendants on this point.

---

[5] Citing *Official Comm. of Unsecured Creditors v. Leucadia Nat'l Corp. (In re Vivaro Corp.)*, 524 B.R. 536, 558 (Bankr. S.D.N.Y. 2015); *Official Comm. of Unsecured Creditors v. Blomen (In re Hydrogen, L.L.C.)*, 431 B.R. 337, 353 (Bankr. S.D.N.Y. 2010); *O'Toole v. Karnani (In re Trinsum Grp.)*, 460 B.R. 379, 392 (Bankr. S.D.N.Y. 2011); *Marwil v. Oncale (In re Life Fund 5.1 LLC)*, No. 10-A-42, 2010 WL 2650024, at *7 (Bankr. N.D. Ill. June 30, 2010); *Global Link Liquidating Trust v. Avantel, S.A. (In re Global Link Telecom Corp.)*, 327 B.R. 711, 718 (Bankr. D. Del. 2005).

17.     Instead, the Committee argues that its allegations that "SUNE was engaged in fraud before, during, and after" the January Financing permit the Court to "infer that the new money received in those transactions did not go to pay legitimate corporate expenses or otherwise benefit SUNE's existing creditors," and note that the Second Lien Defendants "point the Court to merely US $174 million in alleged value flowing to SUNE's subsidiaries in exchange for their . . . guarantees." Comm. Br. at 24. These arguments should be rejected.

18.     To begin with, the fraud alleged in the Complaint is that SUNE's management engaged in "financial manipulation" designed to "conceal SUNE's liquidity crisis and insolvency." *See* Compl. ¶¶ 121–31. There is not a single allegation that the Debtors diverted the proceeds of the January Financing for some non-corporate use. Thus, the Complaint's allegations of fraud do not allow for the plausible inference that the proceeds of the January Financing were used for anything other than the Debtors' benefit.

19.     Additionally, the Complaint itself demonstrates that $174 million of these proceeds was used to satisfy debt on which the Subsidiary Guarantors were obligated. Compl. ¶ 138. The Committee's suggestion that the Second Lien Defendants' failure to explain how the remaining $551 million was used somehow supports its allegation regarding reasonably equivalent value turns the pleading burden on its head. *See* Comm. Br. at 17, 24. It is the ***Committee's*** burden to plead facts establishing that the Subsidiary Guarantors received less than reasonably equivalent value. *See, e.g.*, *In re Vivaro Corp.*, 524 B.R. at 558. The Second Lien Defendants do not need to demonstrate how the proceeds of the January Financing were used in order to show that the Committee has failed to satisfy this burden. Fed. R. Civ. P. 12(b)(6).

20.     The Committee's reliance on *Citicorp N. Am., Inc. v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298, 1311 (11th Cir. 2012) is also

unavailing.  Comm. Br. at 23–25.  In *TOUSA*, an unsecured creditors' committee alleged that

debtor subsidiaries received less than reasonably equivalent value in exchange for guaranteeing a

loan to their parent, which the parent used to settle a lawsuit in which it, but not the subsidiary

debtors, was a defendant.  680 F.3d at 1302.  Thus, it was evident from the face of the *TOUSA*

complaint that the proceeds of the debt the subsidiaries guaranteed were not used to fund the

subsidiaries' liabilities, projects the subsidiaries owned, or the ongoing business of the combined

enterprise.  Rather, the proceeds went directly to third parties.  Thus, the *TOUSA* complaint's

allegations that the subsidiary guarantors did not receive any benefits in exchange for their

guarantees was plausible.  *See TOUSA* Compl. ¶¶ 3, 36.[6]  Here, however, the Complaint alleges

that $725 million was loaned to SUNE, which is a holding company that operates through the

Subsidiary Guarantors and their subsidiaries and affiliates, and does not allege that the funds

were used for any purpose other than to pay expenses of the corporate enterprise.  As such, there

is no basis to draw a plausible inference that the Subsidiary Guarantors did not receive direct or

indirect benefits from the January Financing.

21.    The Committee also fails to adequately allege that the Subsidiary Guarantors were

insolvent at the time of, or rendered insolvent by, the January Financing.  While the Committee's

Brief points to allegations regarding ***SUNE's*** alleged insolvency, it fails to cite any similar

allegation regarding the ***Subsidiary Guarantors***.  Comm. Br. at 25-28.  And despite the

Committee's contention that the Second Lien Defendants "invit[e] [the Court] to review the

Amended Complaint as if it were a summary judgment motion," Comm. Br. at 27, each case

cited by the Second Lien Defendants on this point dismissed claims for constructive fraudulent

---

[6] A copy of the Third Amended Adversary Complaint in *TOUSA* ("*TOUSA* Compl.") is attached as Exhibit A to the Declaration of Deborah J. Newman in Further Support of the Second Lien Defendants' Motion to Dismiss (the "Newman Reply Declaration").

conveyance under Rule 12(b)(6).  *See* 2L Mov. Br. ¶¶ 37, 40.[7]  Finally, the Committee's reliance

on *Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)* is

misplaced, as the court there found that "[f]irst, and most fundamentally, the Creditors'

Committee has made the necessary allegations as to insolvency in its complaint."  365 B.R. 24,

37 (Bankr. S.D.N.Y. 2007).  There are no allegations in the Complaint that would allow the

Court to reach such a conclusion with respect to the Subsidiary Guarantors.

## II.    The Committee Fails to State a Claim for Intentional Fraudulent Transfer (Counts 4 and 5)

22.    The Committee completely ignores the law holding that a plaintiff seeking to state

an intentional fraudulent transfer claim must plead that the debtor incurred an obligation or made

a transfer with the intent to place assets outside of creditors' reach.  2L Mov. Br. ¶¶ 46–47.[8]

Rather, the Committee argues that because the Complaint alleges that the Debtors engaged in

general accounting manipulations that misstated their financial condition, it must *a fortiori* also

sufficiently allege that they incurred and granted the obligations and liens arising out of the

January Financing (other than the liens and obligations associated with the Second Lien Term

Loan, which the Committee does not challenge) in order to place their assets outside of creditors'

reach.  *See* Comm. Br. at 10–11.

23.    The Committee's conclusion does not follow from its premise.  As the Second

Circuit has held, even where a plaintiff alleges wide-ranging fraud by a debtor, in order to state a

claim for intentional fraudulent transfer, it must "[]adequately allege[] fraud with respect to the

transaction that [it seeks] to void."  *Sharp Int'l Corp. v. State St. Bank & Tr. Co. (In re Sharp*

---

[7] Citing *In re Vivaro Corp.*, 524 B.R. at 551; *In re Trinsum Grp.*, 460 B.R. at 389, 392 & n.6; *In re Life Fund 5.1 LLC*, 2010 WL 2650024, at *7; *In re Global Link Telecom Corp.*, 327 B.R. at 718.

[8] Citing *Bear, Stearns Sec. Corp. v. Gredd*, 275 B.R. 190, 195 (S.D.N.Y. 2002); *Weisfelner v. Hofmann (In re Lyondell Chem. Co.)*, 554 B.R. 635, 650 (S.D.N.Y. 2016); 5 COLLIER ON BANKRUPTCY ¶ 548.04 (16th Ed. 2010); *Boston Trading Grp., Inc. v. Burnazos*, 835 F.2d 1504, 1508 (1st Cir. 1987).

*Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005).[9]  The Committee has not done that here.  The

January Financing reduced the Debtors' debt by $356 million, and infused $725 million into the

corporate enterprise.  Notwithstanding the Complaint's allegations that the Debtors engaged in

accounting fraud to conceal their financial condition, there is no allegation that the Debtors, or

their management, misused or absconded with this new money.  Nor is such an allegation made

in any of the shareholder lawsuits or audit investigation report cited by the Committee as

purported support for its intentional fraudulent transfer claim, or the complaint recently filed by

certain of the Second Lien Lender Defendants, which alleges that the Debtors' fraudulently

induced them to enter into the January Financing.  In sum, there is nothing alleged in the

Complaint that would allow the Court to infer that the Debtors intended to remove assets from

creditors' reach when they incurred obligations and granted liens for the purpose of raising $725

million and reducing outstanding indebtedness.

24.    Additionally, the Committee's suggestion that the Court can infer that the

proceeds of the January Financing "may well have been diverted" to "improper ends," "such as,

for example, a preferential transfer to TERP and GLBL," should be rejected out of hand.  *See*

Comm. Br. at 16.  As noted *supra*, **nothing** in the Complaint suggests that the January Financing

proceeds were so "diverted."[10]  Moreover, a preferential payment to SUNE creditors with the

---

[9] In *In re Sharp,* the debtor alleged that its former management engaged in widespread accounting fraud, that the defendant bank, a lender to the debtor, discovered the fraud and demanded that the debtor pay off its debt, and that the debtor's former management then raised funds from unsuspecting noteholders in order to do so.  *Id.* at 56–57, 46–48.  The Second Circuit dismissed the claim, finding that the alleged fraud related to the way in which the money was raised from the noteholders, and not the use of that money to pay off the bank.  *Id.* at 56–57. Tellingly, if the *Sharp* court had adopted the theory propounded by the Committee here—that a debtor's accounting fraud in and of itself can give rise to a claim for intentional fraudulent transfer—then the debtor in *Sharp* would have been able to prevail on an intentional fraudulent transfer theory not only against the bank, but also against the noteholders that were fraudulently induced into lending the debtor money.

[10] As noted *supra*, the Committee's contention that an inference of misuse arises from the Second Lien Lenders' failure to address the alleged "glaring discrepancy" between the funds borrowed and the debt known to have been repaid is significantly misplaced, given that it is the Committee—not the Second Lien Defendants—that bears the pleading burden here.

proceeds of the Second Lien Debt, even if it happened, would not support a claim for fraudulent

transfer against the Second Lien Defendants.

25.    The Committee also asserts in its brief that the Complaint "includes allegations

establishing *every one* of the badges of fraud."  Comm. Br. at 10 (emphasis in original).  But

oddly, the allegations raised by the Committee as purported evidence of the "badges of fraud"

bear little or no relationship to the badges articulated by the Second Circuit.  Comm. Br. at 10–

11.  Indeed, most of them do not relate to the January Financing at all.  Six of them (bullets one

through three and nine through 11) simply regurgitate the Committee's allegations respecting the

Debtors' alleged accounting fraud and the investigations and lawsuits respecting such alleged

fraud.  Others reiterate the Committee's flawed theories regarding (i) the absence of reasonably

equivalent value in the Notes Exchange (bullet seven); (ii) an internal email exchange from a

single Second Lien Lender  Defendant (out of six dozen) that simply offers differing speculations

regarding the Debtors' motivation to enter into the January Financing[11] (bullets four and five);

and (iii) the actions taken by the Second Lien Lender Defendants to exercise their rights as

commercial lenders to the Debtors (bullet 12).

26.    The Committee also argues in its brief that the Second Lien Defendants engaged

in a "*quid pro quo*" that enabled the Debtors to "bury its misdeeds," Comm. Br. at 10 (bullet

eight), but again, the Complaint contradicts that theory by explicitly alleging that the Second

Lien Lender Defendants were unaware of those misdeeds.  Compl. ¶¶ 133, 156.  Finally, the

Committee alleges that the January Financing, which was publicly disclosed, "lacked

transparency," because the Debtors did not publicly disclose the uses of the January Financing

proceeds not used to pay down debt, other than to state that they would be used for general

---

[11] A copy of the email exchange is attached as Exhibit B to the Newman Reply Declaration.

corporate purposes.  Comm. Br. at 10 (bullet six); 12/24/15 8-K.[12]  The Second Lien Defendants,

however, are unaware of a single case (and the Committee does not cite any) in which a court

found that a debtors' failure to publicly disclose or itemize the intended uses of a corporate

financing indicated that the financing lacked transparency or constituted a badge of fraud.[13]

These allegations, considered individually or collectively, do not give rise to a plausible

inference that the Debtors undertook the January Financing with an intent to hinder, delay, or

defraud their creditors. Indeed, the absence of "badges of fraud" relating to the January

Financing lead to the opposite inference.  *See Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 375

(S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004) (noting that the absence of badges of

fraud "would constitute evidence that there was no intent to defraud").

## III.   The Committee Fails to State a Claim for Preferential Transfer (Count 10)

27.     The sole dispute on this Motion respecting the preference claim against the

Second Lien Lender Defendants, which seeks to avoid only the liens securing the Second Lien

Notes, is whether the Complaint alleges that the Second Lien Lender Defendants were insiders at

the time of the January Financing.  It does not.

28.     The relevant allegations in the Complaint focus entirely on the Second Lien

---

[12] A copy of the SunEdison, Inc., Current Report (Form 8-K) (Dec. 24, 2015) ("12/24/15 8-K") disclosing the January Financing is attached as Exhibit C to the Newman Reply Declaration.

[13] The Committee's assertion that numerous courts have sustained intentional fraudulent conveyance claims on similar allegations is about as wrong as one can be.  Comm. Br. at 12.  The cases that are cited by the Committee demonstrate the paradigmatic examples of intentional fraudulent transfer, in which the obligation or transfer at issue was made with the purpose to frustrate creditors' ability to collect on their debts and for little to no consideration in return.  *See* Comm. Br. at 12 (citing *In re Lyondell Chem. Co.*, 554 B.R. 635 (denying a motion to dismiss an intentional fraudulent transfer claim where the plaintiff alleged that a leveraged buyout saddled the debtor with considerable new debt, at a time when the debtor's equity value was either zero or close to it, solely to enable the acquirer to purchase the debtors' outstanding stock from existing stockholders and cash executives out of the company); *Pereira v. Grecogas Ltd. (In re Saba Enters., Inc.)*, 421 B.R. 626 (Bankr. S.D.N.Y. 2009) (denying a motion to dismiss an intentional fraudulent transfer claim where the plaintiff alleged that mere days after an adverse judgment against the debtor was issued, the debtor transferred its ownership interests in its subsidiaries to corporate affiliates with whom the debtor was under common control); *Slone v. Lassiter (In re Grove-Merritt)*, 406 B.R. 778 (Bankr. S.D. Ohio 2009) (ruling that the debtor's transfer of her interest in her home to her significant other so that she could shield it from her creditors was an intentional fraudulent transfer)).

Lender Defendants' purported exercise of control over the Debtors *after the January Financing*. Compl. ¶¶ 147, 156. Indeed, the Complaint alleges that "as a result of Management's gross financial improprieties, the lenders involved in the January 2016 Transactions believed that SUNE would quickly rebound from its liquidity crunch," and alleges that "*[s]hortly after closing the January 2016 Transactions*, *and as a result of the control and influence they achieved over SUNE through those Transactions*, SUNE's secured creditors began to understand the true state of SUNE's liquidity crisis." Compl. ¶¶ 133, 156 (emphasis added).

29. The *only* allegation set forth in the Complaint that could conceivably support the assertion that the Second Lien Lender Defendants were insiders at the time of the January Financing is that the Second Lien Lender Defendants were "at all relevant times an 'insider' of the Debtors" [sic]. Compl. ¶ 235. As a matter of law, such a conclusory and unsupported allegation does not suffice to allege insider status. *See, e.g.*, *Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 447 B.R. 170, 185 (Bankr. S.D.N.Y. 2011) ("Threadbare recitals of the elements of a cause of action supported by conclusory statements are not factual" and are not "sufficient . . . to state a claim for relief . . ."). And this is especially so, given that this conclusory allegation is contradicted by other, more specific, allegations in the Complaint. *See* Compl. ¶¶ 133, 156.

30. The Committee nevertheless argues that the Complaint sufficiently alleges insider status at the time of the January Financing, asserting for the first time in its brief that "there is no dispute that the Prepetition Second Lien Defendants had an existing and long-standing relationship with the Debtors," and that the allegations in the Complaint "regarding the depth of the Debtors' financial improprieties and the effect of their dire financial situation on the January 2016 Transactions plausibly suggest that those Transactions were not at arms' length." Comm.

Br. at 30.  The Committee asserts further that the Second Lien Lender Defendants, "[k]nowing

that [the Debtors] could not raise money elsewhere without exposing their improprieties," were

able to "extract an 'abnormally favorable deal.'"  Comm. Br. at 31.

31.    These new factual allegations are nowhere to be found in the Complaint and thus

have no bearing on the motion to dismiss.  The Committee cannot now amend the Complaint by

asserting additional unfounded allegations in its opposition brief.  *See, e.g.*, *FMS Bonds, Inc. v.*

*Bank of N.Y. Mellon*, No. 15-civ-9375-ER, 2016 WL 4059155, at *8 n.4 (S.D.N.Y. July 28,

2016).  The Complaint does not allege (and the facts would not bear out) that the Second Lien

Lender Defendants had "a long-standing relationship with the Debtors," or that the January

Financing was conducted on anything other than an arm's-length basis.

32.    Moreover, the Complaint itself alleges only that the Second Lien Lenders who

participated in the January Financing were existing lenders of the Company, and that they

"realize[d] that they were receiving an abnormally favorable deal."  Compl. ¶¶ 132–34.  It does

not allege the length of the lending relationship, or that the Second Lien Lender Defendants were

able to "coerce" the Debtors into transactions that were not in the Debtors' best interest, as

would be necessary to show that the January Financing was not negotiated at arm's-length.  *See,*

*e.g.*, *Schubert v. Lucent Tech., Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 399–400 (3d

Cir. 2009).  Rather, it alleges that (i) the Debtors were experiencing a public liquidity crisis, (ii)

as a result of the Debtors' financial improprieties, the extent of that liquidity crisis was worse

than the public markets, including the Second Lien Lender Defendants, believed, and (iii) the

Second Lien Lender Defendants "believed that SUNE would quickly rebound from its liquidity

crunch."  Compl. ¶¶ 121–34.

33.    As a matter of law, these allegations do not support the Committee's contention

that the Second Lien Lender Defendants were insiders.  Superior bargaining power in negotiating

a transaction does not render a lender an insider.  *Official Comm. of Unsecured Creditors v.*

*McConnell (In re Grumman Olson Indus., Inc.)*, 329 B.R. 411, 428 (Bankr. S.D.N.Y. 2005); *In*

*re TBR USA, Inc.*, 429 B.R. 599, 625 (Bankr. N.D. Ind. 2010) ("It is insufficient that the alleged

insider had only a superior bargaining position in a contractual relationship…. This includes

situations where bargaining power is greatly skewed in favor of the lender; otherwise this would

invariably be true whenever a lender is on the verge of terminating a debtor's operations.")

(internal citations omitted); *Gray v. Chace (In re Boston Publ'g Co.)*, 209 B.R. 157, 170 (Bankr.

D. Mass. 1997) ("It is not enough that the alleged insider have only a superior bargaining

position or a contractual relationship with the debtor" to establish insider status); *Hunter v.*

*Babcock (In re Babcock Dairy Co. of Ohio, Inc.)*, 70 B.R. 657, 661 (Bankr. N.D. Ohio 1986)

(same).  Even where a lender engages in "forceful negotat[ion], the fact that one party to a

contract has more leverage does not indicate that the dealings are not at arm's length."  *See*

*Official Comm. of Unsecured Creditors v. Credit Suisse (In re Champion Enters.)*, No. 10–

50514, 2010 WL 3522132, at *9 (Bankr. D. Del. Sept. 1, 2010).[14]

      34.     Indeed, if a lender's alleged bargaining power stemming from a struggling

debtor's need for financing were sufficient to create insider status on the part of the lender,

nearly all (if not all) lenders who extend credit to or renegotiate existing loans with distressed

companies would become insiders and be subject to the one-year preference period.  It is not

hard to see that such a rule would dramatically limit the willingness of lenders (new or existing)

to deal with financially struggling debtors, and result in more bankruptcies.  Neither Section 547,

---

[14] In *Hirsch v. Tarricone (In re A. Tarricone, Inc.)*, 286 B.R. 256, 266 (Bankr. S.D.N.Y. 2002), a case cited
by the Committee in support of its position, the court recognized that for a lender to have control over a borrower
such control must amount to a "stranglehold" or "complete dominion," not merely the exercise of ordinary lender
rights.  Plainly that is not the case here.

nor the case law applying it, supports such a rule.

**IV.    The Committee Cannot Evade the Application of the Section 546(e) Safe Harbor to Its Constructive Fraudulent Transfer and Preference Claims (Counts 7, 8 and 10)**

35.    Even if the Committee had sufficiently alleged a constructive fraudulent transfer or preference claim (which it did not), Counts 7, 8 and 10 are precluded as a matter of law because the liens granted in connection with the Second Lien Debt were "transfers" that were "made for the benefit of" a "financial institution" (Wilmington Trust as collateral agent for the Second Lien Notes and the Second Lien Credit Facility) "in connection with a securities contract" (the Exchange Agreements and the Security Agreement).  11 U.S.C. § 546(e).

36.    The Committee does not contest that the liens it seeks to avoid satisfy the first two elements of Section 546(e)'s safe harbor—that they were "transfers" made to a "financial institution."  Nor does the Committee contest that the liens were granted "in connection with" the Exchange Agreements and the Security Agreement, or that, if the Exchange Agreements are "securities contracts," then the Security Agreement is as well.

37.    Instead, the Committee argues that the Exchange Agreements are not "securities contracts."  Comm. Br. at 34.  But the Exchange Agreements fall squarely within the definition of "securities contracts" set forth in the Bankruptcy Code, and easily meet the standard set for Section 546(e) by the Second Circuit.[15]  *See Picard v. Ida Fishman Revocable Tr. (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411 (2d Cir. 2014).  In *Madoff*, the Second Circuit recognized that Section 741(7)(A) "defines 'securities contract' with extraordinary breadth" and that the definition is "expansive."  *Id.* at 417, 419 ("Yet another indication that Congress intended § 546(e) to sweep broadly is supplied by the text of § 741(7)(A)(vii) which expands the definition of 'securities contract' to include '*any* other *agreement . . . that is similar* to'" a

---

[15] Copies of the Exchange Agreements entered into by the Second Lien Lender Defendants are attached as Exhibit D to the Newman Reply Declaration.

contract for the purchase or sale of a security) (emphasis in original).

38.    Here, while it is true that, from an economic perspective, the Notes Exchange can
be viewed either as the issuance of new debt or a modification of existing debt, regardless of
which view the Court prefers, there can be no question that the Exchange Agreements provided
for the exchange of Unsecured Notes for Second Lien Notes, as if SUNE had sold one note and
purchased another.  Thus, the Exchange Agreements are "similar to" contracts for the purchase
or sale of securities, and qualify as "securities contracts" under the Bankruptcy Code.  11 U.S.C.
§ 741(7)(A)(vii).

39.    The Committee also appears to contend that "notes" are not "securities," and
points to Judge Glenn's decision in *Motors Liquidation Co. Avoidance Action Trust v. JPMorgan
Chase Bank, N.A. (In re Motors Liquidation Co.)*, 552 B.R. 253, 277 (Bankr. S.D.N.Y. 2016) as
"recognizing" that "no existing case law supports the application of 546(e) to transfers made in
connection with promissory notes."  Comm. Br. at 34.  But Judge Glenn actually stated that "no
existing case law supports [the] argument that the section 546(e) safe harbor applies to ***interest
payments*** on promissory notes." (emphasis added).  *Motors Liquidation*, 552 B.R. at 277.  Judge
Glenn stated expressly that "Section 101(49)(A)(i) defines a 'security' to include a 'note,'" and
held that the term loan at issue there, which was "evidenced by a note, … is considered a security
for purposes of the other relevant sections of the Code."  *Id.* at 278.  Judge Glenn concluded that
the issue of whether the periodic interest payments at issue in *Motors Liquidation* were made "in
connection with a securities contract" was a question of fact that could not be adjudicated on the
record before him, given that "the underlying documents concerning the terms of the note, or the
purchase or sale of interests in the note, [were] not part of the record on the pending motions."
*Id.* at 281.

40.    The Second Lien Notes, which are indisputably "notes," and are referred to as such in the Complaint, are "securities" under the Bankruptcy Code. *See, e.g.*, Compl. ¶ 140. Additionally, the Notes Exchange involved contracts for the disposition and acquisition of securities, not merely payments on securities. Thus, *Motors Liquidation* in fact supports the application of Section 546(e) to the liens granted to secure the Second Lien Debt.

41.    Indeed, the Notes Exchange is more similar to the transaction at issue in *Official Comm. of Unsecured Creditors of Quebecor World (USA) Inc. v. Am. United Life Ins. Co. (In re Quebecor World (USA) Inc.)*, 719 F.3d 94 (2d Cir. 2013), than the interest payments at issue in *Motors Liquidation*. In *Quebecor*, the Second Circuit held that payments to noteholders in exchange for private placement notes were protected under Section 546(e) because they were transfers made in connection with a securities contract. *Motors Liquidation*, 552 B.R. at 280–81 (citing *Quebecor*, 719 F.3d at 96–98). As *Quebecor* shows, the Notes Exchange is precisely the type of transaction that Section 546(e) was intended to protect. Further, the Exchange Agreements and Security Agreement, which are properly before the Court, make clear that the liens securing the Second Lien Debt were granted "in connection with" these agreements.

42.    The Committee also argues that Congress did not intend to "exempt constructive fraudulent transfer and preference claims in connection with private term loans and notes like those in this case." Comm. Br. at 35. Binding Second Circuit precedent, however, holds otherwise. *In re Quebecor*, 719 F.3d at 98 (holding that Section 546(e) barred the avoidance of approximately $376 million in transfers made to repurchase privately placed notes); *see also AP Servs. LLP v. Silva*, 483 B.R. 63, 69 (S.D.N.Y. 2012) (Section 546(e) protected "settlement payments" even though shares were privately held); *Cyganowski v. Lapides (In re Batavia Nursing Home, LLC)*, No. 11-13223 K, 2013 WL 3934237, at *1 (Bankr. W.D.N.Y. July 29,

2013) (same).[16]

43.    The Committee next argues that the Second Lien Lender Defendants are

precluded from relying on Section 546(e)'s safe harbor because they engaged in "willful

blindness" or "conscious avoidance" of the underlying fraud.  Comm. Br. at 35–36.  But even if

willful blindness was alleged (it is not), it would not render Section 546(e)'s protections

inapplicable.  The case cited by the Committee, *O'Connell v. Penson Fin. Servs., Inc. (In re*

*Arbco Capital Mgmt., LLP)*, 498 B.R. 32 (Bankr. S.D.N.Y. 2013), applies the test set forth in

*SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, No. 12 MC 115 (JSR), 2013 WL

1609154 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*").  In *Cohmad*, Judge Rakoff clearly stated that

willful blindness will not exempt a transfer from the safe harbor unless there is a special

relationship between the transferee and the transferor.  *Cohmad*, 2013 WL 1609152, at *4 & n.2.

Absent such a special relationship, a plaintiff seeking to avoid the safe harbor must allege that

defendants had "not mere suspicions, but actual knowledge of [the allegedly fraudulent]

scheme.'"  *Id.*  Indeed, the court in *Arbco* explicitly limited its holding to "the particular

relationship between" the defendant and the debtor, which obligated and required the defendant,

under its "fiduciary duties," "various contracts," and "securities law," to "ensure that [the debtor]

was properly funded while conduct [sic] legitimate trading activity."  *Arbco*, 498 B.R. at 43–44.

44.    Here, the Second Lien Lender Defendants are third-party commercial lenders who

loaned funds on commercial terms at arm's-length.  The Complaint does not allege, nor could it,

that there is any "special relationship" between the Second Lien Lender Defendants and the

Debtors.  To the contrary, the Complaint alleges that "the lenders involved in the January 2016

Transactions believed that SUNE would quickly rebound from its liquidity crunch"; notes that

---

[16] The Committee's description of the Second Lien Notes and the Second Lien Term Loan as "private"
does not appear anywhere in the Complaint and should be disregarded.  To the contrary, the Complaint alleges that
the Second Lien Notes had a market value.  Compl. ¶ 143.

the "Prepetition Second Lien Lenders themselves have alleged that they believed that SUNE still

had significant value when they entered the January 2016 Transactions," and that they were

"misled about SUNE's true financial situation"; and alleges that "SUNE's secured creditors

began to understand the true state of SUNE's liquidity crisis" only "[s]hortly after closing the

January 2016 Transactions."  Compl. ¶¶ 133, 147, 156.

45.    Further, the email exchange cited repeatedly by the Committee shows nothing

more than internally inconsistent speculations from a single Second Lien Lender Defendant (out

of six dozen) regarding the Debtors' desire to enter into the January Financing.  *Id.* ¶ 134.[17]  It

does not show that the lender had "actual knowledge" that the Debtors were engaged in fraud, or

even that the lender "subjectively believe[d] that there [wa]s a high probability" of any such

fraud, or took "deliberate actions to avoid learning" of it.  *See Cohmad*, 2013 WL 1609154, at *4

& n.2; *Picard v. Legacy Capital Ltd. and Khronos LLC (In re Bernard L. Madoff Inv. Sec. LLC)*,

548 B.R. 13, 35 (Bankr. S.D.N.Y. 2016).

46.    Finally, in arguing that Section 546(e) does not protect the Debtors' obligations

and guarantees on the Second Lien Debt from avoidance, the Committee ignores Judge Peck's

holding in *Lehman*.  Judge Peck acknowledged the decision cited by the Committee, *Geltzer v.

Mooney (In re MacMenamin's Grill Ltd.)*, 450 B.R. 414 (Bankr. S.D.N.Y. 2011), but stated that

to permit the plaintiffs to avoid obligations secured by liens protected by the safe harbor would

"whittle away at or undermine the effectiveness of the safe harbors."  *Official Comm. of

Unsecured Creditors of Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re

Lehman Bros. Holdings Inc.)*, 469 B.R. 415, 444–46 (Bankr. S.D.N.Y. 2012).  Accordingly,

Judge Peck held that "[a]lthough the Plaintiffs are correct that the obligations themselves are not

---

[17] *See* Ex. B to the Newman Reply Declaration.

21

shielded by section 546(e), they still are unable to prevail on these counts of the Amended

Complaint [seeking to avoid the obligations] and have failed to state claims upon which relief

may be granted." *Id.* at 446. Here too, Section 546(e) precludes the Committee from avoiding

the liens securing the Second Lien Debt, and its claims to avoid the underlying obligations must

thus also fail.

**V.      The Committee Fails to State a Claim for Equitable Subordination of the Second
          Lien Lender Defendants' Claims (Count 11)**

47.      The Committee's equitable subordination claim fails for two reasons. First, the

Committee has not (and cannot) plead that the ordinary lender conduct of the Second Lien

Lender Defendants renders them insiders such that the lower pleading standard for equitable

subordination of insiders would apply. Second, the Second Lien Lender Defendants' conduct as

commercial lenders (which was entirely appropriate) falls far below the gross and egregious

behavior required to equitably subordinate non-insider claims.

**A.      Standard Commercial Conduct and Arm's-Length Bargaining Power
          Cannot Support a Claim for Insider Status**

48.      As discussed *supra*, courts recognize that ordinary lender conduct, which includes

the exercise of bargaining power and bargained-for rights under a credit agreement, does not

constitute the type of "control" necessary to render a lender an insider under Section 101(31). *In

re Champion Enters.*, 2010 WL 3522132, at *7; *In re Boston Publ'g Co.*, 209 B.R. at 170. Yet

despite this well-settled principle, the Committee insists that the Second Lien Lender

Defendants' exercise of their contractually bargained-for rights—many of which were exercised

post-petition and/or approved by this Court under the DIP Financing Order—are grounds for

equitable subordination. Compl. ¶¶ 162–63, 247. This is simply wrong. 2L Mov. Br. ¶ 79. "In

the context of a lender-defendant, courts have refused to apply insider status absent a showing of

a high level of control by the lender." *In re Champion Enters.*, 2010 WL 3522132 at *6; *In re A.*

*Tarricone, Inc.*, 286 B.R. at 266.  Here, the Complaint's allegations demonstrate "nothing more than a normal distressed-borrower/lender relationship," and cannot form the basis for insider status under Section 101(31)(B)(iii) or non-statutory insider law.  *In re Champion Enters.*, 2010 WL 3522132, at *8.

49.    Nevertheless, the Committee attempts to rescue its argument for insider status (and thereby invoke a lower threshold for equitable subordination) by embellishing allegations in the Complaint or simply manufacturing new ones in its opposition brief.  For instance:

- The Committee's Brief asserts that Defendants "dictate[d] critical aspects of the Debtors' operations in the run-up to bankruptcy, including the appointment of key personnel," Comm. Br. at 39, but the Complaint makes no such allegation (nor could it).[18]

- The Committee now claims that "the January 2016 Transactions were not conducted at arm's-length," Comm. Br. at 39, but the Complaint makes no such allegation, and, as noted *supra*, neither the Complaint's allegations nor the facts of this case allow for such an inference.

- The Committee's Brief (again, erroneously) suggests that Defendants "dictate[d] … which entities would eventually file for bankruptcy," Comm. Br. at 39, 41, but the Complaint merely alleges that Defendants "were involved in deciding which entities would file for bankruptcy protection."  Compl. ¶ 162.

These improper embellishments should be disregarded.  *See K.D. ex rel. Duncan v. White Plains School Dist.*, 921 F. Supp. 2d 197, 209 n.8 (S.D.N.Y. 2013) ("Plaintiffs cannot amend their complaint by asserting new facts or theories for the first time in opposition to Defendants' motion to dismiss.") (citations omitted).

50.    Further, the cases cited by the Committee in purported support of its insider argument are either easily distinguished or weigh against a finding that the Second Lien Lender

---

[18] While the DIP Credit Agreement requires the Chief Restructuring Officer retained by the Debtors to be "reasonably satisfactory" to a certain percentage of DIP lenders, the Debtors' retention of John Dubel as their Chief Restructuring Officer occurred post-petition, and was approved by this Court.  *See Order Pursuant to Bankruptcy Code Sections 105(a) and 363(b) Authorizing Debtors to Appoint John S. Dubel as Chief Restructuring Officer Nunc Pro Tunc to April 29, 2016*, June 8, 2016 [Doc. 512].  Moreover, the Committee has expressly stated to the Court that it "took comfort in the hiring of a CRO." *Objection of Official Committee of Unsecured Creditors to Debtors' Motion for Interim and Final Orders*, May 16, 2016 [Doc. 295].

Defendants are insiders.  Comm. Br. at 37, 40.  The lender-defendant in *In re A. Tarricone, Inc.*,

286 B.R. at 269 was a "close, personal friend[] and golfing budd[y]" of the debtor's "de facto"

head; *Official Comm. of Unsecured Creditors v. NewKey Grp., LLC (In re SGK Ventures, LLC)*,

521 B.R. 842, 863 (Bankr. N.D. Ill. 2014) involved the debtor's controlling shareholder; and the

lender-defendant in *Official Comm. of Unsecured Creditors v. Austin Fin. Servs., Inc. (In re KDI*

*Holdings),* 277 B.R. 493, 499 (Bankr. S.D.N.Y. 1999) had a familial relationship with and was a

"long-standing business partner" of the debtor.  Additionally, in *Official Unsecured Creditors'*

*Comm. v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC)*, the court found that there was

an issue of fact as to whether the defendant-lender was a non-statutory insider prior to becoming

a statutory insider, where the plaintiff alleged that the lender-defendant, in addition to having

"substantial holdings" in the debtor, "directed management hiring and firing," and "failed to act

at arm's-length by causing [the debtor] to retain and compensate … its affiliate," and causing its

affiliate to become the agent for the debtor's second lien debt.  444 B.R. 51, 80 (Bankr. D. Del.

2010).  There are no allegations in the Complaint that even resemble those asserted in these

cases.

> 51.      Finally, in *Pan Am Corp. v. Delta Air Lines, Inc.*, the court stated that:

> [b]efore a creditor will be found to be an 'insider' to a debtor for purposes of considering
> whether that creditor's claim should be equitably subordinated, the creditor must be
> shown to have been able to command the debtor's obedience to [the creditor's] policy
> directives to such an extent that there has been . . . a merger of identity.  Unless the
> creditor has become, in effect, the alter ego of the debtor, he will not be held to an ethical
> duty in excess of the marketplace.

175 B.R. 438, 500 (S.D.N.Y. 1994).[19]  The conduct of the Second Lien Lender Defendants

alleged here does not even approach the standard for insider treatment articulated in *Pan Am.*

---

[19] The court went on to hold that the creditor in *Pan Am* was not an insider, notwithstanding that it was the
only debtor-in-possession lender and had special access to the Debtor's premises and personnel.  *Id.*

B.    **The Committee Does Not Satisfy the Standard for Equitable Subordination of Non-Insiders**

52.    Because the Committee cannot establish that the Second Lien Lender Defendants were insiders of the Debtors, the Committee must demonstrate that the Second Lien Lender Defendants engaged in "egregious conduct such as fraud, spoliation or overreaching" to state a claim for equitable subordination of the Second Lien Lender Defendants' claims. *Bank of N.Y. v. Epic Resorts (In re Epic Capital, Corp.)*, 307 B.R. 767, 772 (D. Del. 2004). Additionally, "[p]articularized fact pleading regarding the allegedly egregious behavior is required." *In re Champion Enters.*, 2010 WL 3522132, at *8.

53.    The allegations in the Complaint are patently insufficient to satisfy this standard. As discussed above, the Committee's conclusory allegations that the Second Lien Lender Defendants influenced the Debtors to delay filing for bankruptcy, dictated the appointment of a chief restructuring officer, and improved their collateral position, are far from the "egregious" conduct necessary to equitably subordinate the Second Lien Lender Defendants' claims.

54.    Moreover, the cases cited by the Committee in support of the equitable subordination of non-insiders' claims are, once again, easily distinguishable or support dismissal of the Committee's equitable subordination claim. The language quoted by the Committee from the *W.T. Grant* decision (Comm. Br. at 42) reads in full as follows: "The permissible parameters of a creditor's efforts to seek collection from a debtor are generally those with respect to voidable preferences and fraudulent conveyances proscribed by the Bankruptcy Act; *apart from these there is generally no objection to a creditor's using his bargaining position, including his ability . . . to improve the status of his existing claims.*" *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 610 (2d Cir. 1983) (emphasis added). *W.T. Grant* thus reinforces the fact that the Second Lien Lender Defendants' exercise of their bargaining power and rights as lenders

cannot form the basis for equitable subordination.  The proper avenues for relief, if those claims

were viable (they are not), would be preference and fraudulent transfer claims.

55.     The Committee's reliance on *Madoff* and *Picard* is equally unavailing.  In *Madoff*,

the court denied the defendants' motion to dismiss the trustee's equitable subordination claim on

the basis that the trustee sufficiently alleged that the defendants were "willfully blinded" to

Madoff's fraudulent scheme and consciously misled customers "as to the true financial

condition" of Madoff's investment business.  *Picard v. Merkin (In re Bernard L. Madoff Inv.

Sec. LLC)*, 515 B.R. 117, 157–59 (Bankr. S.D.N.Y. 2014).  In *Picard*, the court refused to

dismiss the trustee's equitable subordination claim, where the trustee sufficiently alleged that the

defendants in that case "invested with Madoff Securities with knowledge, or in reckless

disregard, of its fraud," and therefore engaged in inequitable conduct because the defendants

"did not receive fraudulent transfers in good faith."  *Picard v. Katz*, 462 B.R. 447, 456 (S.D.N.Y.

2011).  Here, far from alleging that the Second Lien Lender Defendants willfully blinded

themselves to, or had actual knowledge of, any fraudulent conduct, the Complaint affirmatively

demonstrates that they acted in good faith, and expressly acknowledges that they were "misled

about SUNE's true financial situation."  Compl. ¶¶ 133, 147.

56.     The Committee also cites *In re SGK Ventures* for the proposition that a delay of a

bankruptcy filing to frustrate potential avoidance actions is the type of inequitable conduct that

may warrant equitable subordination.  But in *SGK*, the defendants were controlling shareholders

of the debtors (and thus ***statutory insiders***), and "engaged in large fraudulent transfers of SGK's

cash and then ***concealed the existence of these transfers*** until the creditors of SGK would be

time-barred from complaining of it."  521 B.R. at 863 (emphasis added).  *SGK* has no relevance

here, where the Second Lien Lender Defendants are not insiders, and are not alleged to have

engaged in the type of fraudulent concealment at issue in *SGK*.

## VI. The Complaint Fails to State a Cause of Action for Aiding and Abetting a Breach of Fiduciary Duty (Count 15)

57.     As discussed in the Second Lien Moving Brief (¶ 84), the Committee fails to state

a claim for aiding and abetting a breach of fiduciary duty under applicable law (in this case,

Missouri law).[20]  But regardless of which state's law applies, the Committee's aiding and

abetting claims should be dismissed.

### A. Even if Delaware Law Applies, the Complaint Does Not State a Claim for Aiding and Abetting a Breach of Fiduciary Duty

58.     The Second Lien Moving Brief cites to numerous cases holding that where, as

here, "a complaint does not adequately contain facts supporting a claim that directors acted in

bad faith or conscious disregard of their responsibilities," the business judgment rule warrants

dismissal under Rule 12(b)(6).  2L Mov. Br. ¶¶ 86–91.  These decisions include dismissals of

breach of fiduciary duty claims premised, as the Committee's claims are here, on the timing of a

debtors' bankruptcy filing.[21]  The Committee's attempt to distinguish these cases on the ground

that "[h]ere, . . . the Debtors had already decided to file for bankruptcy," is unavailing.  Comm.

Br. at 51 n.30.  None of the cited decisions indicates that this factor would alter its holding.

Moreover, the debtors in *Gulf Fleet* had also "already decided to file for bankruptcy," as they

hired bankruptcy counsel and obtained board authorization to file, seven and four months,

respectively, before commencing their bankruptcy cases.  *Gulf Fleet*, 2014 WL 4560441, at *8.

---

[20] The Second Lien Defendants also adopt and incorporate by reference the arguments respecting the application of Missouri law contained on page 25 of the Reply Memorandum of Law in Support of the First Lien Defendants' Motion to Dismiss.

[21] *See, e.g.*, *Official Comm. of Unsecured Creditors v. Nat'l Amusements Inc. (In re Midway Games Inc.)*, 428 B.R. 303, 317 (Bankr. D. Del. 2010); *Goodman v. H.I.G. Capital LLC (In re Gulf Fleet Holdings, Inc.)*, No. 11-05006, 2014 WL 4560441, at *7 (Bankr. W.D. La. Apr. 2, 2014); *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 194 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Trust v. Billett*, 931 A.2d 438 (Del. 2007); *Official Comm. of Unsecured Creditors v. Goldman Sachs Credit Partners, L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 541–43 (Bankr. D. Del. 2009).

59.    The Committee's threadbare aiding and abetting claim is premised solely on allegations that the Debtors chose to file for bankruptcy outside of the preference period notwithstanding their knowledge of potential preference claims against certain secured lenders, and that "Defendants" (who are not individually identified in the Complaint and some of whom did not even own Second Lien Debt at the relevant times[22]) "influenced SUNE to delay filing for bankruptcy," "dictated the appointment of a chief restructuring officer, were involved in deciding which entities would file for bankruptcy protection, and expressly acknowledged potential preference liability."  Comm. Br. at 52.

60.    Based on these unremarkable allegations, two of which simply reiterate protections afforded under the DIP Credit Agreement, the Committee asks the Court to infer that SUNE's Board, which was advised by sophisticated restructuring advisors at the time, "failed to act reasonably, loyally, and in good faith—and also was grossly negligent and wasted corporate assets"— solely to enable the Debtors' secured lenders to avoid preference liability.  Comm. Br. at 51.  Neither the Complaint's allegations, nor the wholly unfounded speculation in the Committee's Brief, allow for such an enormous inferential leap.  *Id.* at 50–51.[23]

61.    Nor is there any basis in the Complaint—or the Committee's Brief—to infer that the DIP Financing was finalized within the preference period, or that the Debtors did not need the time beyond the preference period's expiration to prepare for the filing and, for example,

---

[22] *See infra* at Section VII.

[23] Further, the cases cited by the Committee in purported support of its contention that the business judgment rule is an affirmative defense that cannot form the basis for dismissal under Rule 12(b)(6) do not, in fact, support the contention.  Comm. Br. at 52.  The sole issue addressed in *Halebian v. Berv*, 644 F.3d 122, 130–32 (2d Cir. 2011) is the appropriate interpretation and application of a Massachusetts statute that is not at issue here; *Brown v. One Beacon Ins. Co. Inc.*, 317 F. App'x 915, 918 (11th Cir. 2009) affirmed the lower court's holding that under Alabama law, the affirmative defense of res judicata warranted dismissal under Rule 12(b)(6); and *Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 239 (3d Cir. 2005) affirmed the dismissal of a breach of fiduciary duty claim against the debtors' directors, finding that the complaint failed to overcome the business judgment rule presumption, and noting that the directors' decision to replace jet engines rather than repair them was "a classic exercise of business judgment . . . ."

prevent a free fall bankruptcy and/or a priming fight between its secured lenders on the first day

of the cases.  Instead, it is entirely plausible that the Debtors needed the additional time beyond

April 10, 2016 to secure and memorialize hundreds of millions of dollars of loans from lenders

who had provided the Debtors with $725 million only months before, and were now being told

that the Debtors needed to file for bankruptcy.[24]

### B.    The Aiding and Abetting Claim Is Barred by *In Pari Delicto*

62.    The doctrine of *in pari delicto* bars claims for aiding and abetting a breach of

fiduciary duty where, as here, the debtors "bear[] fault for the claim," and the claim is being

brought by an unsecured creditors' committee standing in the debtors' stead.  2L Mov. Br. ¶¶

98–100.  The Committee nevertheless asserts that *in pari delicto* should not apply here because

the Second Lien Lender Defendants "are similar to the type of defendant the Delaware Chancery

Court was seeking to bar from invoking the" defense in *Stewart v. Wilmington Trust SP Servs.

Inc*., 112 A.3d 271 (Del. Ch. 2015), in that "Defendants acted as functional insiders of the

Debtors."  Comm. Br. at 54.  As discussed *infra,* however, the Complaint fails to allege which of

the Second Lien Defendants engaged in such alleged conduct, or any facts showing that the

Second Lien Lender Defendants' actions "were inconsistent with typical lender behavior in

distressed debt situations or arm's length dealings." *In re Champion Enters.*, 2010 WL 3522132,

at *9.  The Complaint is entirely devoid of any alleged facts supporting the inference that the

Second Lien Lender Defendants "occup[ied] a position of trust and materially participat[ed] in

the [Debtors'] discharge of their fiduciary duties," such that they would fall within the scope of

the *Stewart* holding.  *Stewart*, 112 A.3d at 320.

---

[24] The DIP Credit Agreement and its associated documents are highly complex (as the Court itself has noted), and incorporate, *inter alia*, a resolution of complicated inter-creditor disputes between the First and Second Lien Lenders that provided the DIP Financing.  *See* Interim DIP Order [Doc. 87] at Annex 1; First Day Hr'g Tr. 26:13–14 (Court noting that that the proposed Interim Order was "the longest . . . I've ever seen, in almost twenty-three years").

## VII.    The Committee Relies on Impermissible Group Pleading

63.    Counts 10, 11, and 15 should also be dismissed, as they fail to identify the

Defendants that are alleged to have engaged in the alleged conduct forming the basis for the

claims.  Specifically,

- Count 10 hinges on the alleged insider status of "Defendants";

- Count 11 repeats the insider allegation, and adds a boilerplate reference to
  inequitable conduct on the part of "Defendants"; and

- Count 15 asserts that "Defendants" used their influence to "induce, coerce and
  substantially contribute to SUNE's avoiding filing for bankruptcy within the
  preference period," and thereby "aided and abetted" a breach of fiduciary duties
  by the Debtors' board.

64.    The Complaint, however, fails to identify *which* of the Defendants are alleged to

have engaged in the alleged wrongful conduct giving rise to these claims.[25]  This is a fatal flaw

that warrants dismissal of the claims against *all* Defendants.  *See Stanziale v. Heico Holdings,*

*Inc. (In re Conex Holdings, LLC)*, 514 B.R. 405, 414-15 (Bankr. D. Del. 2014) ("[T]he Trustee

has failed to satisfy the *Twombly* and *Iqbal* pleading standard [because] the Trustee lumps all of

the Individual Defendants together … without supplying specific facts as to each defendant's

wrongdoing.").  Additionally, the Committee cannot obtain any relief on these claims against

Second Lien Lenders that are not named Defendants.  *See Motors Liquidation*, 552 B.R. at 275.

## VIII.    The Committee's Blanket Allegations Fail to Sufficiently Identify the Assets Alleged to Be Subject to Unperfected Liens (Counts 12 and 13)

65.    The Committee's categorical allegations in support of Counts 12 and 13 provide

no detail on the specific assets they claim to be subject to unperfected liens, or the specific liens

they seek to avoid.  Accordingly, these allegations fail to satisfy Rule 8.  *See Stanziale v. DMJ*

---

[25] Additionally, certain Second Lien Lender Defendants purchased their Second Lien Debt *after* the
bankruptcy filing (and thus *after* the allegedly wrongful conduct is alleged to have occurred), and as such, are not
appropriate defendants to these claims.

*Gas-Mktg. Consultants, LLC* (*In re Tri-Valley Corp.*), No. 14-50446, 2015 WL 110074, at *1 (Bankr. D. Del. Jan. 7, 2015) ("Rule 8(a)(2) requires a 'showing' rather than a blanket assertion of an entitlement to relief . . . . [W]ithout some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice,' but also the 'grounds' on which the claim rests.").

66.    For this reason, courts have held that, to survive a motion to dismiss, a preference claim must provide specific details concerning the transfer sought to be avoided. *Id.* The same rationale applies to the Committee's claims to avoid allegedly unperfected assets. Because the Committee has not provided such detail, its claims must be dismissed.

## CONCLUSION

For the reasons stated herein and in the Second Lien Moving Brief, the Second Lien Defendants respectfully request that the Court enter an order dismissing Counts 4, 5, 7, 8, 10–13 and 15 of the Complaint, with prejudice.

Dated:        New York, New York
              January 20, 2017
                                        AKIN GUMP STRAUSS HAUER & FELD LLP

                                        By:    */s/ David M. Zensky*
                                               David M. Zensky
                                               Erik Preis

Deborah J. Newman
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
apreis@akingump.com
dzensky@akingump.com
djnewman@akingump.com

*Counsel to the Second Lien Lender Defendants*

WILMER CUTLER PICKERING
HALE AND DORR LLP

By:    */s/ Andrew Goldman*
      Andrew Goldman
      Charles C. Platt
      Benjamin Loveland (admitted *pro hac vice*)
      Lauren Lifland
      7 World Trade Center
      250 Greenwich Street
      New York, New York 10007
      (212) 230-8800 (Telephone)
      (212) 230-8888 (Facsimile)
      andrew.goldman@wilmerhale.com
      charles.platt@wilmerhale.com

*Counsel for Wilmington Trust, National*
*Association, in its capacity as Indenture Trustee*
*under the Second Lien Indenture and Collateral*
*Trustee under the Security Agreement*

PILLSBURY WINTHROP
SHAW PITTMAN LLP

By:    */s/ Leo T. Crowley*
      Leo T. Crowley
      Daniel S. Brown
      1540 Broadway

New York, New York 10036
(212) 858-1000 (Telephone)
(212) 858-1500 (Facsimile)
leo.crowley@pillsburylaw.com

*Counsel to Wilmington Savings Fund Society,
FSB, in its capacity as successor Administrative
Agent under the Second Lien Credit Agreement*